UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

| | |
|---|---|
| IN RE: | . Chapter 11 |
| HO WAN KWOK, et al | . CASE NO.: 22-50073 (JAM) |
| | . (Jointly Administered) |
| Debtors. | . |
| PACIFIC ALLIANCE ASIA OPPORTUNITY FUND L.P., | . Adv. Pro. No.: 22-05032 |
| Plaintiff, | . |
| v. | . |
| HO WAN KWOK, | . Bridgeport, Connecticut |
| Defendants. | . December 5, 2022 |

TRANSCRIPT OF 1) MOTION TO SEAL
AND 2) MOTION FOR PRELIMINARY INJUNCTION
**BEFORE THE HONORABLE JULIE A. MANNING**
**UNITED STATES BANKRUPTCY JUDGE**

**(REDACTED - DAY 1)**

APPEARANCES:

For the Plaintiffs: PETER FRIEDMAN, ESQ.
DAVID HARBACH, ESQ.
DANIEL CANTOR, ESQ.
O'Melveny & Myers, LLP
Times Square Tower
7 Times Square
New York, New York 10036

Transcription Company: Reliable
1007 N. Orange Street
Wilmington, Delaware 19801
(302)654-8080
Email: gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

APPEARANCES (CONTINUED):

| | |
|---|---|
| For the Plaintiff: | PATRICK BIRNEY, ESQ.<br>ANNECCA SMITH, ESQ.<br>ROBINSON & COLE<br>28 Trumbull Street<br>Hartford, Connecticut 06103 |
| For the Defendant: | DAVID WACHEN, ESQ.<br>WACHEN LLC<br>11605 Montague Court<br>Potomac, Maryland 20854 |
| | JEFFREY HELLMAN, ESQ.<br>LAW OFFICES OF JEFFREY HELLMAN<br>195 Church Street, 10th Floor<br>New Haven, Connecticut 06510 |
| Chapter 11 Trustee: | LUC DESPINS, ESQ.<br>NICK BASSETT, ESQ.<br>PAUL HASTINGS, LLP<br>200 Park Avenue<br>New York, New York 10166 |
| | NANCY KINSELLA, ESQ.<br>NEUBERT PEPE & MONTEITH<br>195 Church Street<br>New Haven, Connecticut 06510 |
| Committee of Unsecured Creditors: | KRISTIN MAYHEW, ESQ.<br>PULLMAN & COMLEY<br>850 Main Street<br>Bridgeport, Connecticut 06601 |

INDEX

WITNESSES


| PLAINTIFF'S WITNESSES: | PAGE |
|---|---|
| BRIAN NAPIERALA | |
| Direct examination by Mr. Harbach | 36 |
| Cross-examination by Mr. Wachen | 79 |
| Redirect examination by Mr. Harbach | 84 |
| Recross-examination by Mr. Wachen | 85 |
| HO WAN KWOK | |
| Direct examination by Mr. Harbach | 104 |
| Direct examination by Mr. Bassett | 227 |

| EXHIBITS: | PAGE |
|---|---|
| PAX 58 | 52 |
| PAX 59 | 52 |
| PAX 60 | 52 |
| PAX 61 | 52 |
| PAX 10-C | 54 |
| PAX 18-C | 54 |
| PAX 18-D | 54 |
| PAX 41-B | 54 |
| PAX 41-C | 54 |
| PAX 12 | 56 |

| | |
|---|---|
| PAX 14 | 56 |
| PAX 16 | 56 |
| PAX 50 | 144 |
| PAX 8 | 146 |
| PAX 26-A | 146 |
| PAX 30-A | 146 |
| PAX 53 | 146 |
| PAX 55 | 155 |
| PAX 55-A | 155 |
| PAX 69 | 186 |
| PAX 70 | 186 |
| PAX 71 | 186 |
| PAX 72 | 186 |
| PAX 73 | 186 |
| PAX 74 | 186 |
| PAX 75 | 186 |
| PAX 76 | 186 |
| PAX 77 | 186 |
| PAX 79 | 186 |
| PAX 57 | 186 |
| PAX 56 | 186 |
| PAX 38-D | 186 |
| PAX 38-E | 186 |
| PAX 43-B | 186 |

| | |
|---|---|
| PAX 42 | 186 |
| PAX 40-B | 202 |
| PAX 45 | 202 |
| PAX 44 | 203 |
| PAX 67 | 203 |
| PAX 68 | 203 |
| PAX 38-A | 219 |
| PAX 38-B | 219 |
| PAX 81 | 225 |

(Proceedings commenced at 10:01 a.m.)

THE CLERK: Case Number 22-5032, Pacific Alliance Asia Opportunity Fund, L.P., versus Ho Wan Kwok.

THE COURT: Okay. Good morning. If we could have appearances for the record, starting with the Chapter 11 Trustee, please.

MR. DESPINS: Good morning, Your Honor. Luc Despins, Chapter 11 Trustee.

THE COURT: Good morning.

MR. BASSETT: Good morning, Your Honor. Nick Bassett, from Paul Hastings, on behalf of the Chapter 11 Trustee.

THE COURT: Good morning. If we could have appearances on behalf of the creditor, PAX.

MR. FRIEDMAN: Good morning, Your Honor. Peter Friedman, from O'Melveny & Myers, on behalf of PAX. I think you'll hear today from my colleague, Mr. David Harbach, from O'Melveny & Myers, and my colleague, Mr. Daniel Cantor, from O'Melveny & Myers, as well as Mr. Birney, from the Robinson & Cole Firm, Your Honor. Thank you.

THE COURT: Good morning.

MR. FRIEDMAN: Good morning.

THE COURT: Mr. Birney and Ms. Kinsella, I saw you stand up, but I didn't take your appearances. I'm sorry. Go right ahead.

MR. BIRNEY: Good morning, Your Honor. Patrick Birney, Robinson & Cole, co-counsel for PAX.

THE COURT: Good morning.

MS. KINSELLA: Good morning, Your Honor. Nancy Kinsella, Neubert Pepe & Monteith, on behalf of the Chapter 11 Trustee.

THE COURT: Good morning.

MS. MAYHEW: Good morning, Your Honor. Kristin Mayhew, Pullman & Comley, on behalf of the Official Committee of Unsecured Creditors.

THE COURT: Good morning. Did I take everyone on this side of the room's appearance, or is there anyone else that needs to appear? Okay. Good morning, counsel. Go right ahead, please.

MR. WACHEN: Good morning, Your Honor. David Wachen, on behalf of the Defendant, Miles Guo.

THE COURT: Good morning.

MR. HELLMAN: Good morning, Your Honor. Jeffrey Hellman, local counsel for Mr. Kwok.

THE COURT: Good morning. All right. The first matter on today's calendar is a -- the joint motion of PAX and the Chapter 11 Trustee to seal some information in connection with a motion for civil contempt and the failure to comply with the temporary restraining order, certain exhibits to that motion, which was filed last week, and it

was set for a hearing today.

Counsel, I don't know if you had any chance to look at that motion. I didn't see any response from you to that motion; is that correct?

MR. WACHEN: We have not filed a response, Your Honor. We've only been in the case for a very short period of time. We do oppose the motion. I'd be happy to explain --

THE COURT: Okay. Then, I'm going to let counsel make their presentation, and then, I'll hear from you in response, okay?

MR. WACHEN: Yes, thank you, Your Honor.

THE COURT: Thank you.

MR. FRIEDMAN: Good morning, Peter Friedman from O'Melveny and Myers, on behalf of PAX. I think, Your Honor, that the reason that we believe it's appropriate to have certain information under seal in connection with the motion for contempt is the same as the motion -- is the same as with respect to the preliminary injunction hearing motion, last -- the temporary restraining order motion from last week.

And in fact, we would also ask the Court to seal certain information and witness testimony today for the next hearing, as we did with last week's hearing, and that is, there's information that is filed in connection with the motion for contempt that relates to people's private

information.

It's true that it was filed publicly on GETTR by Mr. Kwok and his affiliates as part of their harassment and intimidation tactics to disrupt the proceeding and then in violation of your prior order. But that doesn't mean it should be further published, which would simply serve the purposes that Mr. Kwok intended by engaging in this conduct in the first place.

Publication of home information, personal information, home addresses, people engaged in conduct in front of identifiable addresses is all, I believe, precisely the kind of material that does not need to be further broadcast. The Court can view it.

We are simply trying to keep the posting, the links to specific posts, we don't need -- believe need to be further disseminated and in fact, have obtained a restraining order with respect to the continued publication of that material, which should be kept under seal. The conduct is impermissible. The information should be kept under seal.

There's already a temporary restraining order in place concluding that that kind of conduct shouldn't continue, and there's just no reason to continue the publication of people's home information, home addresses, especially linked with respect to behavior that is designed to interfere with an ongoing court proceeding.

We laid out our other arguments last week and in our papers. And that's why we believe that the Court should issue an order in this matter identical to the one that it issued last week in its oral ruling, which was then confirmed by an order. Thank you, Your Honor.

THE COURT: Thank you. I just want to ask you, Mr. Friedman, what you've done in the -- what has occurred in certain situations is that there was a redacted version and then a sealed version of certain things.

I think with regard to this motion, ECF 43, and I could be wrong, and that's why I'm asking you this question, is there anything that's been filed that's been redacted at this point, or are you seeking specific documents to be filed?

I know there are exhibits to a motion, to the contempt motion, Exhibits 3 and 4. I know that. I just don't recall if they're in redacted form because there have been certain pleadings that were filed that were redacted and then sealed.

MR. FRIEDMAN: Your Honor, may I step away --

THE COURT: Absolutely.

MR. FRIEDMAN: -- for a moment.

THE COURT: Yes.

MR. FRIEDMAN: Thank you, Your Honor. I appreciate it. Your Honor, I'm advised by my colleague, Ms.

Smith, that we filed both redacted versions --

THE COURT: Okay.

MR. FRIEDMAN: -- and sealed versions.

THE COURT: I thought that was the case, but as I know you and others understand, there's been quite a lot of paper in the last few days, and so I wanted to make sure that I was accurate in my recollection.

MR. FRIEDMAN: Yes.

THE COURT: So the document has -- the Exhibits 3 and 4 that you're seeking to seal have already been filed in redacted version, in my recollection now, and Ms. Smith can tell me if I'm wrong, is that their information is contained in footnotes, I think, and there are links that are redacted. Ms. Smith, would you just state your name for the record, please?

MS. SMITH: Thank you, Your Honor. Annecca Smith, Robinson & Cole, on behalf of PAX.

THE COURT: Good morning.

MS. SMITH: Good morning. Exhibit 3 and 4 were sealed entirely.

THE COURT: Okay.

MS. SMITH: So when we filed those exhibits, it's a slip sheet that indicates they were sealed.

THE COURT: Okay.

MS. SMITH: The other portions of the contempt

motion were filed in redacted form, and then, we did subsequently file, under seal, the unredacted contempt motion and unsealed, unredacted Exhibits 3 and 4.

THE COURT: Is my recollection of the contempt motion correct that with the information that was redacted, the majority of it were in footnotes and links to certain social media sites? Is that recollection correct? I mean, I can go back and find it. I just don't have it in front of me at the moment.

MS. SMITH: That's correct, Your Honor.

THE COURT: Okay. All right. That's what I -- my recollection is the way that we've proceeded in this case and in the adversary proceeding is when something has been requested to be filed under seal, it's been filed in a redacted version first, then filed under seal, awaiting a court order as to whether it would be under seal.

And that is how -- that's Motion 43 in this adversary proceeding is the same thing, same mechanism and method, I should say, with regard to the information that's sought to be -- that is already filed under seal but for which you're seeking a Court order to have that remain under seal. Is that accurate?

MS. SMITH: That's accurate, Your Honor.

THE COURT: Okay. Thank you. Thank you. Anything further, Mr. Friedman?

MR. FRIEDMAN: No, Your Honor. Thank you.

THE COURT: Okay. I'm going to hear from counsel for Mr. Kwok then.

MR. WACHEN: Good morning, Your Honor.

THE COURT: Good morning.

MR. WACHEN: David Wachen again. As I understand it, there are two documents that they are seeking to seal at this point, Exhibit 3, which was an email to employees at Paul Hastings, a firm that has 1,000 lawyers and God knows how many employees, worldwide.

The second one is an email that was sent to O'Melveny & Myers employees, which, I believe, they have 700-plus lawyers, and again, probably a similar number of employees worldwide, three offices in China, both firms.

There is nothing in either of these documents that one could even remotely consider to be private information as that is defined in the statute. 18 USC 1028(d) lists what is considered private information. They cite it in their papers. There is no private information.

It does mention Mr. Despins, who's obviously a public figure. He's the Trustee in the case. I don't think it's any secret that he's involved. But it doesn't say anything about his home addresses, his Social Security number, his date of birth, nothing. There's nothing in there.

And it is a public document. It's not -- it was not sent by Mr. Guo. Doesn't purport to have been sent by Mr. Guo. And there's really no reason that it should be sealed. This is an open proceeding.

You know, ironically, obviously, Mr. Guo is a Chinese dissident. The people who support him are -- many of them are Chinese dissidents who suffered oppression in China. You'll be hearing from them in -- on the second matter and what they -- why they're doing what they're doing.

And they came to this country because we're an open and free society where the First Amendment is fundamental, and you know, there's a reason it's first. And so this is just an example of free speech, two emails sent to very many employees.

The burden is on them to justify sealing. There's no justification that I can see. They have not pointed to anything. They've mentioned the TRO. They're trying to bootstrap, which, obviously, we'll get to that. We think that should not have been granted to begin with, but put that aside, the emails were not sent by Mr. Guo. They were sent by other individuals.

And so for these reasons, these documents have been widely disseminated. They are critical. In this country, you're allowed to criticize other people, and that's about all they are. They're maybe unflattering. I could

understand why maybe they don't want their colleagues to see these emails, but that's already happened.

And so there is really no reason that these documents should be sealed. So we'd asked Your Honor to deny the motion.

THE COURT: Okay. Thank you. Any response from PAX?

MR. FRIEDMAN: Yes. Sorry, Your Honor, yes. I just think that maybe there's -- I'm just -- I'm super confused. When I look at Document Number -- Docket Entry 40, and I look at the footnotes, Footnote 5, in particular, I don't see a letter to O'Melveny employees or Paul Hastings employees. When I look at 30 and 32 and 33, I just don't know what he's talking about.

Those are links to websites. They're not emails. They're not emails to people from O'Melveny. When I look at our brief on Page 12 and 13 and a bunch of other footnotes from the joint motion for entry of an order holding Ho Wan Kwok in civil contempt, I just see something very different, very different.

And that's what we're trying to have under seal, Your Honor, not -- like that -- that's the kind of information that we, you know, referenced and have in redacted form. So I think there's just maybe some things fundamentally different in what we're asking for and what Mr.

Wachen is opposing. I mean, you can look at Docket Number 40.

THE COURT: Give me one second, and I will do that, okay?

MR. FRIEDMAN: Yeah.

THE COURT: What document do you want us to look at, 40?

MR. FRIEDMAN: Docket Number 40, joint motion for entry of an order holding Ho Wan Kwok in civil contempt for failure to comply with temporary restraining order.

THE COURT: All right. Give the courtroom deputy a moment, please.

MR. FRIEDMAN: What Mr. Wachen is talking about is just easily falsifiable.

MR. WACHEN: Well, if you don't want -- Your Honor, may I be heard?

MR. FRIEDMAN: I prefer not to be interrupted, Your Honor.

THE COURT: Just hold on. What we're going to do is we're going to pull up the document so we can all see it at the same time, okay?

MR. WACHEN: Thank you, Your Honor.

THE COURT: And then, we can make sure we're all looking at the same document.

MR. WACHEN: Great.

THE COURT: I'm not getting anything on my computer, but I think it might be because the screen is not on. I'm not -- I don't -- this screen is not on.

MR. FRIEDMAN: Your Honor, I can --

THE COURT: I'll just take a second. We'll just have to turn on the screen. I just want to make sure that the IT people take care of it, and I don't do something incorrect.

May I ask the courtroom deputy, is there a way to make that view a little bit more than a 100 percent, so we can see it? Is it projecting on the screen for everyone to see?

COURT OFFICER: Yes, Your Honor.

THE COURT: Okay. Okay. Great. Now, where, Mr. Friedman, would you like us to go in this document?

MR. FRIEDMAN: I'm just looking at Page 3.

THE COURT: Page 3?

MR. FRIEDMAN: Yeah. And it -- the footnotes, they talk about not emails to people from law firms. They talk about links that were visited, and if Your Honor cares to look at Page 10, you'll see the same thing.

THE COURT: And we're going to the footnotes on Page 10?

MR. FRIEDMAN: Yes, Your Honor. Footnotes 30 through 33. You'll see the same on Page 12. You'll see the

same on 13.

THE COURT: All right. Let's just take it --

MR. FRIEDMAN: Sorry, Your Honor.

THE COURT: -- a section at a time. That's okay.

MR. FRIEDMAN: I'll slow down.

THE COURT: Let's look at Page 12. Okay. And then, we could turn to Page 13, please.

MR. FRIEDMAN: Both in the text at the top --

THE COURT: Yeah.

MR. FRIEDMAN: -- and then 13 -- on 13. Pages 14 and 15, same thing. Pages 16 --

THE COURT: Hold on just a second, Mr. Friedman. Let's just get it so I can see it while you're -- all right. Page 14.

MR. FRIEDMAN: Yes, Your Honor. Page 15.

THE COURT: In the footnotes, again?

MR. FRIEDMAN: Yes, Your Honor. Page 16.

THE COURT: Okay. I see that.

MR. FRIEDMAN: Page 17, Your Honor, in the footnotes.

THE COURT: I see that.

MR. FRIEDMAN: Page 19, Your Honor.

THE COURT: Okay. 19.

MR. FRIEDMAN: Page 21, Your Honor. Page 24 in the footnotes.

THE COURT: Okay.

MR. FRIEDMAN: Page 25, there's a redaction in the text in Paragraph 48 as well as in the footnotes.

THE COURT: Okay.

MR. FRIEDMAN: Pages -- both Pages 26 and Page 27, Your Honor. And just to be clear, Your Honor, we have, in virtually every instance, not redacted the text of what was said but instead sought redaction of the links to prevent further publication. So this is not trying to censor the content of what somebody's saying.

We'll talk about later why it's appropriate to issue injunctions. But this is just -- I mean, the ham-handed arguments that this financial case where somebody owes hundreds of millions of dollars based on loans he paid back has nothing to do with the First Amendment.

It's as incorrect as the argument that you heard from Mr. Wachen a moment ago, that this is about a nasty email sent to somebody while he ignores 25 pages of redaction in a brief that we have sought redaction to be filed under seal. Thank you, Your Honor.

THE COURT: Thank you. Mr. Wachen?

MR. WACHEN: Yes, Your Honor. And I apologize because I got copies of Exhibits 3 and 4 that were marked sealed. So I guess you don't want Exhibits 3 and 4 sealed?

MR. FRIEDMAN: Don't -- you can talk to the Court.

MR. WACHEN: Okay. Well, I didn't hear him say he was opposed to sealing Exhibits 3 and 4. So perhaps we can at least agree that that doesn't have to be sealed. As for these links, what I heard Mr. Friedman say was that they're not trying to censor the content. I believe that's an exact quote.

And if that's the case, why do we need to redact the citations? In other words, they can make accusations, many of them which are not true or half true, and anyone who wants to check them by going to these links can't do so because they've blotted out the citations. It's akin to citing a case, saying the Supreme Court said X, but I'm not going to tell you what the case citations is. That's all this is.

These are all citations that he's pointing to for things that are on the internet, publicly available, anyone could do a Google search and probably find them, but for some reason, they're more concerned about the citation than the content itself, which they recite in their papers, and they haven't asked you to redact those.

So the burden is on them to show that there's a basis for seeking sealing. They point to a rule that talks about papers with scandalous and defamatory matter, except they've included the "scandalous and defamatory matter" in their papers. He told me that. All they're asking to redact

is the citations, which allows someone who's following this from the public to be able to see is this actually what these posts say.

And so someone who is in the public or in this proceeding ought to be able to see what those citations are to see if the way they're characterizing this is actually correct. The burden of proof is on them, and they have not offered any legitimate basis under the rules that they've cited.

Section 107(b)(2) deals with papers involving scandalous or defamatory matter. They haven't redacted that. 107(c)(1) talks about identifying information. They haven't -- as far as I can say, you know, if we're talking about someone's address, I don't think we're opposed to redacting someone's home address or the name of someone's children.

I mean, we won't oppose it for purposes of this because that's not really what we're focused on. I think it's public information. It's easily available on the internet. I Google searched Luc Despins. I found the name of his children. It was the fourth link listed. And it had nothing to do with this case. It had to do with his divorce case.

So in any event, we ask Your Honor to deny their motion. Leave this available to the public so they can

scrutinize what the Plaintiff and the Trustee are accusing Mr. Guo of that we believe is invalid. Thank you, Your Honor.

THE COURT: Thank you. Anything further, Mr. Friedman?

MR. FRIEDMAN: Yes, Your Honor. Of course, I'm perplexed by the idea that we are -- that this is akin to not putting in a Supreme Court citation. A, obviously, parties that have an interest in this case who want the information, who are parties to either a protective order or otherwise have the information. The Court has the information. Opposing counsel has the information. The Trustee has the information.

And the reason we have sought to redact is because there is information in these texts, pictures of people's homes, people protesting outside of homes, people's addresses, and other similar information, and that is a key to why this should not be filed except under redacted seal. I think there's -- so I do believe we meet the standard just as we did last week for protection of the information. Thank you, Your Honor.

THE COURT: Okay. Thank you. Mr. Wachen, anything further?

MR. WACHEN: Again, everything he's asking you to seal -- sorry, Your Honor -- everything he's asking you to

seal is on the internet, publicly available, and they reference, you know, they're basically just seeking you to seal the citations. Really, that's all it is.

These are citations for how to find the information that they have recited in their papers, haven't asked you to redact that. And members of the public should be able to see that. The burden of proof is on them.

The only legal authority they cite for citing -- for sealing, as I can see it in their papers, is Section 107(b)(2), and 107(c)(1), neither of which provides a basis for sealing citations to Twitter, YouTube, GETTR. So we'd ask you to deny the motion. They have not met their burden.

THE COURT: You just mentioned, though, that you wouldn't have -- I think I heard you say that you wouldn't have a problem with sealing the addresses and names of people. Did I hear you correctly?

MR. WACHEN: With respect to this motion, we would not be opposed if they would like to have -- I don't think the addresses are actually recited, but if they are, we would not be opposed to having someone's home address, not their office address, which is obviously public information, easily found on the websites of these law firms.

But if the home addresses are there, if the names of the children are there, we would not be opposed to having that sealed. They're not members -- they're not part of the

proceeding, and I don't know that they are in there, but we would not be opposed to for purposes of this motion.

THE COURT: I think there's also allegations that there -- the individuals of the creditors, their personal names, and home addresses, and maybe family members, as well, are in there. And what I'm hearing you say is, I think, that with regard to the individuals, you would not oppose it. With regard to the law firms, you would oppose it. Is that what you're saying?

MR. WACHEN: Sure. The address of these law firms is easily public information. But the home addresses of some of the participants here, if they would like that sealed, we would not be opposed to sealing the home addresses for purposes of this filing, the names of their children.

THE COURT: I think there was more than just the addresses, though, is my recollection of the individuals, now I'm talking about. I'm not talking about the law firms. I think the -- what I recall in reading and looking at this document now that we're all looking at it --

MR. WACHEN: Yes.

THE COURT: -- is I think there are actual -- I don't recall if it's video, photos, or both, or livestreaming of those individuals' homes. Do you oppose that being redacted?

MR. WACHEN: Well, these are links to websites

where there's video of people protesting. Yes, we would oppose you sealing those links because they make allegations that this is happening, and they've cited links, and we want the public to be able to see what they're talking about.

THE COURT: Do you --

MR. WACHEN: This is public --

THE COURT: I understand.

MR. WACHEN: -- property.

THE COURT: Have you looked at the protective order that's in place in the main case?

MR. WACHEN: I'll confess, Your Honor, I've not.

THE COURT: Okay. The reason I ask the question is there are some boundaries, I suppose I would say, counsel, I don't know if that's exactly the right word, but there are some -- there have been agreements that have already been entered into with Mr. Kwok's counsel in the Chapter 11 case regarding information.

That doesn't mean it's not going to be -- I think if you looked at any of the orders that we've sealed, that have been sealing things, they're sealed for a specific purpose, and they're sealed in connection with specific matters before this Court. They're not -- and it says sealed at this -- most of them, I believe, say sealed at this time.

That there's a reason why the Court believed that under the specific circumstances of the personally

identifiable information and the agreement reached in connection with the protective order in the main case that that was applicable.

So what I'm going to do with regard to the motion to seal is I'm going to think about it. I wanted to hear from you. I've heard from you. I will tell you that there are -- the main case protective order in addition to the motion filed in the adversary does provide, I think, protections for your client, as well.

And that was the point of why Mr. Kwok's Chapter 11 counsel agreed to the protective order, okay? That was something that was discussed and negotiated with the parties. With regard to this information being out there, we'll have to see how the day progresses, I suppose, with regard to the motion to seal.

But I will tell you, I have granted the motions to seal in the past as they relate to the specific proceedings before the Court, and they are as they say, they're granted at this time, so that there is some -- there's a reason why they're being granted. And we'll have to see how things progress today, but there -- I've heard you that you don't oppose the names and addresses of the individuals that are part of this motion to seal --

MR. WACHEN: Personal -- personal addresses.

THE COURT: Personal, yes, that's what I said.

The individuals, not the law firms. I'm talking about the individuals, okay?

MR. WACHEN: But, Your Honor, what's maybe a little bit different than the other situations is that this is -- they're seeking contempt, to hold our client in contempt --

THE COURT: I understand.

MR. WACHEN: -- over his exercise of First Amendment rights. And so I think that maybe puts us in a slightly different category from the others, which --

THE COURT: I understand what you're saying.

MR. WACHEN: Thank you.

THE COURT: Okay. All right. Thank you. Attorney Friedman?

MR. FRIEDMAN: Your Honor, there's one other issue I would like to discuss, and it's raised by what Mr. Wachen said, which is that video links are really important because they don't just say addresses, but for example, protestors over the weekend have now shown up at one of my colleague's homes.

And so -- and reposting video of that identifiable information, where that person lives, where that, you know, that person's house, people walking up to people's homes, and you know, making it very clear where they live, I think would fall under the same category of, you know, not just

somebody's address, but in a physical saying, you know, person lives at 125 ABC Drive, but posting videos of -- and reposting videos with clearly identifiable information, I think, falls within the same category. Thank you, Your Honor.

THE COURT: I did ask Mr. Wachen about his position on that. But you're welcome to reiterate it if you'd like. I mean, that's what I said, Attorney Friedman, that I thought that it wasn't just the addresses, but that it was either photos or videos at people's homes.

MR. WACHEN: Right. And I believe I said we were opposed to sealing videos and photos. I mean, these are public places. He lives on a public street. And quite honestly, Your Honor, last night just for kicks, I Googled Luc Despins's home address. And within the first three, and I offer Your Honor, if you could do the exercise, as well, it's very easy to find his home address.

But putting that aside, we're not opposed to sealing it the actual address, but a video of his house, people standing outside his house, unless you know, you know, where he lives pretty well, I think it would be very difficult for an average person to look at it and say, oh, I know where he lives. But it wouldn't be very difficult for them to find the address just by Googling Luc Despins's home address. So thank you, Your Honor.

THE COURT: Okay. Thank you. All right. Then, I'm going to take the motion to seal under advisement for now, and we'll proceed with the preliminary injunction hearing.

MR. FRIEDMAN: Your Honor, so I think we are going to encounter some similar issues during the preliminary injunction hearing. We have -- the way we intend to proceed is we have a witness named Brian Napierala, who we will call to testify. Then, we will call Mr. Kwok to testify. And then, we will do publication of evidence. And then, we will call Mr. Despins to the stand.

And then, opposing counsel can do what they wish, and then, I would argue in closing in support of the preliminary injunction, Your Honor.

THE COURT: Okay. When you say -- I mean, when you start to call your first witness, are you saying that there's information that you're going to be discussing or questioning this witness about that is part of the motion to seal?

MR. FRIEDMAN: Not the motion to seal, per se, Your Honor, but there will be information in that person's testimony that involves authentication of information that we have placed under seal previously or would seek to place under seal.

THE COURT: So how do you -- how will we be able

to address that in this hearing?

MR. FRIEDMAN: I think Mr. -- so we would ask, Your Honor, that for purposes of this hearing, I think the way to handle it is either to seal the testimony or a more surgical way to do it would be to when Mr. Harbach has information to inquire of the witness that relates to under seal, just be very specific that this question will relate to information under seal.

Mr. Harbach has provided the Court's clerk with, in a sealed envelope, evidence that we believe should be sealed. When we try to deal with publication of that evidence, we will reflect that that is to be under seal and ask the Court to seal that portion of the transcript in the hearing.

I do not intend in my argument to specifically refer to sealed information. I can conduct my argument in a manner that does not relate to any specifics that are sealed. So I think the best way to handle it is for Mr. -- I don't think everything about Mr. Napierala's testimony, or Mr. Kwok's, or Mr. Despins's testimony needs to be sealed, but there will be portions that we ask to be placed under seal.

THE COURT: Did -- the information that you've said that has been provided to the Court, has that been provided to Mr. Kwok's counsel?

MR. FRIEDMAN: To be clear, it's been provided to

the clerk. I don't -- we didn't --

THE COURT: I mean, the clerk, yes.

MR. FRIEDMAN: Yeah.

THE COURT: I haven't seen it. But what I'm saying is does Mr. Kwok's counsel have it?

MR. FRIEDMAN: This is the -- what we provided to the Clerk's office this morning. So Your Honor, with that, I would turn things over to Mr. Harbach to call our first witness.

MR. WACHEN: Your Honor, before we do that, on the sealing, can we just -- maybe this is what he was saying, that we just take them as they come.

THE COURT: I think we're going to have to do that, counsel. We'll have to take it as they come. I, obviously, don't know what it is anyone's talking about yet, either. So we'll have to see where we are when that issue comes up.

I think we should do our best to try to put that information or those questions together, so we're not breaking up testimony of an individual. So for example, the questioning of the individual that is not at all related to or implicate anything under seal, let's ask all those questions, and then, we'll see how we do with the sealed -- the request for the sealed portion of that testimony or any evidence.

I think that -- you know, I don't know that there's a better way to proceed.

MR. FRIEDMAN: That seems like a very good way.

THE COURT: So I think that's what we'll do, okay?

MR. WACHEN: Your Honor, did you want to hear argument initially or just --

THE COURT: I think we're going to go right into the evidence because I think we'll have quite a lot of argument ultimately.

MR. WACHEN: Okay.

THE COURT: And I -- so I'd like to start with the evidence and then, let's see how things progress.

MR. WACHEN: Sure. Thank you.

THE COURT: All right. Thank you. All right. Then, PAX may proceed with your first witness.

MR. HARBACH: Thank you, Your Honor. PAX calls Brian Napierala.

THE COURT: And counsel, I know your name, but we need to note it for the record when you're doing your examination because otherwise, our record isn't going to pick that up. So if you would just don't mind stating your name for the record.

MR. HARBACH: Yes, Your Honor. David Harbach, H-A-R-B-A-C-H.

THE COURT: Thank you.

MR. HARBACH: And I'll ask the witness to spell his last name.

THE COURT: Yes. Thank you.

MR. HARBACH: Your Honor, while the witness is coming in, if it would be helpful to the Court, I can tender to Your Honor and to counsel, if he wants one, a copy of an exhibit list. It might make it easier for you to monitor what's come in, and what's been admitted, and what hasn't.

THE COURT: I have no problem with that. Counsel, I think that makes some sense.

MR. WACHEN: Sure.

THE COURT: To share the witness list, okay? All right. Thank you.

MR. WACHEN: And are we invoking the rule of witnesses with respect to -- because we have some witnesses, as well.

THE COURT: Well, it's -- go ahead, counsel.

MR. HARBACH: I appreciate counsel letting us know that there are witnesses in the courtroom, and sure, we'd invoke the order to sequestration, yes, please.

THE COURT: Okay. Thank you. And you have an extra copy for me, did you say?

MR. HARBACH: Yes, Your Honor.

THE COURT: If you could approach the courtroom deputy, please. Thank you.

MR. WACHEN: And so other than the witness you're calling now and Mr. Guo, is there any other witness that is in the courtroom that you're going to be calling?

MR. BASSETT: Your Honor, Nick Bassett from Paul Hastings --

THE COURT: You have to speak up or we won't be able to hear you. I'm sorry.

MR. BASSETT: No, Nick Bassett, Your Honor, from Paul Hastings on behalf of the Chapter 11 Trustee. As Mr. Friedman noted earlier, Mr. Despins will be testifying, but he's a party, and therefore, under the applicable rule --

THE COURT: Hold on a second, Attorney Bassett, she can't hear you. You're --

MR. BASSETT: I'm sorry.

THE COURT: Unfortunately, the only way we can hear is, you know, recording, so we just need you to speak as clearly as you can, and if we can't hear you, we just have to make -- we'd ask you to state what you were stating against for the record.

MR. BASSETT: Not a problem at all, Your Honor. As I was stating, as Mr. Friedman had indicated at the outset, one of the witnesses that our side will be presenting is the Trustee, Mr. Despins. He is a party to this proceeding, and therefore under the applicable rule, I believe it is Federal Rule of Evidence 615, if I'm not

mistaken, as a party, he's allowed to stay in the courtroom during the testimony of other witnesses. Thank you, Your Honor.

THE COURT: Okay. Thank you.

MR. WACHEN: And we agree with that. I just didn't know if there were any others.

THE COURT: That's fine. I thought that that's what they said as far as their witnesses were concerned, counsel, but that's fine. Let's make it clear for the record, okay? All right. Mr. Harbach, go right ahead.

MR. HARBACH: Thank you, Your Honor.

Mr. Napierala, if you're in the courtroom, could you please come up to the witness stand?

THE COURT: Mr. Napierala, you just need to stand for a minute, and she's going to administer the oath to you, okay?

THE CLERK: Raise your right hand, please. Do you solemnly swear the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE CLERK: State your name and address for the record, please.

THE WITNESS: Brian Napierala, address is (Sealed).

THE CLERK: Would you please spell your last name?

THE WITNESS: N-A-P-I-E-R-A-L-A.

THE CLERK: Thank you.

THE COURT: You can have a seat, sir. And there's some water there for you if you need some water, okay?

THE WITNESS: Okay.

THE COURT: Thank you.

MR. HARBACH: May I inquire, Your Honor?

THE COURT: Yes, please.

DIRECT EXAMINATION

BY MR. HARBACH:

Q. Good morning, Mr. Napierala.

A. Good morning.

Q. What do you do for a living, sir?

A. I am an intelligence analyst.

Q. What does that mean?

A. My specialty is open-source intelligence and cyber investigations. So I perform a variety of investigations for a broad range of purposes on the internet.

Q. Could you pull that microphone a little closer to you? Thank you.

A. How's that?

Q. That's much better.

THE COURT: That's better. Thank you.

BY MR. HARBACH:

Q. How long have you been engaged in that line that work, sir?

A. Approximately 13 years.

Q. Who do you currently work for?

A. Guidepost.

Q. What does Guidepost do, to your knowledge?

A. Guidepost is an investigative and executive protection firm.

Q. Based on the experience that you've just described, are you familiar, generally speaking, with techniques that one can use to authentically preserve internet content?

A. I am.

Q. Tell us a little bit about that type of technology and try not to get too far in the weeds, but just explain for the Court what the technology is and how it works.

A. Sure. So the technology to preserve evidence can be had in multiple ways, but the most common one is to take a screenshot or a screen capture of any specific content that you're observing on the internet and also capturing the metadata behind whatever you're physically observing. That's the code that is in the computer, in the webpage, that gives you the visual that you see on your screen.

Q. When you make a capture like that with whatever software tool is involved, how is it that that enables you to

say one way or the other whether it was, in fact, on the internet?

A. Sure. So most social media platforms utilize an alpha numerical sorting system for their data. For example, we'll say Facebook, all right? Facebook has volumes and volumes of data. They sort that by a combination of letters and numbers to identify specific artifacts within the Facebook system.

So every profile, post, photo, video, they're all assigned a unique alpha numeric or numerical code that is only representative of that piece of information. It can't be duplicated within that specific platform.

Q. It's unique, in other words?

A. Correct.

Q. Focusing on the task that we've just been talking about, namely, capturing and preserving in an authentic manner content that's on the internet, how much experience do you have with that particular task?

A. Quite a bit.

Q. Okay. Is that something you've been doing for years?

A. Yes.

Q. All right. I want to talk now a little bit about what you were asked to do in connection with this case. Did -- were you provided with a list of -- well, ultimately,

they became exhibits, but a list of internet content with URLs associated with each in order for you to conduct the analysis you just described?

A. Yes, I was.

Q. And for the record, what is a URL?

A. The web address, the www., whatever you're -- website you're visiting, that is the URL.

Q. And what does that stand for?

A. The URL is the streamline code or directory where someone would go to visit something. So there's subdomains, or domains, or prefixes of the domain where you can navigate to, and that specific URL or link is specific to that content that you're viewing.

Q. Okay. That makes perfect sense, and I asked a poor question. Does the acronym URL stand for Uniform Record Locator?

A. Oh, yes.

Q. Thank you. Tell us a little bit about what you did after -- well, withdrawn.

Did you yourself conduct the capturing of these various URLs that you were provided with?

A. No.

Q. Do you know who did? I don't mean the person, but what entity did.

A. Guidepost.

Q. And does Guidepost have software tools at its disposal that can accurately and authentically capture content in the way we've been describing?

A. They do.

Q. Were those tools used in this instance?

A. They were.

Q. Okay. Did you review all of the URLs that you were provided in an attempt to ascertain whether they had been captured appropriately?

A. I did.

Q. So -- and during your preparation for your testimony today, did you have occasion to cross-reference the various URLs that you examined with the exhibit numbers that our team has assigned them?

A. I did, yes.

Q. So you're familiar with identifying the information by exhibit number?

A. Correct.

Q. All right. And as part of your preparation in this case, did you conduct a post-by-post analysis for every single one of the exhibits that I'm about to direct you to?

A. I did.

Q. Okay.

MR. HARBACH: Now, Your Honor, I apologize for the lengthy chain of numbers I'm about to recite, but I'll do it

slowly. Unfortunately, I don't know any other way to do it for clarity of the record.

THE COURT: Okay. Thank you.

MR. HARBACH: What what I intend to offer at this stage is a batch offer of evidence of a fair number of exhibits that -- their authenticity having been testified to by the witness. And they are the following numbers: 3-A, 3-B, 4-A, 4-B, 5-A, 7, 8, 9, 10-A, 10-B, 11-A, 11-B, 11-C, 13, 15, 17, 18-A, 18-B, 19-A, 19-B, 20-A, 20-B, 21, 24-A, 24-B, 25, 26-A, 26-B, 27-A, 27-B, 27-C, 28-A, 28-B, 30-A, 30-B, 31 through 36, inclusive, 37-A, 37-B, 38-A, 38-B, 39 through 47, inclusive, 49 through 54, inclusive, 63, 65, and 66.

MR. WACHEN: We object, Your Honor.

THE COURT: He hasn't done anything yet.

MR. WACHEN: Oh, I thought he -- I apologize if I'm --

THE COURT: But I -- just I was going to ask him a question or two first.

MR. WACHEN: Sure.

THE COURT: Okay? I think what counsel said is he was going to offer a batch of exhibits. So I'm going to ask to go back over and make sure I have the exhibits properly. I think I do, but I may have missed some. And then, I think he's going to move for their admission, and then, I think we can hear your objection, counsel, okay?

MR. WACHEN: Thank you.

MR. HARBACH: May I inject, please, Judge?

THE COURT: Yes.

MR. HARBACH: I think -- and it's my fault. I think I would like to ask just a couple more foundational questions before I formally offer. But if you'd like to go through the list, let's do it.

THE COURT: Do you mind? I just want to make sure that I've gotten everything. So why don't you start -- I have 3-A, 3-B, 4-A, 4-B. Now, I may have missed something between 4-B and 7. Did I miss something?

MR. HARBACH: Yes, ma'am. It's 5-A.

THE COURT: Okay. And then --

MR. HARBACH: And then, 7.

THE COURT: -- 7, 9 --

MR. HARBACH: No, ma'am. There's also 8.

THE COURT: Okay. So see, I may have missed them. That's why I want to go over this. 8, 9, 11-A.

MR. HARBACH: No, ma'am.

THE COURT: Okay. Go ahead.

MR. HARBACH: Would you like me to do the whole thing one more time?

THE COURT: Why don't you go from 7 up? How about that?

MR. WACHEN: Very good. So from 7 onward, there's

8, 9, 10-A and 10-B, 11-A, 11-B, and 11-C, 13, 15, 17, 18-A and 18-B, 19-A and 19-B, 20-A and 20-B, 21, 24-A, 24-B, 25, 26-A, 26-B, 27-A, 27-B, 27-C, 28-A, 28-B, 30-A, 30-B, 31 through 36, 37-A, 37-B, 38-A, 38-B, 39 through 47, 49 through 54, 63, 65, and 66.

THE COURT: Okay. Thank you. I did miss a few in the early part, but I have most of them, so now, I have heard what you're proposing with regard to evidence. And then, you said you wanted to ask a few additional questions --

MR. HARBACH: Yes, please.

THE COURT: -- before you move for that admission? Okay. Go right ahead.

BY MR. HARBACH:

Q. Mr. Napierala, you heard the list of exhibits that I just went through. Is that the same list of exhibit numbers that you and I went through last night?

A. It is.

Q. And with respect to every single one of those exhibits, did you verify viable information provided by Guidepost that the relevant screenshot or video in the case of video exhibits were authentically captured from the internet?

A. I did.

Q. Okay.

MR. HARBACH: So Your Honor, PAX offers the list

of exhibits that I just recited for the Court.

THE COURT: Okay. Thank you. Counsel?

MR. WACHEN: We object, Your Honor. We believe the foundation has not been fully met, and there's been no proof that any of this -- these exhibits are relevant. And we haven't even reviewed -- I received, as you saw that thumb drive just a few minutes before we started this, and I haven't -- I, unlike the witness, I have not had the opportunity to look at these exhibits.

MR. HARBACH: May I respond, Your Honor?

THE COURT: Certainly.

MR. HARBACH: I have an idea that might streamline matters, maybe not. What we could do is -- let me back up one second. The reason I decided to do a batch offering is to try and save some time. It was my intention to utilize some of these exhibits with other witnesses who might testify. Of course, Mr. Napierala isn't competent to testify about any of the content.

And then, there are some other exhibits that I intend to publish separately for the Court without a witness in the chair. Now, if the concern is relevance, I could offer the list of exhibits that I just tendered to the Court, subject to a later finding of relevance by the Court. The point being that I've established authenticity of them at this stage with this witness.

I'll remind the Court that this is an emergency hearing, and that's part of the reason for the delay in tendering exhibits to co-counsel. Candidly, part of the other reason for the delay in tendering exhibits to co-counsel is that this is an ever-evolving body of evidence, and there were numerous late-breaking exhibits that we had to add.

Finally, I'll remind the Court that the rules against hearsay, for example, do not apply in this proceeding and that, generally speaking, the evidentiary rules are a bit more relaxed, given the emergency relief that's being sought.

All of that being said, as I said a moment ago, given that neither the Court nor counsel has had a chance to actually see these exhibits yet, I'd be happy to offer them seriatim, assuming that they're -- that the relevance is self-evident or if you want to entertain argument on the relevance of each one, we can do it that way.

THE COURT: Well, hold on one second. Let me just take a look at this for one moment, please. So Mr. Wachen, I heard the grounds for your objection. And I think what I heard counsel say is that, at the very least, he's offering these exhibits to -- and through testimony of the witness -- to establish authenticity. Do you have an opposition to the establishment of authenticity through this witness?

MR. WACHEN: No, Your Honor.

THE COURT: Okay. So then, the issue becomes whether they're relevant from your perspective, from your objection.

MR. WACHEN: Well -- and counsel made a comment about hearsay. I was not aware that the hearsay rules didn't apply in this proceeding. And we believe they should.

THE COURT: Well, we haven't gotten there yet.

MR. WACHEN: Okay.

THE COURT: You think?

MR. WACHEN: So we may have an objection on hearsay, as well.

THE COURT: But unless you're telling me I should be there at the moment, I don't see where I have a hearsay issue at the moment.

MR. HARBACH: Not yet.

THE COURT: Yeah, I don't have one yet, anyway, from the Court's perspective.

MR. WACHEN: Okay.

THE COURT: With regard to relevance, I think we'll have to address them as we go.

MR. HARBACH: Very good.

THE COURT: But I do agree, Mr. Wachen, that -- and you have no opposition -- that as far as authenticity, the witness has testified about the process that Guidepost and he has undertaken with regard to all of these exhibits.

He's testified that this is his business, that he understands what URLs are, that he's gone through each of the exhibits with counsel. And so I have no issue as to authenticity based upon his -- the witness' testimony and with regard to the authenticity of these documents.

When and if there's a question specifically about each one of these exhibits, you can certainly raise your relevance issue, objection, and/or hearsay, and I'll have to address that at that time.

MR. WACHEN: Will I be able to cross-examine him on authenticity when counsel's done because I do have some questions?

THE COURT: Well, I thought you just said you didn't object to it.

MR. WACHEN: I guess I'm sorry, Your Honor. I don't object conceptually, but I may have some questions for the witness that may go to the issue of whether all these exhibits are authentic.

THE COURT: Well, then, are you saying we have to go through each one, or are you saying that you're going to ask him questions about authenticity in general?

MR. WACHEN: Well, it would probably be more the latter, but yeah, more the latter. But based on the way this has been presented, I think he's raised some issues that need to be addressed.

THE COURT: Well, again, I mean, I understand that you did not become involved until last week. I understand that. But unfortunately, the Federal Rules of Civil Procedure require that this hearing happen --

MR. WACHEN: Sure, I --

THE COURT: -- quickly, as you know. It's not the Court's decision. It's the Federal Rules of Civil Procedure's decision.

MR. WACHEN: And I'm not objecting to that.

THE COURT: Right. No, no, I understand. But when you say produced this way, I mean, the -- there is -- we're under -- we're all under a time crunch here because of the Federal Rules of Civil Procedure.

You know, one of the things I talked about last week with Mr. Hellman very briefly, so he -- I wasn't asking him to do anything other than hear what I said essentially, which is right now, as we sit here, the temporary restraining order expires at 6:00 p.m. on Wednesday.

The only way that that can be continued or extended is if I find it needs to be extended because we're involved in an evidentiary hearing on the preliminary injunction or if the parties agree or consent to the extension.

So I have no problem going through each one of these exhibits with regard to anything that you want to raise

that is relevant. But I will tell you, and this is one of the reasons why I wanted to start the hearing, you know, we were going to do it Friday. I understood that you needed that extra time, and we continued it till today.

But as you can appreciate, I'm sure, it's going to take the Court some time to go through all this as well. So I think what counsel was trying to do, and if you don't agree with that, that's fine, then, we're going to have to go through each one, but what he was trying to do with this witness is to establish -- to move past the issue of authenticity and then get into the issue of whether you think it's relevant, or whether it's hearsay, or whatever.

He's going to argue it's not. You may argue that it is, and then the Court's going to have to rule, right? That's where we are, but the point being there's a lot of information here, and there's a lot of evidence here. And I haven't even heard what you may put forth, right?

So if you're going to object to authenticity, then I think we need to address that now because that is a fundamental issue with regard to these exhibits.

MR. WACHEN: And I understand, Your Honor, and I thought what counsel proposed was a practical way to do this, but -- and I'm not opposed to doing it that way, except I think there are some foundational aspects of his authenticity proffer that have not been fully laid out.

THE COURT: What in particular, if you wouldn't mind letting me know? Because obviously, the Federal Rules of Evidence deal with this to a large extent. The case law that's evolved --

MR. WACHEN: Sure.

THE COURT: -- in the last few years deal with this. The witness has testified that he has personal knowledge, that he reviewed all the URLs, that he analyzed them in connection with the case and with the information -- not analyzed the content. I'm only speaking about authenticity now, okay? That's all I'm talking about.

That they -- that he has for 13 years been an intelligence analyst whose job is investigative -- he's an investigator of the information on the internet, on social media, that he and his firm used techniques for preserving the information from the internet, that the most common way to do that is to get a screenshot and the metadata behind it, so that it's clear that whatever information is going to be shown would be that information at that point in time --

That there's an alpha numerical code associated with each one of the exhibits that's going to be produced, and that that is unique, and that he was provided with this -- all the information of the URLs and that he and/or Guidepost -- I actually think he said he went through a post-by-post analysis.

So from a foundational standpoint, I'm not sure what else you need under the Federal Rules of Evidence for a foundation.

MR. HARBACH: Your Honor, may we approach?

THE COURT: Who's we?

MR. HARBACH: Counsel and I.

THE COURT: To talk with me?

MR. HARBACH: Yes.

THE COURT: Yes, you can come over here, please.

(Sidebar)

MR. HARBACH: May I continue, Your Honor?

THE COURT: Yes, please do.

BY MR. HARBACH:

Q. Mr. Napierala, I would like to ask you about three other categories of exhibits that you reviewed. Is it the case that for a small group of the exhibits, namely four, you were unable to adequately verify the authentic providence of those materials from the internet based on the information that Guidepost had given you?

A. That is correct.

Q. What was deficient about that information?

A. The metadata was lacking. They only provided the screenshots.

Q. Okay.

MR. HARBACH: And I'm going to proffer to the

Court that those four exhibits were Exhibits 58, 59, 60, and 61.

BY MR. HARBACH:

Q. With respect to those four exhibits, Mr. Napierala, were you able to otherwise confirm their authentic appearance on the internet?

A. I was.

Q. How did you do that?

A. I went to the current posts as they're all still active online, compared the screenshots that were provided by Guidepost to what the actual live URLs were showing, and they matched.

Q. And when did you do that exercise?

A. Last night.

MR. HARBACH: So Your Honor, I'll also offer 58, 59, 60, and 61 under the same understanding we had just a moment ago.

THE COURT: Understood. Thank you.

(PAX Exhibits 58 to 61 entered into evidence)

BY MR. HARBACH:

Q. Two more categories, Mr. Napierala. Were there instances where there was a video that Guidepost captured and as to the video, you were able to adequately ascertain its authenticity but as to which my colleagues and I selected a single screenshot to be an exhibit for the Court?

A. Correct.

MR. HARBACH: I'll proffer to the Court that there were four examples of what I just described. Those are 10-C, 18-C, 18-D, 41-B, and 41-C.

BY MR. HARBACH:

Q. So the record is clear, is it correct that the videos from which those screenshots were taken, with respect to the videos, you were able to adequately ascertain authenticity from the internet, correct?

A. Correct.

Q. All right. With respect to the still shots, the five exhibit numbers that I just mentioned a moment ago, those were -- those still shots were not independently authenticated by Guidepost, correct?

A. Correct.

Q. Were you able to authenticate them in another fashion?

A. Yes.

Q. How so?

A. By watching the videos from which they came from and authenticating at the timestamps, and the content that was depicted in the screenshots was present fluidly in the video as it played.

Q. And were you satisfied that that was the case with respect to 10-C, 18-C, 18-D, 41-B, and 41-C?

A. Correct.

Q. Okay. Final category -- oh, excuse me.

MR. HARBACH: Your Honor, I'll tender those under the understanding we've described just a few minutes ago.

THE COURT: Yes. Thank you.

(PAX Exhibits 10-C, 18-C, 18-D, 41-B, and 41-C entered into evidence)

BY MR. HARBACH:

Q. And then, the final category, Mr. Napierala, there were three exhibits that involved some addresses. Do you know the ones I'm talking about?

A. I do.

Q. All right. They are Exhibits 12, 14, and 16. Let's start with number 12. Are you familiar with the platform called Google Earth or the website called Google Earth?

A. I am.

Q. What is it?

A. It is a satellite imagery platform that shows a variety of visuals of the earth and various positions on the earth, can be from a sky view or street view.

Q. Can you put in a particular address to navigate the software to that location?

A. Yes, you can.

Q. Is it -- is the resolution high enough such that

you can ascertain even an individual house?

A. Yes.

Q. And see it clearly?

A. Yes.

Q. With respect to Exhibit 12, that was a Google Earth screenshot of an address on (Sealed). Do you remember that one?

A. I do.

Q. Okay. Exhibit 14 was from a website called Bing. You familiar with that one?

A. I am.

Q. Does Bing offer a similar satellite imagery service like Google Earth?

A. They do.

MR. HARBACH: I'm pausing, reflecting on the sealing issue, Your Honor.

BY MR. HARBACH:

Q. And so for the moment, I'll just say to identify it, that 14 was an address in Foxboro, Massachusetts; you recall that?

A. I do.

Q. And then, finally, Exhibit 16, another Google Earth image from San Francisco, California. Do you remember that one?

A. I do.

Q. So with respect to each of those exhibits, did you independently -- well, let me ask it this way -- you took a look at the screenshots that are Exhibits 12, 14, and 16. And how did you ascertain one way or the other whether they accurately showed a photo from that address?

A. I performed the same task that would have needed to be done to obtain the screenshots in the first place, just to confirm that the screenshots that were provided accurately reflected what was present in either Google Earth or Bing Mass.

Q. So what did you do?

A. I myself went onto Google and Bing and looked at the respective addresses, looked at what was presented to me in real time as I reviewed them, compared them to what the evidence had showed or the exhibits had showed, and confirmed that those were accurate representations.

Q. Thank you.

MR. HARBACH: Your Honor, PAX offers PAX's 12, 14, and 16 subject to connection as we discussed before.

THE COURT: Thank you.

(PAX Exhibits 12, 14, and 16 entered into evidence)

MR. HARBACH: Okay. Now, Your Honor, at this stage, I was actually intending to publish a couple of examples with the witness, to essentially decipher a social media post and explain the different components of it. But

the guinea pig examples that I wanted to use are not formally in evidence yet. So at this juncture, it may make sense to allow counsel to take him on voir dire for the authenticity issue if that suits the Court

THE COURT: That's fine with me. Are you going to specifically identify those exhibits at the moment?

MR. HARBACH: I'm happy to.

THE COURT: Okay.

MR. HARBACH: The main guinea pig that I want to use with him is PAX Exhibit 8.

THE COURT: PAX Exhibit 8?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. All right. We're not going to pull that up yet. We're going to have some -- Mr. Wachen, did you want to voir dire the witness with regard to to PAX Exhibit 8?

MR. WACHEN: Yes, Your Honor. Can I do it on that whole long list, as well, or would you like me to only limit it to 8?

THE COURT: Well, why don't you two have a discussion about that for a moment.

MR. HARBACH: Your Honor, after speaking with counsel, if I might be permitted to ask maybe one or two more questions of the witness, I think we may have solved this problem.

THE COURT: Sure. Go right ahead.
BY MR. HARBACH:
Q. Mr. Napierala, you recall that there was a great big list of numbers that I read out to the Court a couple of times a few minutes ago.
A. I do.
Q. And during the course of our preparation, did we refer to that as Bucket 1?
A. Yes.
Q. Okay. Meaning these were the group of exhibits as to which you were able to, based on the information that had been provided from Guidepost, adequately ascertained the authenticity of them, correct?
A. Correct.
Q. And to make sure that the numeric list is accurate, I want to add a little more color to what we did last night. Were you and I working with an exhibit list that was also numbered?
A. Yes.
Q. Were you able to correlate the images that you received from Guidepost and the associated metadata with each of the exhibit numbers in Bucket 1?
A. Yes.
Q. And did you go through them all one by one on your own to satisfy yourself that, as to every exhibit in Bucket

1, your testimony, as you've given it today, would be accurate?

A. I did.

Q. Do you remain confident that that is the case?

A. I do.

Q. Okay.

MR. HARBACH: So --

THE COURT: Anything further, counsel?

MR. WACHEN: Your Honor, if counsel will represent that the long list of exhibit numbers that he read earlier constitute Bucket 1, then I'll accept his representation.

THE COURT: Okay. Thank you.

MR. HARBACH: Just one moment, Your Honor. May I just have one moment, Your Honor.

THE COURT: Certainly.

BY MR. HARBACH:

Q. I just remembered something. Mr. Napierala, did we go over a couple of exhibits in the car this morning on the way to court?

A. We did.

Q. And for the record, those were Number 50 and Number 61. Do you happen to recall that those were the numbers?

A. I do.

Q. Okay. Were those exhibits somewhat different than

the ones we looked at last night?

A. Yes.

Q. Do you recall the reason?

A. They were screenshots of videos as opposed to full videos themselves, I believe.

Q. Okay. Do you recall an issue about whether, with respect to a couple of exhibits, the capture that Guidepost had originally done, rather than being an entire great, big, long post was just a truncated version of the beginning of the post?

A. That is correct.

Q. And do you recall that the revised Exhibits 50 and 61, and by revised I mean revised since last night when we looked at the bigger list, that they included, as of this morning, the entirety of the post?

A. Correct.

Q. As to 50 and 61.

A. Yes.

Q. Based on your review, do you have any concerns about the authenticity of those exhibits as they were amended since last night?

A. I do not.

MR. HARBACH: With that caveat, I will represent to the Court that the Bucket 1 list that I recited earlier is the same as we went over last night in tandem with this

morning in the car, Your Honor. And I thought I heard counsel to say that with that representation, he would withdraw his objection to authenticity.

MR. WACHEN: That is correct, except I just am a little confused because 50 and 61 were not on your list of -- maybe I misunderstood. When you read that long list of exhibits, 50 and 61 were not on that long -- oh, 50 was, you're right.

THE COURT: 50 was.

MR. WACHEN: But not 61.

THE COURT: 61 would be, what I would call for lack of a better term, the second bucket, right?

MR. HARBACH: Correct.

THE COURT: Okay.

MR. WACHEN: Okay. Then, I'll accept his representation.

THE COURT: Okay. Thank you.

MR. HARBACH: So just so the record's clear, Your Honor, are we proceeding on the understanding that all the exhibits that PAX has tendered to the Court to this point have been accepted as authentic, subject to later connection as being relevant or whatever else?

THE COURT: Counsel?

MR. WACHEN: Yes, Your Honor.

THE COURT: Okay. Thank you. I appreciate that.

Okay, then, yes, we are proceeding in that manner. Authentication has been established, so we can proceed with the introduction of the exhibits to the extent that you desire.

MR. HARBACH: Thank you, Your Honor. I'd like to start by publishing PAX Exhibit 8, please.

THE COURT: It'll just take a moment, but it'll come up. PAX Exhibit 8.

THE CLERK: PAX Exhibit 8 is being displayed.

THE COURT: Thank you.

MR. HARBACH: Madam --

THE COURT: Is there a way we can make that a little bigger? Is that what you were going to ask?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. How's that?

MR. HARBACH: That's terrific.

THE COURT: Okay. And is it on the screen for people to see, as well?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. All right. Thank you. All right. Please proceed.

BY MR. HARBACH:

Q. Can you see it on your screen, Mr. Napierala?

A. Yes.

Q. So publishing PAX Exhibit 8 now, what are we

looking at here?

A. This is a GETTR profile.

Q. What's GETTR?

A. GETTR is a social media platform, similar in structure to Twitter in many ways, where people can go on and post commentary, photos, videos on their own accord, on their own profiles. They can also leave commentary on the activity of other users. They can follow other users, be followed by other users. They can like posts, things of that nature.

Q. You mentioned earlier your experience with Facebook and Twitter. Have you had prior experience with GETTR before your involvement in this case?

A. Yes.

Q. You're familiar with the platform and how it works?

A. I am.

Q. I'd like to ask you first about on this page that is Exhibit 8, you'll see there's a -- on the left-hand side, there's a photograph of an Asian man in a circle. You see that?

A. I do.

Q. And then, right underneath it, it says, Miles Guo Official, in black bold.

A. Yes.

Q. What is that?

A. That is the display name for the profile.
Q. And what does that mean?
A. Display name is what anyone can put on their profile as what they want to be called, or known as, or recognized as. Specifically with GETTR, it can be changed at any time, just simply by logging into the profile and clicking the edit button.
Q. Meaning that it is the user -- it is up to the user what the name shown here?
A. That is correct.
Q. And say again what you called it.
A. It's a display name.
Q. Display name, okay. Thank you. Right underneath the display name, there -- it says at Miles.
A. It does.
Q. What is that?
A. That is a handle or username.
Q. Tell us what a handle or username is.
A. Sure. So the handle or username is a little more sticky to the profile. It can't be changed with the same ease that a display name can. Typically, it requires an authentication email to be sent to the email address that's associated with the profile if you intend to change it.
Typically, we see usernames or handles stay with an individual as they go from platform to platform, again,

based on availability. We also tend to see those as part of a person's name or used as an email prefix.

Q. Is a handle a unique identifier within a given platform?

A. It is.

Q. Meaning that no two people can have the same one?

A. Correct.

Q. What about display name?

A. They can have that as the same.

Q. Okay. So if I was a user on Twitter and I wanted to have a display name of Miles Guo Official, I could.

A. Correct.

Q. But if I wanted to use at Miles and it was in use by someone else, I could not.

A. Correct.

Q. Okay. I've just underlined in a green on PAX 8, a button that says follow. Do you see that?

A. Yes.

Q. What is that?

A. So when you follow somebody, that's an indication that you want to be made aware or visually see within your own homepage or timeline the activity of that person. So if they make a post or they post a video, post a photo, that gets amplified within your own timeline. So that is something that could be visible just by simply logging into

your own profile, provided that you're following that person.

Q. I think I understand. Next to the display name, Miles Guo Official, there's a red circle with a white V in it.

A. Yes.

Q. You see that?

A. I do.

Q. Tell us what that means in the context of the GETTR website.

A. So that is a verification mark. That means GETTR has gone through whatever their internal process is of validating the identity of the individual who has the profile.

Typically, you see that with celebrities, sports figures, politicians, people that have a larger following, that have a larger audience tend to be verified to ensure that the person that is representing the profile is who they say there are for lack of having someone else acting as the person.

Q. In general, what sort of verification methods might be used?

A. While I'm not familiar with GETTR specifically --

Q. That's why I asked in general.

A. Typically, it's a form of photo ID, other engagement with the subject to ensure that the person that is

representing the profile is who they say they are.

Q. Okay. A little bit farther down the screen, I'm going to underline in green some more information that I want to ask you about.

A. Sure.

Q. You see where it says, NYC, NY?

A. I do.

Q. What is that?

A. That's the location the person says that they are located.

Q. And that is within the control of the user?

A. That is correct.

Q. In other words, it's not like some kind of tracking thing where wherever the user is, that's where it shows the person is?

A. Correct.

Q. Next to that, it says, joined July 2021. What does that mean?

A. That is the month and year in which the profile was created on the platform.

Q. You mentioned a moment ago when talking about the handle that it was a little stickier --

A. Correct.

Q. -- than the display name. Does that mean that if I have a handle, I can't ever change it?

A. You can change it.

Q. How would you do that?

A. You'd have to be logged into the profile, you'd have to go into your account settings, and with GETTR specifically, you have to make a request to do so. What they would do is send an email address, I believe it's a six-digit authentication code that they would send to the email address associated with the profile. You'd have to enter that authentication number into the profile to be able to change the handle.

Q. Okay. And then, once -- let's take an example and say that I had a handle that was at David. And I wanted to change it to at David5. If I changed it to at David 5 in the manner that you just described, at that point, would at David be available for somebody else to use as a handle if they wanted to?

A. Yes.

Q. Once someone is registered with a username and a handle, is access to that person's account typically password protected or otherwise secured?

A. Yes.

Q. What about the ability to post in that person's name, is that also typically password protected or otherwise secured?

A. Yes.

Q. So back to my at David example, let's say that I own the handle, at David, and I'm at an airport, and I can't get the internet for some reason, but I can call you, and there's something that I wanted posted on my feed. And I say, hey, Brian, can you just post this for me? What would you ask me for?

A. Your log-in credentials.

Q. Which includes what?

A. Username and password. It also could be email address, phone number. It depends what is associated with the profile. If both a phone number and email address are associated, you could use one or the other. But typically, it's an email address and a password.

Q. Okay. And if I were to provide that information to you, would you be able to switch the handle -- or correction, not switch the handle, would you be able to access my account in order to post what I asked you to post?

A. Yes. However, I will add that in certain instances, most social media platforms have some sort of security measure in place where if you're attempting to log in from an IP address that has not been utilized in the platform before, they once again may ask for an authentication code, meaning they'll send a secondary email to that email address that is used to log into the account as a secondary verification that you are actually someone who

should be in this profile.

Q. Okay. And could that dual authentication also be done by phone?

A. Yes.

Q. And in either case, the user who owns that email address or phone number would have to approve it; is that right?

A. Correct.

Q. Okay. A little farther down on this page, there are three pieces of data that I've just underlined. Again, we're still on PAX Exhibit 8. The first says, 5,626 following. What does that mean?

A. Those are other profiles that this profile has clicked the follow button on.

Q. So that means that whoever owns this at Miles handle is him or herself following 5,626 other users?

A. Correct.

Q. Okay. What about the one in the middle there that says, 171.2K GETTR followers. What do that mean?

A. Those are all people on the GETTR platform that have followed this specific profile.

Q. In other words, they've clicked this follow button up here and decided to follow at Miles.

A. Correct.

Q. And 171.2K, what number is that?

A. That's 171,200 --

Q. 200.

A. -- yeah.

Q. Okay. The third one says, 811.4K, in other words, 811,400 total followers. What does that mean?

A. So with GETTR, you have the ability to also connect other social media platforms, mostly Twitter is the one that correlates with GETTR. So it will show you the correlating other social media platforms that have been linked and approved with this GETTR profile. Those follower accounts will be added together across those specific platforms to give you a total follower count across those synced platforms.

Q. You said accounts that had been linked and approved.

A. Yes.

Q. What does that mean?

A. So you have -- you have the option to go on and say, yes, this Twitter profile is also me. You can link it to this, and those followers will also be counted in the fashion that you see here.

Q. So that's user controlled?

A. Yes.

Q. Is that number -- withdrawn.

To your knowledge, is there typically any

verification protocol in place to ensure that when somebody says, that other profile on Twitter is also me, to make sure that it is?

A. Typically when you're syncing platforms, there's a button that represents the platform that you're looking to associate with, whatever profile you're currently logged into. The authentication is typically to log into that other profile that you're looking to sync up with, and then, you'll see the API talking back and forth.

Q. Hold on. What's that?

A. So it's just this profile is talking to this profile code, right, that they're sending an authentication back and forth. This person's logged into the GETTR profile, I'll use Twitter as an example, this person successfully logged into the Twitter profile, they both check, so the link will be granted.

Q. I see. And then, the followers that that person has on Twitter will be added to the total followers count on GETTR?

A. Correct.

Q. Okay. Toward the bottom now, there are five headings.

MR. HARBACH: And thank you, Madam Clerk, could you scroll up until I say stop? Stop. Thank you.

BY MR. HARBACH:

Q. Still on PAX Exhibit 8, there are five headings up here that are listed. I just want to ask you about two. The first one is the one that's highlighted right now that says, posts. Tell us what that means.

A. Sure. So the posts tab is what someone would see when they're viewing this profile. It is any post that the profile has made. It can be in the form of a video, photo, text. It can also be a repost of someone else's content, either with that content on its own or with added commentary by the profile.

Q. Okay. And the particular post that's on the screen now, directly below those five headings, what example is -- of what you just described is that?

A. That would be a repost of someone else's content with that person's own commentary added.

Q. All right. And we're talking about, for the record, the NFSC Speaks post that appears indented and underneath the Miles Guo Official header, correct?

A. Correct.

Q. So the user associated with at Miles has here reposted something from another user?

A. Correct.

Q. Okay. What about likes, what does that mean? If you click on that, what do you see?

A. You can see anything that that profile has liked,

provided that it's public, of course.

Q. Okay. Next to the -- where it says Miles Guo Official and then at Miles, it says, 13H. What does that mean?

A. That means the specific retweet was posted 13 hours prior from the time it was viewed and captured.

Q. You said retweet. Is that what you meant to say?

A. Reposted.

Q. Thank you.

A. Yeah.

Q. 13 hours from when?

A. That would have been the date in which the capture was taken.

Q. Okay. And when you say capture, you're talking about what Guidepost did or whatever -- using whatever software, when it was captured from the internet?

A. Yes.

Q. Okay.

MR. HARBACH: In this example, Madam Clerk, could you please scroll down a little bit more? Go up. I'm going to try to catch that footer at the bottom of the page there, right there near the sticker. Perfect. May I please make a suggestion? If you go up to view, all the way at the top left, and then, go down to page navigation, sorry, page display, and click enable scrolling, it will move more

smoothly.

BY MR. HARBACH:

Q. Okay. So at the bottom of the first page of PAX's 8, there's some information that's typed in the footer. Can you see that?

A. Yes, I can.

Q. And what I'm going to focus on is the last line where it says, capture timestamp. See that?

A. Yes.

Q. What does that date and time mean?

A. That is the date that this capture took place.

Q. So in this case, November 21st at 6:08, Greenwich Mean Time.

A. Correct.

Q. Okay. And so if we wanted to ascertain in this example when the user at Miles reposted this NFSC Speaks content, we would subtract 13 hours from 6:08 Greenwich Mean Time on Monday, November 21st?

A. That is correct.

Q. Okay.

MR. HARBACH: Madam Clerk, could we scroll down a little bit more, please? Okay. You can stop there.

BY MR. HARBACH:

Q. I just wanted to point out that these times are pretty precise. This one on the second page of PAX 8 says,

13M. Is that 13 minutes?

A. It is.

Q. Again, measured from the capture time?

A. Yes.

Q. Okay.

MR. HARBACH: You can take that exhibit down, please. I'm sorry for the hold up, Your Honor. Can I just have one second?

THE COURT: That's fine. Thank you.

BY MR. HARBACH:

Q. Mr. Napierala, was every capture that Guidepost did able to produce as output the date and time that the capture occurred?

A. No.

Q. In other words, there were some examples where you were able to confirm authenticity, but the data did not enable you to ascertain when the capture occurred; is that fair?

A. That's fair.

Q. For the ones where the exhibit does allow you to ascertain capture time, would it appear in the format similar to the way we've just seen with Exhibit 8?

A. It would.

Q. And would it be fair to say that if a screenshot exhibit does not have that footer information, then that

means that you were not able to determine the time that the capture occurred?

A. That is correct.

Q. Okay.

MR. HARBACH: And that reminds me, I'm sorry, Madam Clerk, can we go back to 8 for more time, please? Okay.

THE CLERK: PAX Number 8 is on the screen -- is displaying, sorry.

MR. HARBACH: Thank you.

THE COURT: Can you just make it a little bit bigger, please? Thank you.

BY MR. HARBACH:

Q. Okay. On PAX 8, I'm looking at the first post that's listed here, and right underneath Miles Guo Official, there's a date that says, 2022.11.20. Where does that date come from?

A. That's just text entered by the user who made the post.

Q. Okay.

MR. HARBACH: All right. Now, you can take down 8. Thank you. Okay. I'm going to take a look at an example of video. Could we please see PAX 9?

THE CLERK: PAX 9 is displaying.

THE COURT: It's not displaying -- oh, here it is.

Now, is it coming -- can everyone see it?

MR. HARBACH: Yes, Your Honor. We can see it.

BY MR. HARBACH:

Q. So I just want to confirm for the video content, Mr. Napierala, like Exhibit 9 here, where the exhibit consists of only a video, even though it's not part of a social media page, you were nevertheless able to confirm its authenticity and that it came from the internet?

A. Correct.

Q. And with this example, would you be able to say anything about -- just from looking at Exhibit 9, would you be able to say anything about the date or time that this video was posted to the internet?

A. No.

Q. Okay. Some -- I won't struggle to find it an example now, but some of the video exhibits in the case within the video itself, there is a date and time stamp.

A. Um-hum.

Q. And in those examples, what generates the date and time stamp within the video?

A. Whatever medium is used to take the video.

Q. Okay. All right.

MR. HARBACH: I need just one minute, please, Judge.

THE COURT: Certainly.

MR. HARBACH: Okay. Your Honor, I pass the witness.

THE COURT: Okay. Thank you. Attorney Wachen?

CROSS-EXAMINATION

BY MR. WACHEN:

Q. Mr. Napierala, did I get that right?

A. Yes, you did. Thank you.

Q. I'm used to people mispronouncing my name, so I just want to make sure I got you.

A. I appreciate that.

Q. I had just a few questions. I believe you testified earlier about the difference between a handle and a username, right?

A. A handle and display name.

Q. Display name, excuse me. Okay. And perhaps, is a username the same as a handle?

A. Yes.

Q. Okay.

MR. WACHEN: And is it possible to put Exhibit 8 back up, PAX Exhibit 8? Thank you.

THE CLERK: Exhibit 8 is displaying on the screen.

MR. WACHEN: Can everyone see it?

THE COURT: Can you make it a little bit bigger? 125, maybe, I think that would be easier for everyone. There you go. Thank you.

BY MR. WACHEN:
Q. And Mr. Napierala, at Miles, that was the handle or username, correct?
A. That is correct, yes.
Q. And I believe you testified that only one person can have that handle or username; is that what you said?
A. At one time, yes.
Q. At one time. And were you speaking generally or were you speaking about GETTR?
A. Both.
Q. And how do you know at GETTR only one person can have a handle or username at a time?
A. I tried that myself just to make sure.
Q. Okay. So if Mr. Harbach and I both wanted to have at David, for example --
A. You cannot.
Q. We cannot. But suppose Mr. Harbach and I decided that we wanted to share the handle, could we do that?
A. You mean have two profiles with the same handle?
Q. Yes.
A. No.
Q. Could we both use that handle?
A. The handle is only affixed to one profile. So the only way that two people could essentially use the same handle is if you had two users utilizing the same account.

But you cannot have two accounts with the same handle.

Q. Okay. But multiple users could use the same account, for example?

A. If they had the log-in credentials, yes.

Q. Okay. You were talking earlier about dual authentication practices.

A. Um-hum.

Q. Were you speaking generally about social media or were you speaking at GETTR?

A. I know specifically with GETTR, and I believe you're talking about changing the username or handle.

Q. Or even logging in, for example.

A. It's a variable scenario, right? So if you've been logging in from the same phone, same computer regularly, then you can log in simply by utilizing the username and password or email address and password, whatever the combination is that's required to get in.

But typically, across social media, if you've established a longstanding history of utilizing the same devices to access your accounts, and then, suddenly, you have another account attempt to access it with the same credentials, most platforms have security built in to require a second authentication, typically with a six-digit number.

Q. Does GETTR require second authentication?

A. I know that I have seen that personally with

changing a username. With having established an account that's attempting to log in from a new device, I personally have not observed that.

Q. So it's possible that someone could log into a username without dual authentication on GETTR?

A. I would have no knowledge one way or the other.

Q. Okay. And with respect to linking, you spoke earlier -- testified earlier about linking profiles. Were you speaking generally or about linking GETTR profiles with Twitter profiles?

A. Generally.

Q. Okay. So what -- your testimony doesn't necessarily apply to linking GETTR or a GETTR profile with a Twitter profile, correct?

A. Not specifically.

Q. And looking at PAX Exhibit 8, Mr. -- well, whoever's profile this is has 171,200 followers on GETTR?

A. Specifically on GETTR, yes.

Q. Okay. And the 811,400 total followers, is that -- was your testimony that that was GETTR plus Twitter or GETTR plus something else?

A. GETTR plus what other platforms may be linked to this account. I would not have knowledge of what other platforms that encompasses.

Q. Okay.

MR. WACHEN: And can we take a quick look at PAX Exhibit-- well, I don't even think --
BY MR. WACHEN:
Q. You remember what PAX Exhibit 9 was?
A. I do.
Q. And how do you know that was posted to the internet?
A. Sure. So that video was actually part of a post, so I examined the post that contained the video to authenticate that that post in and of itself, which encompasses any artifact within the post, in this instance the video, were actually captured and examined the metadata to ensure that that was a valid capture and post.
Q. And which post was that?
A. The video stream that you saw, there was a post associated with that.
Q. Okay. And where was that post?
A. I couldn't tell you from the video that you showed.
Q. Okay. Or counsel.
A. Yeah, sure.
Q. Okay. So you don't know where that video came from. You're just saying you recall that it came from somewhere.
A. I knew it came from a profile specifically, yes.

Given how many I had to review, I -- memory does not recall exactly which one.

Q. Okay. Thank you.

MR. WACHEN: No further questions.

THE COURT: Okay. Thank you. Any redirect, counsel?

MR. HARBACH: Yes, Your Honor. Very briefly, please.

REDIRECT EXAMINATION

BY MR. HARBACH:

Q. On the subject of multiple users with a single handle, you were explaining to counsel a moment ago that that would require sharing log-in identity and credentials, correct?

A. Yes.

Q. Meaning the password, or the email address, or the phone number that was associated with the account.

A. Correct.

Q. So if I own account at David and I want to achieve a situation where you are able to post on my account, I would have to give you my log-in credentials, wouldn't I?

A. Yes, you would.

MR. HARBACH: Nothing further, Your Honor. Thank you.

THE COURT: Thank you. Any re-cross?

MR. WACHEN: Yeah, just one question.

RECROSS-EXAMINATION

BY MR. WACHEN:

Q. So in the scenario counsel was posing, wouldn't it also be possible for someone to guess the log-in credentials and log in without getting the information from the owner of the account?

A. I suppose. That depends on the password that was set by the user.

Q. But it certainly would be possible if someone used a simple password that someone could log in without authorization, correct?

A. It could be possible, yes.

Q. On GETTR?

A. Correct.

Q. Thank you.

A. Um-hum.

THE COURT: Anything further from this witness or are we going to address issues under seal with regard to this witness?

MR. HARBACH: Well, Your Honor, from this witness' testimony, the only sensitivity is the addresses that were associated with PAX Exhibits 12, 14, and 16. And for 12 -- I mentioned the street name. For 14 and 16, I just mentioned the towns. So that's -- that's the only sensitive

information that has been elicited to this point, and I think with respect to my, admittedly, inadvertent naming the street on 12, we'd ask for that to be sealed and/or redacted from any public transcript.

THE COURT: Counsel?

MR. WACHEN: Since I'm not even sure what these are pictures of, we would object subject to having some more information.

These are public -- obviously, by his testimony, these are public streets, public addresses, public locations. I'm not sure what the sensitivity is.

THE COURT: Go ahead. Anything --

MR. HARBACH: Your Honor --

THE COURT: Yeah.

MR. HARBACH: -- it -- it -- there'll be a proffer later in our presentation about who resides at these addresses, which is the reason that they're relevant and that we care about them.

THE COURT: All right. Then I will -- what I'll do is I'll wait to rule on that. I understand Counsel for PAX has asked for that information to be sealed in Exhibits 12, 14, and 16. You, Counsel, have objected to that, and we get to that point, I'll -- I'll rule on that. Thank you.

MR. HARBACH: Your Honor, forgive me for interrupting, but --

THE COURT: Go ahead.

MR. HARBACH: -- I want to be crystal clear. It's only as to 12.

THE COURT: It's only as to 12 because 13 -- 14 and 16 you just indicated the location of the town.

MR. HARBACH: Just the town, yes, ma'am.

THE COURT: Okay. Only with regard to 12.

MR. HARBACH: Correct.

THE COURT: Okay. All right. Thank you. All right. So then this witness may step down?

MR. HARBACH: He may be excused, as far as Pax is concerned, Your Honor.

THE COURT: Yes. So you'll have to --

MR. HARBACH: Thank you, ma'am.

THE COURT: -- remain in the courtroom in case counsel -- opposing counsel calls you. Okay?

THE WITNESS: Yes, ma'am. Thank you.

THE COURT: All right. Thank you.

All right. PAX, you going to call your next witness?

MR. HARBACH: I'm happy to, Your Honor. I'll proffer that it might save us a little time in logistics if we took a short break.

THE COURT: That's fine. How much time would you like?

MR. HARBACH: Ten minutes is fine.

THE COURT: We'll come back between 12:15 and 12:20.

MR. HARBACH: Thank you, Your Honor.

THE COURT: Okay. Court is in recess.

COURT OFFICER: All rise. The Court is in recess.

(Off the record at 12:04 p.m.)

(On the record at 12:21 p.m.)

COURT OFFICER: All rise. Court is in session after recess.

THE COURT: Do you need more time? If you need more time, it's fine.

MR. HARBACH: I'm sorry, Your Honor.

THE COURT: No, it's fine. I just assumed that you were ready, and I guess I shouldn't have.

MR. HARBACH: All right. Thank you for your indulgence, Your Honor. We're trying to save some time.

THE COURT: Certainly.

MR. HARBACH: During the break, Counsel and I conferred and would like to enter a stipulation for the Court, but it will involve, for illustration purposes, displaying PAX Exhibit 4-A.

THE COURT: Okay. Courtroom Deputy will just need a moment to pull up exhibit -- Pax's Exhibit 4-A.

MR. WACHEN: Your Honor, while -- while she's

doing that, can I bring something to the Court's attention that I mentioned to Counsel during the break? And that is that I learned during the break that Mr. -- Mr. Guo's father is, apparently, very ill and was just admitted to a hospital in China, and --

THE COURT: Sorry to hear that.

MR. WACHEN: -- and under -- yeah, thank you -- and under his religion, if his father passes away, he would like to be excused so he could go pray, so that --

THE COURT: What -- and I -- I have -- you know, all I'm asking is how does that impact today, if I think PAX was going to call him as a witness.

MR. WACHEN: Right.

THE COURT: So when -- if Mr. Kwok wants to, understandably, go pray, is he planning on coming back? Or -- or is he leaving the courtroom for the day? That's -- that would be my question.

MR. WACHEN: All right. He -- my understanding is that this only comes into play if his father passes away.

THE COURT: Okay.

MR. WACHEN: And if she -- if he does, then he would need to go pray for three weeks, so I guess he would want to be excused. So I think -- it sounds like, Counsel, it's about ready to call him as -- as a witness, so --

THE COURT: Okay. Okay. Well, why don't we

proceed, and we'll see how things go?

MR. WACHEN: Right. Thank you, Your Honor.

THE COURT: And we're pulling up PAX's Exhibit 4 now? Is that correct?

MR. HARBACH: 4-A, Your Honor.

THE COURT: 4-A, I'm sorry. You're -- you're correct.

MR. HARBACH: So with referring to 4-A, the stipulation that the parties have agreed to is that the text that appears undeath the embedded video on this -- on this exhibit --

THE COURT: Yes.

MR. HARBACH: -- which in this example says, posted at -- on 5:14 p.m., November 24th, 2022, that when a date and time stamp appears like that on GETTR underneath a video, it is GETTR-generated and not user-generated. However, the time zone could well be incorrect. Fair?

THE COURT: Okay. So hold on.

MR. HARBACH: Yes.

THE COURT: I think I understand what you're saying. All right. So when I'm looking at Exhibit 4-A, and you're looking at the -- at posted on 5:14 p.m., November 24th, 2022, you're saying that you -- you parties -- the parties agree that when that time -- when that date and time stamp appears, it is GETTR-generated, but it's not

necessarily the correct time zone?

MR. HARBACH: Exactly right.

THE COURT: Okay. Okay.

MR. HARBACH: All right. With that clarification and stipulation, PAX calls Mr. Ho Wan Kwok.

THE COURT: All right. So Mr. Kwok, and I believe we're going to need the interpreters up -- up with Mr. Kwok. Okay?

MR. HARBACH: Yes, Your Honor.

THE COURT: Mr. Kwok bring his interpreter? Yes.

So both of you, if you would stand -- do you -- where those two microphones are, and like we did the last time you both were here, I'm going to have you --

THE INTERPRETER: last time.

THE COURT: Oh, you weren't? I'm sorry.

THE COURT: But I know -- I -- I recognize this -- this lady. I'm sorry.

THE INTERPRETER: Yeah, I was here virtually for him once.

THE COURT: Okay. Okay.

THE INTERPRETER: But I don't think I was in person.

THE COURT: You can have a seat, sir.

THE WITNESS: Good afternoon.

THE COURT: Good afternoon. You can have a seat,

sir.

THE WITNESS: Thank you.

THE COURT: All right. So what we're have to do is I'm going to ask both of you one at a time to tell me your name. Okay? And then spell it. And then the Court Room Deputy is going to swear you in. Okay? So we'll start with you first, please.

THE INTERPRETER: My name is Shi Feng. First name, S-H-I. Last name, F-E-N-G.

THE COURT: Okay. Now and the Courtroom Deputy is going to swear you in. Okay?

THE INTERPRETER: Of course.

COURT OFFICER: Do you -- raise your right hand, please. Do you solemnly swear that you will well and truly interpret the testimony in this matter from English to Mandarin and from Mandarin to English, so help you God?

THE INTERPRETER: Yes, I do.

THE COURT: Thank you.

COURT OFFICER: And please state your name (inaudible) your address (inaudible).

THE COURT: Just -- and could you just state your address for the record, Ms. --

THE INTERPRETER: Yes, my address is (Sealed).

THE COURT: Thank you. Good morning -- or good afternoon. How are you? If you would please state your name

for the record.

THE INTERPRETER: Yes, Una Wilkinson, U-N-A W-I-L-K-I-N-S-O-N.

THE COURT: And then she's going to swear you in, Ms. Wilkinson, as well. Okay?

COURT OFFICER: Sorry. I just want to make sure I have that last name. W-I-L-K-I --

THE COURT: Is it Wilkinson?

THE INTERPRETER: Yes, Wilkinson.

THE COURT: -inson, yes. She just wasn't sure if she heard you properly. That's all.

THE INTERPRETER: Yes. Your Honor --

THE INTERPRETER: I'm a little confused at how this is going to work --

THE INTERPRETER: Yep.

THE INTERPRETER: -- with her. So she's just explaining to me.

THE INTERPRETER: Yes.

THE COURT: Okay.

THE INTERPRETER: And I am only hear as a checking interpreter. I am not the official interpreter, as I understand it. She is --

THE INTERPRETER: (Inaudible).

THE INTERPRETER: Yes. So she is the official interpreter. Only if she's making any mistake that I think

that I need to correct, then I will just same something.

THE COURT: And that's what we did, I believe --

THE INTERPRETER: Yes.

THE COURT: -- the last time we were here.

THE INTERPRETER: Yes. Yes, exactly.

THE COURT: With both of you, so that if you believe, as the official interpreter --

THE INTERPRETER: Yes.

THE COURT: -- is saying something that is not accurate or correct, you will correct that record, and you will two talk about it, and then we'll see where we stand.

THE INTERPRETER: Yes.

THE INTERPRETER: Of course.

THE COURT: Okay?

THE INTERPRETER: But other -- otherwise, I will remain just silent.

THE COURT: I wish we had chairs for you, but unfortunately, I think it might -- you might have to stand.

THE INTERPRETER: That's okay.

THE COURT: You can lean against the wall, if that's helpful.

INTERPRETER: That's okay.

THE CLERK: If you want me to I can slide over. They can have these chairs.

THE COURT: Oh, okay. Thank you.

(Overlapping voices)

THE COURT: All right. Thank you.

INTERPRETER: Thank you.

THE COURT: All right. Now, Ms. Wilkinson has to be sworn in, right? You haven't done that yet? Okay.

COURT OFFICER: Raise your right hand, please. Do you solemnly swear that you will tell -- or you will well and truly interpret the testimony in this matter from English to Mandarin and Mandarin to English, so help you God?

THE INTERPRETER: Yes, I do.

COURT OFFICER: (Inaudible) state your name again and address for the record.

THE INTERPRETER: I can't -- I can't hear --

THE COURT: You just need to state your name and address for the record, unfortunately.

THE INTERPRETER: Okay. Yes.

THE COURT: Go ahead.

THE INTERPRETER: Una Wilkinson. Address is (Sealed).

THE COURT: Okay. Thank you both.

Now Mr. Kwok has to be sworn in, as well --

COURT OFFICER: Okay.

THE COURT: -- Madam Courtroom Deputy.

MR. WACHEN: Your Honor?

THE COURT: Yes.

MR. WACHEN: I was hoping to make a statement before Mr. Guo testifies.

THE COURT: Okay. I apologize. In our -- in this case, he is referred to as to Mr. Kwok, and you refer to him as Mr. Guo. Whatever -- we -- we just want to make sure we're talking about the same --

MR. WACHEN: Sure.

THE COURT: -- individual. I know Mr. Kwok has -- has had other names at different times, but in this Court, he -- he signed his petition as Mr. Kwok, so I just want to make sure we're using the right names.

MR. WACHEN: I'm just trying to be respectful of --

THE COURT: Of course.

MR. WACHEN: -- of how he wants his name pronounced.

THE COURT: As -- as are we. But -- you know, in this Court, it's signed as -- I'm trying to be respectful, as well.

MR. WACHEN: Sure.

THE COURT: So I -- I believe that for here -- for here, Mr. Kwok, that's what I've referred to you as. Okay? And all the other parties in this. But your lawyer's referring to you as Mr. Guo, so I just want to make sure that that -- we're talking about you, whether we talk about --

THE INTERPRETER: Your Honor, do you want me to explain this to him?

THE COURT: -- Mr. Kwok or Mr. Guo.

THE WITNESS: Actually, Your Honor, let me explain to you. The -- this is one of -- H-K Hong Kong spelling another one is the one -- the spelling mandarin China. They might pronounce slightly different, but ultimately, it's the same character in Mandarin.

THE COURT: Okay. Thank you. Thank you. All right. And now, Counsel, you said you wanted to say something before questioning -- before direct exam?

MR. WACHEN: I do, Your Honor.

THE COURT: Okay. Go right ahead.

MR. WACHEN: Would you like me to approach the -- can I do it from here?

THE COURT: Certainly.

MR. WACHEN: Okay. Your Honor, the Trustee recently made certain representations to the Court that he had put materials in the hands of the U.S. Trustee and U.S. Marshall and asked this Court to make a criminal referral as to Mr. Kwok. The areas of inquiry by the Chapter 11 Trustee and PAX today appear to concern the same areas of inquiry that the Trustee has sought to be investigated by law enforcement regarding Mr. Kwok.

Although Mr. Kwok would otherwise testify today

about the issues today about the issues before the Court and his constitutional rights to speak freely and express his views on these subjects -- rights that do not exist in China due to the restrictions imposed by the Chinese regime -- as a result of the Trustee's statements to the Court and on advice of Mr. Kwok's counsel, Mr. Kwok will be invoking his constitutional right against self-incrimination today in response to all inquiries relating to these areas.

THE COURT: Okay. Thank you. All I would say to that is, are you saying Mr. Kwok's not going to answer any questions? Or just with regard to certain areas?

MR. WACHEN: I believe he's not going to answer any substantive questions.

THE COURT: Okay. Will he -- okay. Well, I need to know that directly so that we can figure out how we're proceeding.

MR. WACHEN: Yeah, I -- I -- you know, he can, obviously, state his name and -- and -- and stuff like that, but -- nonsubstantive, but I think, based on our understanding of what they're going to be asking, that he's going to probably be invoking his Fifth Amendment right as to all questions.

THE COURT: All right. Well, let's see how things progress. Now, as you've stated and Mr. Hellman stated on Friday, the Plaintiff is moving forward with a preliminary

injunction. Mr. Kwok is one of their witnesses. If Mr. Kwok isn't going to answer any questions, then, you know, we may have an issue. But we'll -- we'll see how it progresses.

And I understand the point that you raised, but what we're talking about -- with regard to any possible criminal referral, the Court hasn't taken any action. Okay? You -- you talked about the Trustee asking the Court to do something. All that has happened in this courtroom is with regard to any motions that have been filed in the main case and in the adversary proceeding --

INTERPRETER: I can --

THE COURT: -- and then, of course, obviously, the entry of the temporary restraining order. Okay? So where we are right now is whether are not they'll be a preliminary injunction. I understand what you've said, and I -- I -- well, I guess we'll have to see how things unfold as questioning occurs.

MR. WACHEN: Your Honor, it's my -- as I said, it's my understanding that the Trustee has spoken to the U.S. Trustee and the U.S. Marshall Service about this, and so I think on advice of his counsel, that that's what -- that's what he's going to do, unfortunately.

THE COURT: All right. Well, let's see how things unfold.

MR. FRIEDMAN: Your Honor, may I just ask a

question to the Court that I would ask the Court then to relay to opposing counsel as to which counsel has given that advise to Mr. Kwok?

THE COURT: Okay. That's a fair question, I think, Counsel, actually, because we -- as you know -- as you know, there's -- he -- Mr. Kwok has counsel in the main Chapter 11 case, and then you are in the adversary. And as I've said on many occasions in this courtroom, this -- this Court's job is just to look at the bankruptcy case in the adversary proceedings, correct? I mean, we're -- that's what this Court is here for. So I don't know from whom you've gotten that information, but it appears you're not appearing that advice to Mr. Kwok; someone else is; is that correct?

MR. WACHEN: My understanding is he's been advised by his criminal counsel.

THE COURT: Okay. And do we know who that is?

MR. WACHEN: It's Petrillo, Klein & Boxer.

THE COURT: Thank you. Because if you -- if you were here -- if -- if it -- if we were proceeding today, and you were instructing Mr. Kwok to invoke his Fifth Amendment right, then that would be clear from the record that it was your advice, you know? And that's the reason why we just need to make sure we understand where things stand today. Okay? Mr. Friedman?

MR. FRIEDMAN: Your Honor, I think this raises a

deeper question with respect to Petrillo, with respect to Mr. -- Wachen?

MR. WACHEN: Um-hum.

MR. FRIEDMAN: -- Wachen -- with respect to Mr. Mitchell, who's made an appearance in this case. Mr. Wachen, I guess has time. Mr. Mitchell never filed a 320 -- anything in connection with 329, although he entered an appearance back in May. We haven't heard anything from Mr. Petrillo under 329 or Bankruptcy Rule 2016, all of which obligate them to disclose the source of funding for their retentions.

I -- there's something troubling under the surface going on, and I think people need to comply with the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. If they are representing the Debtor, they have to tell us who's paying.

THE COURT: Well, with regard to Mr. Mitchell, I don't know Mr. Mitchell. You've just pointed to Ms. -- I presume, Mr. Mitchell, that's you. I don't know you, obviously. I've never seen you before, or if I have, I don't recall, and I apologize.

MR. FRIEDMAN: He's filed something on the record in this case --

THE COURT: Oh, I know that.

MR. FRIEDMAN: -- if you recall.

THE COURT: That I'm aware of. I'm --

MR. FRIEDMAN: And he says --

THE COURT: -- I'm aware of that. I'm aware that Mr. Mitchell filed a letter some time ago at the time that the Trustee was appoint -- excuse me, not that the Trustee was appointed, but that the motion was granted appointing the Trustee but before the Trustee was actually appointed. So I recognize Mr. Mitchell's name. Don't get me wrong. I -- I just -- I didn't know that was Mr. Mitchell until you -- you pointed him out in the courtroom.

So with regard to that issue that you've raised, Mr. Friedman, I agree. Mr. Mitchell has to disclose how he gets paid, just like Zeisler & Zeisler had to disclose how they got paid. Everyone has to -- even if -- you're not getting paid from the estate; we know that.

But the rules still require compliance with that, and so Mr. -- the U.S. Trustee's Office is usually the office that polices that issue. That's one of their jobs as a Department of Justice agency, to police who -- if counsel represents a Debtor who pays them, whether or not the Debtor is a Debtor in possession or not.

There was a recent case just came out the other day about these issues, not necessarily in the context of who got paid, but that a -- a lawyer for a Debtor out of possession cannot be paid from the estate. So you'll have to -- we'll have to talk to that about with the United States

Trustee's Office, and they're not here today. I -- I believe they're not here because they're not a party to this adversary proceeding.

MR. FRIEDMAN: Yeah, but --

THE COURT: So it would have to be addressed in the main case. But in any event, I think we need to proceed and see what happens. If Mr. Kwok asserts his right against his Fifth Amendment privilege, then we'll have to address that. That's all we can do.

So Counsel, you ready to proceed?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. We just need to swear in Mr. Kwok now.

COURT OFFICER: Do you solemnly swear (inaudible) -- sorry.

THE COURT: You need to say it just a little louder, too, because she's going to have to interpret it to Mr. Kwok.

COURT OFFICER: Oh, let me stand back here then.

THE COURT: Yeah, that'd be great. Thank you.

COURT OFFICER: Do you solemnly swear that the testimony that you're about to -- oh, I'm sorry. Should I do it piecemeal?

THE INTERPRETER: You don't -- no.

THE COUTROOM DEPUTY: Okay. Do you solemnly swear

that the testimony that you're about to give in these proceedings shall be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: Yes, I do.

COURT OFFICER: Thank you. State your name and address for the record.

THE INTERPRETER: He did not give a ZIP Code or a full address yet.

THE WITNESS: (Sealed). My name is Guo Wengui.

THE COURT: I'm not sure I understood what you said, but that's okay. Can you say it one more time?

THE INTERPRETER: Yes, I live in (Sealed). It's in (Sealed), and my name is Guo Wengui.

THE COURT: Okay. All right. Thank you.

All right. You can sit, sir.

THE WITNESS: Thank you.

THE COURT: Thank you.

THE WITNESS: Your Honor.

THE COURT: Okay. Go right ahead, Counsel.

MR. HARBACH: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. HARBACH:

Q. Mr. Kwok, do you understand the purpose of today's hearing?

A. Personal bankruptcy case.

Q. Do you understand the reason that we're having a hearing today?
A. Personal bankruptcy.
Q. Do you understand that in connection with that bankruptcy, PAX has filed a motion for a preliminary injunction?
A. Yes, I do.
Q. Do you know what a preliminary injunction is?
A. Yes, I do.
Q. Are you aware that this Court entered a temporary restraining order back in November?
A. I will take the Fifth.
Q. You would -- you would take the Fifth on the question -- the question I'm asking, sir, is whether you're aware that this Court entered a temporary restraining order in this case on November 23rd of this year.
A. I will take the Fifth.
Q. Do you understand that invoking the Fifth means that you believe that a truthful answer to the question might tend to incriminate you?
MR. HARBACH: Objection, Your Honor.
THE COURT: On what basis?
MR. HARBACH: Mr. -- Mr. Kwok is not a lawyer, and it calls for a legal conclusion.
THE COURT: Well, I don't -- I'm not sure I agree

with that in that -- in so far as you've -- not you but someone -- I'm sorry, and I don't recall the lawyer's firm name -- has instructed and advised Mr. Kwok to take the Fifth, so they would have had to instruct him what that means, so I think the question that's being asked is, does he understand what that means. And I think that's a valid question, so I'm going to overrule your objection.

THE WITNESS: I take the Fifth.

BY MR. HARBACH:

Q. Do you know what the Rule of Law Foundation is?

A. I take the Fifth.

Q. What is the Whistleblower Movement?

THE INTERPRETER: Allow me one more.

THE WITNESS: I take the Fifth.

MR. HARBACH: For the record, was that a correction of the translation of my question about the Rule of Law Foundation?

THE INTERPRETER: Yes, it is.

MR. HARBACH: Thank you.

THE INTERPRETER: And his answer is the same.

MR. HARBACH: Thank you.

BY MR. HARBACH:

Q. My next question was whether you know what the Whistleblower Movement is.

A. I take the Fifth.

Q. You've been sitting in the courtroom today, haven't you?
A. Yes.
Q. And you've seen the exhibits that I used with the preceding witness, correct?
A. Yes.
Q. Okay.
MR. HARBACH: Can we pull up PAX 8?
THE CLERK: PAX 8 is displaying.
THE COURT: And if I could --
MR. HARBACH: Madam Clerk --
THE COURT: -- bother you to make that a little bigger, again, please. Thank you.
BY MR. HARBACH:
Q. Mr. Kwok, can you see the exhibit on your screen?
A. Yes, I can.
Q. The person whose image appears in the circle on the first page of Exhibit 8 is you, isn't it?
A. I take the Fifth.
Q. Your name is Miles Guo, isn't it?
A. Yes.
Q. At one time, you -- you were the registered owner of the at miles handle, weren't you?
MR. WACHEN: Objection. Leading, Your Honor.
THE COURT: I'll overrule it. I'll allow it at

this point.

THE WITNESS: I take the Fifth.

MR. HARBACH: Your Honor, under the circumstances, I'll request a little latitude to ask leading questions in light of what, to this point, has been a pattern of invoking the Fifth, just so the record is clear on the topics as to which the witness refuses to answer a question.

THE COURT: I'll let you proceed, and I'll listen to any objections that might be made. Okay?

MR. HARBACH: Yes, Your Honor.

Can we pull up PAX 61, please? Actually, excuse me, Madam Clerk. I made a mistake. Can we please look at PAX 26-A?

THE CLERK: 26-A is displaying.

BY MR. HARBACH:

Q. 26-A appears to be a post from an account called Miles Guo Official. Do you see that there, sir?

A. Yes.

Q. And you'll notice in the -- in the English version, at least, the pronoun I is used three lines from the bottom, correct?

A. I don't understand your question.

Q. Do you understand what the first-person pronoun I means in English?

A. Yes, I understand the word I.

Q. Yeah, it means that the speaker is referring to him or herself, doesn't it?

A. My limited English proficiency prevents me from understanding such.

Q. You speak some English, don't you?

A. Yes, I do.

Q. When you use the word I, to whom are you referring? In normal speech.

A. I have extremely limited English proficiency. I do not wish to discuss with you about the use of English language.

Q. But your testimony is that you do know what the word I, for the record spelled I, means in English?

A. I understand the word I means -- I, me -- but I don't understand if there's any other meaning attached to I or --

Q. What about the word my, as if -- as if, in the example, I were to say, this is my pen?

MR. WACHEN: Objection, Your Honor.

THE COURT: On what basis?

MR. WACHEN: Vague.

THE COURT: I'll allow it. Objection overruled.

THE WITNESS: I wouldn't say that I'm 100 percent certain.

MR. HARBACH: Can you repeat the translation?

THE INTERPRETER: I would not say that I'm 100 percent certain.

MR. HARBACH: Okay. Can we look at 30-A, please?

THE CLERK: 30-A is displaying.

THE COURT: And if I could bother you again to make it a little bigger.

THE CLERK: Um-hum.

MR. HARBACH: Let's go for 200 on this one. It's got some small text. Thank you.

BY MR. HARBACH:

Q. Can you see Pax's 30-A on your screen, sir?

A. Yes, sir

Q. It is true, is it not, that you have an ongoing personal bankruptcy case?

A. I do not understand what you mean.

Q. Do you have a current ongoing personal bankruptcy case?

A. Yes.

Q. Did you have an ongoing personal bankruptcy case in July of this year?

A. Yes.

Q. The current Trustee in bankruptcy is from a law firm called Paul Hastings, LLP, correct?

A. I do not remember exactly the English name of it.

Q. Have you ever done any -- done, withdrawn.

Have you ever recorded or broadcast any content on the internet mentioning that the Trustee is from the Paul Hastings Law Firm?

A. I take the Fifth.

MR. HARBACH: Could we please look at PAX 61?

THE CLERK: PAX 61. PAX 61 is displaying.

MR. HARBACH: Can we make that 150? Thank you. Okay.

BY MR. HARBACH:

Q. On PAX 61 -- first question, can you see it okay?

A. Yes.

Q. The -- the person pictured in the circular photo at the center of the screen right now is you, isn't it?

A. I take Fifth.

Q. Your name is Miles Guo, correct?

A. Yes.

Q. Have you ever interacted with personnel at GETTR to verify your identity?

A. No.

MR. HARBACH: Could we --

THE INTERPRETER: Allow me, sir -- Mr. Guo wanted to ask a question. He wanted to clarify one more time whether it's Twitter or GETTR. You said GETTR. So let me repeat that one more time.

THE WITNESS: No, it's the same answer.

BY MR. HARBACH:
Q. How did you first learn about GETTR?
A. I do not use GETTR. This is a great waste of the time. The three exhibit you showed me, they're not my posts, and I do not use them. If you can trace the IP address or go to the data agency, you will find out, so this is a waste of time. I wanted to clarify it's not like I don't use it at all. It's, like, I'm not completely using. Like, the early, the one you posted in English, like, that's not me.
Q. So what do you use it for?
A. Posts on simple article.
Q. Under what handle?
A. Miles Guo. A lot of people use that.
Q. Okay. Well, I'm going to be -- make sure that we're being crystal clear about what I'm asking about. What I've underlined in green on PAX's 61 is what you heard a witness earlier today testify about is a handle. That is your handle, isn't it, sir?
A. Your -- your witness is a fraud because this is basic, common knowledge that the only thing that can prove authenticity is that the data regarding the IP address of this handle and information that you post, so I don't know where you find this witness, this fraud scientist.
Q. That's it? The question, sir, is at Miles Guo is your handle, isn't it?

A. It does not belong to me personally, exclusively. A lot of people have access to this.
Q. Does it belong to you at all?
A. It does not belong to me personally.
Q. You're aware of it, aren't you?
A. Yes.
Q. You monitor it, don't you?
A. No.
Q. How many times in your life have you filed a lawsuit for defamation?
A. I take the Fifth.
Q. On how many times you've filed a lawsuit for defamation?
A. I take the Fifth.
Q. It would be fair to say, would it not, that if someone were posting something under the handle at Miles Guo that you disagreed with, you would do something about it?
MR. WACHEN: Objection, Your Honor.
THE COURT: On what basis?
MR. WACHEN: Leading, again, and speculation.
THE COURT: I'm going to allow it. Objection's overruled.
THE INTERPRETER: Allow me. You want me to translate the objection from the Honor's part?
MS. WILKERSON: I'm asking the Interpreter to

interpret the objection, as well.

THE INTERPRETER: Oh, I'm so -- I'm sorry. We're having a little argument because the other counsel he object to this question, and you overruled that, so I only repeated the -- his question one more time. I did not translate the part that he object --

THE COURT: Okay. You can just do --

THE INTERPRETER: -- and you overrule.

THE COURT: You could translate the objection to say that --

THE INTERPRETER: Objection and overruled?

THE COURT: Your -- the objection you said, Counsel, was -- the basis again?

MR. WACHEN: Was leading and speculation, Your Honor.

THE COURT: Leading and speculative -- speculation. And then I -- then I overruled that.

THE WITNESS: Do I have to answer this question?

BY MR. HARBACH:

Q. Yes. Well -- correct. Withdrawn.

That's, actually, up to Her Honor, but the objection has been overruled, so ordinarily, that means that you should answer the question.

A. Here's the thing. For the last -- for the past five years, I've probably -- I probably was the individual

who's under most hacking and bully on the internet, and it was worldwide, and the Stanford University, Australia Government, U.S. Government, the DOJ has list me as dissident, and if you wanted to look under the name Miles Guo, you'll find hundreds, if not thousands, of account and name, and the only thing that prove -- can prove authenticity is data and IP address, and the screenshot you got is ridiculous, and your witness is a fraud.

THE INTERPRETER: Allow -- allow me to ask a question. Okay.

THE WITNESS: Here's the thing, like -- a lot of people have access to this handle, Miles Guo. About two days ago I tried to post article about this Trustee, Mr. Luc, and also another Trustee who I don't know the name but was -- is sitting right next to him about this article that they tried to blackmail me for 250 million U.S. dollars. I cannot post that on this account.

BY MR. HARBACH:

Q. What account did you attempt to post that on, sir?

A. Yes, this --

Q. The one that's --

A. -- this account.

Q. -- at Miles Guo.

A. I only know about Miles Guo. I don't know about anything else.

Q. What about at Miles?

A. I really don't remember clearly.

Q. At miles was a handle that you used at one time, wasn't it?

A. When you put at in front, I'm quite confused. I don't know. All I know is Miles Guo.

MR. HARBACH: Well, let's go back to PAX 8, please.

THE CLERK: PAX -- PAX 8 is displaying.

BY MR. HARBACH:

Q. The -- the picture in the circle on PAX 8 is the same as the picture that was on PAX 61 that we were just looking at, isn't it?

A. Yes.

Q. And this one has as a display name Miles Guo Official.

A. I do not understand English.

Q. Well, that's why we have a translator, sir. My question is, whether right underneath your photo it says Miles Guo Official.

MR. WACHEN: Objection, Your Honor.

THE COURT: Hold on one second. Don't answer yet, sir. I -- (inaudible). Okay.

MR. HARBACH: I'll with -- I'll withdraw, Your Honor.

THE COURT: Oh, you're going to withdraw the question?

MR. HARBACH: I'll rephrase.

THE COURT: Okay.

MR. HARBACH: That was inadvertent, Your Honor.

BY MR. HARBACH:

Q. Underneath the circular photo that appears on PAX 8, it is written Miles Guo Official. Do you see that there?

A. I do not understand the English in the latter part.

Q. Do you recognize your name, sir?

A. I do know Miles Guo.

Q. You see it written there on the page in English letters, do you not?

A. Miles Guo is my name.

Q. Do you see the words Miles Guo on this page? Are you able to read your own name in English?

A. Yes, I can.

Q. Underneath where it says Miles Guo Official, it says at Miles. You see that there, right?

A. Yes, I did.

Q. My question from earlier, that I'll repeat now, is whether at Miles was at one time your handle on the GETTR platform.

A. I did use this one. However, it was never my

personal account.
Q. When did you use it?
A. I don't remember.
Q. When did you stop using it?
A. I don't remember exactly when, but I have not used this account for really long.
Q. What does that mean, really long?
A. I don't remember.
Q. More than three years?
A. I don't remember.
Q. More than two weeks?
A. I don't remember.
Q. At the time you had the Miles -- you -- you used the Miles handle, that handle had many thousands of followers, did it not?
A. Yes.
Q. That's part of the reason you used GETTR is to communicate to lots of other people, right?
A. Yes.
Q. I mean, that's why you were seeking to post, as you just testified a moment ago, a poster of the Trustee in this case with an allegation about his having extorted you, right?
A. I take the Fifth.
Q. You said just a few minutes ago, did you not, that

you attempted to make a post about the Trustee and the fact that, in your view, he had extorted you, but were unable to. Isn't that what you testified to?

A. It's not, like, in my view he attempted to blackmail me. We meet over a meeting here. He already asked me for $250 million, and I already notified the police.

Q. That wasn't my question. My question was, a few minutes ago, didn't you testify that you attempted to post something about the Trustee in Bankruptcy and his extortion of you on a GETTR site, but you were unable to do so? Have I got that testimony correct?

A. Yes.

Q. And I believe you said that the handle was the at Miles Guo handle where you made that attempt.

A. I used other handle.

Q. What handle did you use?

A. The one belongs to Miles Guo.

Q. What is -- what is the -- the handle associated with that account?

A. I only know by the name Miles Guo.

Q. Is the handle for the account at Miles Guo?

A. I do not understand.

Q. When did you attempt to do that post?

A. About two or three days ago.

Q. At the time you attempted to make that post, were

you aware of the temporary restraining order that this Court had entered?

A. Yes. I do.

Q. And do you --

A. I didn't try to post any fraudulent rumors. What I tried to post was the fact -- the truth.

Q. And what exactly was it; was it a photograph, or a video, or was it just text that you typed?

A. It was a widespread report from the media.

Q. It was a -- a news article?

A. Yes.

Q. What -- what news outlet?

A. I don't remember.

Q. Did you use a telephone or a computer to make this attempt?

A. A friend was assisting me.

Q. Was it a phone or a computer that your friend was assisting you with?

A. I don't know.

Q. You don't know, or you don't remember?

A. I don't know.

Q. Were you --

MR. WACHEN: Your Honor, I'm -- I'm sorry to interrupt, counsel, but we would like to take a break to talk to our client.

THE COURT: Well you can't take a break, and go over the examination, counsel. So you'll have to wait until counsel's done with his examination.

BY MR. HARBACH:

Q. The -- the question that I'm trying to explore first is whether it was a photo -- whether it was a phone, or a computer that was used to make this post. And I believe you said you didn't know.

A. All I know is a friend was asking me there was a news article about I was extorted $250 million, and if he can post this -- this handle. And I said that this is a fact because I actually met Luc, and he did try to extort me $250 million, so -- but -- so he can post it if he wants to. And later he told me he cannot post it on his handle.

Q. Who is that person?

MR. WACHEN: Your Honor, I'd like to object to this whole line of inquiry. I'm not sure how this relates to their request for a preliminary injunction.

THE COURT: Okay. What's your response to that, counsel?

MR. HARBACH: About how this -- well, okay. Our -- our request for a preliminary injunction includes, among other things, the prospect that the witness has violated the temporary restraining order. Would certainly be germane to the issuance if -- if in the interim between entry

of the TRO, and your granting the PI, the witness were to have violated the temporary restraining order, it would not only expose him to contempt, but it would certainly be relevant to the Court's consideration about whether a preliminary junction remains warranted at this point.

So when the witness says that a few days ago, he attempted to post on GETTR information about the Trustee and extortion, which is plainly the subject of much of the harassment that the Trustee has endured, it's obviously germane what the details are of that transaction.

First he said that he tried to do it and wasn't able to. Now he's said that he got a friend to help him. And -- and furthermore, he's retreated to the friend, who was trying to help him, decided not to do it himself. And all I'm entitled to do is it's -- I think, respectfully, it's up to the Court -- it to explore what the circumstances are. That's what I'm trying to do. That's why it's relevant.

THE COURT: Thank you. Anything further, counsel?

MR. WACHEN: Yes, Your Honor. This may be relevant to their motion for contempt, but we're not hearing that motion today, and the issue of whether they are entitled to a preliminary injunction really has no basis on what happened with respect to the temporary restraining order. It's not one of the elements. We would maintain Mr. -- Mr. Kwok was not even represented at the hearing where the TRO

was imposed, and we would -- we are going to argue that it wasn't -- it should never have been entered to begin with as a violation of the First Amendment.

But we can deal with that issue of the contempt at another time. But for him to ask that now, I don't see how that demonstrates irreparable harm, likelihood of success on the merit of their claim, whatever it is. This is all just harassing the witness over something that has nothing to do with why we're here today. So I'd say it's irrelevant.

THE COURT: Okay. I disagree, and I'm going to overrule your objection, so continue your questioning, please.

BY MR. HARBACH:

Q. The -- the pending question was who was the friend who was helping you?

A. A Japanese name?

Q. What is the name?

THE INTERPRETER: He answered, as I heard, Kurado (phonetic), as you heard.

BY MR. HARBACH:

Q. Okay. Can you spell it for us?

A. I don't know how to spell it.

Q. Okay. How long have you known Kurado?

A. I don't remember.

Q. Well, you characterize him as a friend; is he

someone you've known for a few weeks, a few months, a few years?

THE INTERPRETER: Interpreter inquires for clarification.

THE WITNESS: We have millions of people who are -- join our whistleblower movement/revolution. We all call each other friends.

BY MR. HARBACH:

Q. So you --

A. In general.

Q. -- so you are part of the whistleblower movement?

A. Yes.

Q. And you know what it is, right?

A. We want to take down the Chinese Communist Party.

Q. Okay. I -- I'm only re-asking it because earlier in your testimony you invoked the Fifth Amendment when I asked you that question. So now I'm going to ask another one that I've asked before. What is the Rule of Law Foundation?

A. I take the Fifth.

Q. Did you start the whistleblower movement?

A. Take the Fifth.

Q. Do you know where your Japanese friend lives?

A. Probably in Japan.

Q. Well, were you speaking to him over the phone?

A. Yes.

Q. Who called whom?
A. I don't remember.
Q. Was it a cellphone that you were speaking on?
A. Burner phone.
Q. What's a burner phone?
A. You use it to make one phone call one time.
Q. That's what you understand a burner phone is?
A. Yes.
Q. And have you used burner phones before?
A. Many times.
Q. And so I understand your testimony, your testimony is that when you've used a burner phone, you've made one call on it and then never used it again?
A. Yes.
Q. How may burner phones would you say you've used in your life?
A. I don't remember.
Q. How many burner phones have you used in the last six months?
A. I don't remember.
Q. More than one?
A. Yes.
Q. More than 20?
A. I don't remember.
Q. Could we have PAX Exhibit 53, please? And while

that's coming up, I'll put this question to you: Why do you use burner phones?
A. Because I'm the Number 1 enemy of China's Communist Party. They try to assassinate me globally.
Q. And isn't it true that using a burner phone makes it very difficult for someone to trace the person using the phone, correct?
A. I take the Fifth.
Q. It's a way to stay anonymous, right?
A. I take the Fifth.
Q. What about your internet service; how do you use the internet?
A. I take the Fifth.
Q. Do you ask other people you're acquainted with or who work with you to make internet posts for you?
A. I take the Fifth.
Q. When was the last time you used a burner phone?
A. I don't remember.
Q. Within the last two weeks?
A. I don't remember.
Q. Well, you -- you said you used one just a few days ago to talk to your friend in Japan; do you remember that, or no?
A. I do remember that.
Q. How do you pay for the burner phones?

A. They were given to me by my fellow -- as a gift from my fellow revolutionists.

Q. Let's --

THE CLERK: Excuse me. 53 is on display.

MR. HARBACH: Thank you. Madame Clerk, could we scroll down on 53 until I ask you to stop. That's good. Right there.

BY MR. HARBACH:

Q. Now, Mr. -- Mr. Kwok, actually, forgive me. Could we scroll back up to the top first? All right. I'm going to start while we're looking at 53 here pointing out that this is a screenshot of at Miles Guo, correct?

A. Yes.

MR. HARBACH: Okay. So now I'm going to scroll down a little bit now. Okay. And you can stop right there. And could
you -- let's try making that maybe 200 percent? That's too big. Sorry. There we go. And now scroll up a little bit so we can see that -- that's good. Perfect.

BY MR. HARBACH:

Q. So this appears in the -- under the likes tab on the at Miles Guo page. Okay. And what's pictured here, among other this is -- are images of a man with a hammer and sickle on his forehead. Okay. I'm -- I'm not asking you to say his name, but I am asking you, you know who that is,

don't you?

A. I don't understand the question.

Q. You recognize the -- the man whose face has been emblazoned with a hammer and sickle on his forehead, don't you?

A. I take the Fifth.

Q. These are protesters that are part of the whistleblower movement who are pictured here with the blue and yellow umbrellas; are they not?

A. I take the Fifth.

MR. HARBACH: You can take that down, please. Let's pull up 66, please.

Actually, Your Honor, before we get to 66, may I request a brief recess? I have a technical issue.

THE COURT: Counsel agrees?

MR. WACHEN: Yes, Your Honor.

THE COURT: All right. How much time are you looking for?

MR. HARBACH: I really only need five minutes, and probably -- I'll request an instruction to counsel and the witness that, since he's on cross, he may not communicate with counsel about any substance of his testimony.

THE COURT: That's more than fair. I think that's appropriate. Obviously, I wasn't going to allow a break while the examination was still ongoing, so that instruction

would have to be made, counsel.

MR. FRIEDMAN: Just -- Your Honor, for the record, that's -- that's any counsel in --

THE COURT: Any counsel.

MR. FRIEDMAN: Thank you.

THE COURT: No counsel needs -- can talk to anyone while this -- during this break. It's a five minute break for technical issues. We're not having discussions about any of the testimony that has been -- has already occurred or will occur] or may occur. Okay? So that's the instruction to all parties.

MR. WACHEN: Your Honor --

THE COURT: So we're going to take a five minute break.

MR. HARBACH: Can we also use it as a bathroom break, Your Honor?

THE COURT: Yes. We'll take a five minute break. We'll be back at 1:45. Court is in recess.

(Off the record at 1:37 p.m.)

(On the record at 1:47 p.m.)

THE COURT: Please be seated. Okay. We just have to wait for Mr. Kwok's counsel to come back. Mr. Kwok, you can have a seat. You can seat --

THE WITNESS: Thank you, Your Honor.

THE COURT: Did anybody notice if counsel was out

in the hallway by any chance? I'm not suggesting that you should go back out, I was just asking if you noticed.

FEMALE VOICE: No. They weren't in the hallway, Your Honor. But I --

THE COURT: Okay.

FEMALE VOICE: You want me to take a look?

THE COURT: If you don't mind, yes. Thank you.

MR. WACHEN: I apologize, Your Honor.

THE COURT: That's okay. We're -- I just wanted -- we just -- we're ready to start, so we just wanted to get you back into the courtroom, okay?

MR. WACHEN: Yes. Thank you. And -- and I just wanted to ask Your Honor, would it be possible for me to confer with my client not about anything substantive that he's testified about, but to remind him, and to counsel him about his first -- Fifth Amendment rights.

THE COURT: Not at the moment, but you can after he's done on direct examination, okay?

MR. WACHEN: Thank you.

THE COURT: All right. Continue, counsel, please.

MR. HARBACH: Yes, Your Honor. Can we pull up PAX 50, please?

THE CLERK: PAX 50 is on display.

MR. HARBACH: Okay. Thank you.

THE COURT: I don't see it yet, but I'm -- I

assume it's coming.

MR. HARBACH: I see it.

THE COURT: It's not on my screen. Can you all see it?

MULTIPLE VOICES: Yes, Your Honor.

THE COURT: Okay. Well, then go -- I can't see it. I --

MR. FRIEDMAN: I think it's important that you see it.

THE COURT: I -- I presume it is, actually. I don't know why I can't see it.

FEMALE VOICE: (Inaudible).

THE COURT: Yes.

FEMALE VOICE: Maybe it's turned off.

THE COURT: The green button is on as though the power is there, so I don't know. Oh, here it is. It just came -- it just showed up. Okay. It's here. And it's at 150 percent resolution. Is that fine for everyone? Can everyone read it? Okay. So this is Exhibit 50?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. Go right ahead.

BY MR. HARBACH:

Q. Mr. -- Mr. Kwok, can you see Exhibit 50 on your screen?

A. Yes.

Q. This is a screenshot of a GETTR page with the handle at Miles Guo Live, do you see that there?
A. Yes.
Q. Are you familiar with this GETTR page?
A. No.
Q. This -- this GETTR page was opened with your permission, was it not?
A. I take the Fifth.
MR. HARBACH: Could I ask the translator to please translate these characters that I'm circling in green, which, for the record, appear directly under the handle at Miles Gou Live on PAX's 50.
THE INTERPRETER: Can I take a closer look?
MR. HARBACH: You -- you can. And if you needed to -- if you need it enlarged, we can make that happen.
THE INTERPRETER: Can I take a closer look?
MR. HARBACH: Sure. Can you -- Madame Clerk, can you please enlarge it. Is that better?
THE INTERPRETER: Yeah. That's better.
THE COURT: It's not circled any more. Do you know what you're looking at?
THE INTERPRETER: Yes. Yes, yes.
MR. HARBACH: So the request is that you please translate that to him.
THE INTERPRETER: This GETTR page is open with Mr.

Wengui's permission. It is called Wengui live information collection. It is -- it is to build a platform for Mr. Wengui and the revolutionists to communicate and to broadcast information. You can write your -- you may write your comments and your questions in the comments section.

THE COURT: Okay. But before you go, I -- I need to understand the name that you said in the middle of that. When you were saying it, I'm not sure if I understood what you said.

THE INTERPRETER: Yes. What I said is Mr. Wengui. It --

THE COURT: Can you spell that, please? In English? Just -- we need it for the record.

THE INTERPRETER: W-E-N-G-U-I.

THE COURT: Okay.

THE INTERPRETER: That -- that's the transliteration.

THE COURT: Thank you.

THE INTERPRETER: And this is --

THE COURT: Otherwise, we -- we don't have it for the records. No one will be able to understand what it means.

THE INTERPRETER: And this is Mr. Guo's given name. And his family name is Guo, so this mister use his first name as Mr. Wengui.

THE COURT: Okay. Thank you very much. I appreciate that. Go ahead, counsel. I'm sorry. I just -- I wanted to make sure I understood what it said.

MR. HARBACH: Not at all, Your Honor. Thank you.

You testified a moment ago --

MR. WACHEN: I -- I'm sorry to interrupt, counsel, but I thought he was going to ask a question about this. This is -- this document has not been admitted into evidence, and its hearsay, obviously, as well. So I'm -- I'm not sure what the point --

THE COURT: So it's not hearsay if it's Mr. Kwok's statement because he is a party, right?

MR. WACHEN: But that --

THE COURT: So it's an admission of a party if it's Mr. Kwok's statement, Number 1. Number 2, all that counsel has done at this point is ask the interpreter to interpret what that says -- what the -- and I should have asked the interpreter. Is that -- is that Mandarin or Chinese on that -- in that -- those symbols?

THE INTERPRETER: The symbol -- well, Mandarin is a dialect of Chinese --

THE COURT: Okay.

THE INTERPRETER: -- which is Mr. Guo and I were using, but the symbol's Chinese, yes.

THE COURT: The symbols are Chinese.

THE INTERPRETER: Yes.

THE COURT: Okay.

THE INTERPRETER: Yes.

THE COURT: Thank you. I -- all -- all she -- all the interpreter did was interpret what that says, so we just know what it says. So at this point, I don't think its hearsay, Number 1. And Number 2, he hasn't asked any questions, or offered it yet, so I'm going to let him do that.

MR. WACHEN: Okay. Thank you, Your Honor.

THE COURT: Thank you.

BY MR. HARBACH:

Q. Mr. Kwok, you testified a moment ago that you were aware of this -- this page, correct? Or, to be fair, you may have taken the Fifth. I honestly don't remember. So what is the answer?

A. I don't remember either. Can you repeat the question?

THE COURT: I hate to tell you that I believe Mr. Kwok took the Fifth when you asked if you were -- if he was familiar with this GETTR page.

MR. HARBACH: Thank you, Your Honor.

THE WITNESS: Thank you, Your Honor.

BY MR. HARBACH:

Q. Okay. Mr. Guo, isn't it true -- excuse me. Mr.

Kwok, isn't true that you approve what gets posted under this handle?

A. No.

Q. Isn't it true that you control the person or people who post under this handle?

A. No.

Q. You've never taken any action to stop any of the posts that are going out under your name with your picture, have you? And -- and excuse me if I'm -- if I may be clear, restricting my question to the at Miles Guo Live handle. I'm sorry.

MR. WACHEN: Objection, Your Honor. He -- I don't think it's been established that he posted under at Miles Guo Live. Or that it was --

THE COURT: I don't know that it has, or it hasn't, but I think the question is with regard to Exhibit 50, which the handle is at Miles Guo Live, so I think the question is fine.

THE INTERPRETER: The interpreter asks for clarification. Do you want me to ask the question, he never take action to stop the post on at Miles Guo Live?

MR. HARBACH: That is the question.

THE WITNESS: I take the Fifth.

BY MR. HARBACH:

Q. You never filed a lawsuit saying, hey, someone

else is using my name. Someone else is using my picture to say things that I don't want? You've never done anything like that?

A. I take the Fifth.

MR. HARBACH: Let's scroll down a little bit on past 50. You're going to have to adjust the -- yeah. Thank you. And just keep scrolling. I'll tell you when to stop. You can stop there for a moment.

THE CLERK: This is exhibit -- this is Document 50 displaying.

MR. HARBACH: Yeah. This is still Exhibit 50. We're somewhere down the page. It's a -- it's a lengthy post. Let's continue, please.

Okay. You can stop there. And scroll back a little bit. Actually, that's fine. Okay.

BY MR. HARBACH:

Q. Mr. Kwok, do you -- do you recognize -- well, let's get the record clean, first. We're still in PAX 50. We've paused the scrolling at a point where there's an entry that says Miles Guo Live, November 29. And then there's Grand Central written in English. Okay. And then there's a photograph underneath with a gentleman holding a placard with an image of the Trustee.

So the question for you, Mr. Kwok is you recognize the scene in that photograph that I've just described as

being Grand Central Terminal in New York City, right?

A. I take the Fifth.

Q. Were you -- you were aware, were you not, that there were protesters in Grand Central Terminal carrying placards like this on November 29th?

A. I take the Fifth.

MR. HARBACH: All right. PAX will offer PAX's 50, and you can take it down.

THE COURT: Counsel?

MR. WACHEN: I'm sorry?

THE COURT: Counsel's offered Exhibit 50 as a full exhibit.

MR. WACHEN: We object to that as being hearsay, and not -- not relevant. And -- and no foundation.

THE COURT: Okay. Tell me how it's hearsay, please?

MR. WACHEN: Well, it has not been established that Mr. Kwok had anything to do with this or that he made these statements. So in the absence of an exception under the hearsay rule for a party, it's somebody else making a statement that -- an out of court statement. And so --

THE COURT: Okay.

MR. HARBACH: Your Honor, I'd like to start with the proposition announced by the Second Circuit in Mullins versus City of New York, which is found at 626 Fed.3d 47.

It's a 2010 case that plainly stands for the proposition that hearsay is admissible in a district court in determining whether to grant a preliminary injunction.

I'll quote briefly from the opinion in two places. The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on procedures are less formal and evidence that is less complete than in a trial on the merits. Consistent with this -- excuse me. Consonant with this view, six of our sister circuits have permitted district courts to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction.

And then there's a recitation of the six sister circuits, and then, finally, the Second Circuit concludes that it agrees with those other appellate courts, holding as follows, we agree with these courts and conclude that hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight rather than preclusion as the preliminary injunction stage. To hold otherwise would be at odds of summary nature of the remedy, and would undermine the ability of courts to provide timely provisional relief.

So in -- it is PAX's view that -- that -- that hearsay is certainly admissible in this proceeding, and that

if a hearsay character of any particular evidence is established at all, it, at most, would enable Your Honor to give it whatever weight you think appropriate.

I'll also point out, however, that with respect to many of our exhibits, including several portions of this one, PAX's 50, we're not offering them for the truth of any assertion, so there is no hearsay issue.

Now, with respect to this particular one, I will acknowledge that -- that in the portion of the page that the translator translated from Chinese into English, there is an assertion that we are offering for the truth, namely that Mr. Wengui approved creation of the post, or gives permission for the post to be used, so just to be clear to that extent with respect to 50. I think it's all a nonevent in any case because hearsay's admissible.

Relevance is plain as day. I won't address it unless you'd like me to.

THE COURT: I don't -- I don't need you to address relevance at this time.

Counsel, have you -- do you understand the argument about -- that is made with regard to the Mullins versus the City of New York case?

MR. WACHEN: I heard what counsel said. I have not had an opportunity to look at that case right now. But I think we have a situation where we have a post that it hasn't

been established that -- thank you -- that the -- Mr. Kwok had anything to do with this post. And -- and it -- clearly we have no way to determine, or cross-examine whoever did to know anything about it. And so it's problematic in a number of respects.

And since he -- it's not connected to him, and the preliminary injunction is sought only against him, that's one of -- one of the reasons it's not relevant to this proceeding.

THE COURT: Well, with regard to the issue that you said that Mr. Kwok doesn't -- there is no connection, counsel asked questions about that of the witness, and the witness took the Fifth at -- took the Fifth, so I'm not sure that you can say there isn't any information about it. It's just there isn't any information that being able to be elicited from this witness at this time.

I'm -- I'm trying to see what page on the -- in -- in Mullins versus City of New York do you think stands for the proposition that you think hearsay is allowable? I'm -- I'm sorry. Yes?

MR. HARBACH: Bear with me, Your Honor. Does Your Honor have the opinion in front of her?

THE COURT: I'm looking at it now.

MR. HARBACH: Okay. So I'll -- I'll direct you to, if you follow the headings, it looks like it's -- there's

a heading that's called discussion, and then it says standard of review. It looks like the pin cite is 52. The Supreme Court quote that I mentioned straddles 51 and 52.

THE COURT: I see.

MR. HARBACH: And then --

THE COURT: So counsel, I'm -- I'm looking at this case right now, City of Mullins -- Mullins versus the City of New York. And it's a Second Circuit decision. I'm looking at the bottom of page -- I'm looking at what would be the West Reporter version. I don't know if that's what you printed out -- the book version.

But the bottom of Page 51 says the Supreme Court has observed the decision of whether to award preliminary injunctive relief is often based on procedures that are less formal and evidence that is less complete than a trial on the merits. And then it cites to the Supreme Court case of the University of Texas versus Camenisch. And it talks about six of our sister circuits have permitted district courts to rely on hearsay evidence for the limited purpose of determining whether to award a preliminary injunction.

MR. WACHEN: I -- Your Honor, I can see, in at least some cases, they're talking about affidavits, which -- that is not unusual. But here we're talking about a social media post that hasn't been -- it hasn't been established who put it up there, and it's obviously not under oath.

THE COURT: Well, it's been authenticated. Remember, we went through that this morning. It's been authenticated. I -- I understand your argument, but I -- I just want to be clear. It's been -- every one of these posts has been authenticated for purposes of admissibility, okay? So then the issue becomes, from my perspective, if I admit it as pole exhibit, what weight do I give it?

And this case, the Mullins versus City of New York case on Pages 51 to 52 seems to support the proposition that it should be admitted, and then the Court will give it whatever weight it determines is appropriate.

It's citing to a -- another Ninth Circuit case when it's talking about circuits finding that district courts can rely on hearsay evidence for the limited purposes of determining whether to award a preliminary injunction. The final say -- cite says the urgency -- or the -- the quote from the final case that's cited, Republic of the Philippines versus Marcos, a Ninth Circuit case, says the urgency of obtaining a preliminary injunction makes it difficult to obtain affidavits from persons who would be competent to test at trial -- testify at trial. The trial court may even give inadmissible evidence some weight.

I -- I think it -- it -- it's admissible. We've already discussed -- we've already established its authenticity. So the issue is, is whether or not I will

fully admit it and then give it weight.

They also -- the Second Circuit goes on to say additionally, although it is a question of first impression in this circuit, meaning in 2010, the lower courts routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief, and it cites to a case here from the District Court of Connecticut. In considering a motion for a preliminary injunction, the Court may rely on affidavits, depositions, and sworn testimony, even when they include hearsay.

So for those reasons, I'm going to overrule your objection, and admit the exhibit as a full exhibit, and give it whatever weight I deem appropriate under the circumstances of the case.

(PAX Exhibit 50 entered into evidence)

THE COURT: So you may continue, counsel.

MR. HARBACH: Thank you, Your Honor. While, we're at this juncture, I think it makes sense to offer some additional exhibits.

THE COURT: Go right ahead.

MR. HARBACH: Thank you. One of them is 8, which we've seen several times, starting with Mr. Napierala this morning. We will also offer 26-A, 30-A, 61, 53.

MR. WACHEN: And we have the same objections.

THE COURT: Okay. Thank you. Now 8, I know we've

looked at on several occasions today. Then the next is 26-A, did you say, counsel?

MR. HARBACH: Yes, Your Honor.

THE COURT: And we did look at 26-A as well.

MR. HARBACH: It's 26-A and 30-A were the first person singular pronouns exhibits.

THE COURT: I'm just looking back at my notes for a moment, please. Okay. And I see that we discussed -- you discussed with Mr. Kwok 30-A. And then we're looking for 53. And that -- okay. I -- I remember now looking at 53. We -- I just wanted to refresh my recollection.

MR. HARBACH: Yes, Your Honor. And there's also 61.

THE COURT: Yes. 8 and 61 you talked about together at one point, about the picture being the same on 8 as in 61.

MR. HARBACH: Correct.

THE COURT: Okay. And I understand that counsel for Mr. Kwok objects to the admission in full of Exhibits 8, 26-A, 30-A, 53, and 61 on the basis that they're hearsay, they're irrelevant, and it hasn't been established that Mr. Kwok created these documents.

Given the Court's review of the Second Circuit decision in Mullins versus the City of New York, 626 F.3d. 47, Second Circuit in 2010, and of the cites in that case at

Pages 51 and 52, including other circuits that have held, as this circuit, did that the procedures are less formal, and evidence that is less complete than in a trial, on the merits, may be admitted in a preliminary injunction context, including a District of Connecticut case, Southern District of New York -- Eastern District of New York case, excuse me. Southern District of New York case -- two -- and two Southern District of New York case -- cases.

So therefore the objection is overruled, and Exhibits 8 -- PAX Exhibit 8, PAX Exhibit 26-A, PAX Exhibit 30-A, PAX Exhibit 53, and PAX Exhibit 61 are admitted as full exhibits.

(PAX Exhibits 8, 26-A, 30-A, and 53 entered into evidence) (61 previously entered)

MR. HARBACH: Thank you, Your Honor. May I continue?

THE COURT: Yes, please.

MR. HARBACH: I would like to play now PAX Exhibit 46-B, as in bravo. It's a video, and I'll give you the timestamp that I'd like you to move the slider to, please, Madam Clerk. It's at the 8:33 mark.

THE COURT: Exhibit 46-A, did you say?

MR. HARBACH: No, Your Honor. 46-B.

THE COURT: Oh, B, I'm sorry.

THE CLERK: Exhibit 46-B is on display.

MR. HARBACH: At the 8:33 mark, please.

(Audio played)

THE COURT: I'm sorry. You're going to have to stop that for a second because I can't see it yet. I don't know why. Hold on a second. This might be working now. Hold on. Is everybody else seeing it, and I can't see it again?

MULTIPLE VOICES: No.

THE COURT: You can't see it either?

MR. HARBACH: No, Your Honor.

THE COURT: Okay. Okay. No -- no one can see it, right?

MR. HARBACH: Correct, Your Honor.

THE COURT: No one can see it, yeah? This keeps turning to red for whatever reason. I don't know why. Do you see that? It's turning to red because she's -- got it. Okay. So I'll just leave it alone. But I haven't seen anything yet, so I think she probably does need some help down there, Will. On the video because it's a video. It's not a -- okay.

THE CLERK: I think everything's in 8:33?

MR. HARBACH: Yes, ma'am.

THE CLERK: Okay. 46-B is this one.

MR. HARBACH: So could you please start it, and then I'll ask you to pause it, Madame Clerk.

(Audio played)

BY MR. HARBACH:

Q. Can you see the video on the screen that is PAX 46-B, Mr. Kwok?

A. I take the Fifth.

Q. On whether you can see it?

A. I take the Fifth.

Q. That -- that is you pictured there, isn't it?

A. I take Fifth.

Q. And you're shaking hands with Steve Bannon].

A. I take Fifth.

MR. HARBACH: For the record, we've paused PAX's 46-B at the 8:39 mark. We can resume playing, please.

(Audio playing)

MR. HARBACH: Pause it, please. Could you please translate what Mr. Bannon said for the witness?

THE INTERPRETER: I did not hear very clearly. Could you repeat that one more time? There was some background noise. Maybe one more time.

(Audio playing)

MR. HARBACH: Pause it, please. Could you please translate that for the witness?

BY MR. HARBACH:

Q. The question, sir, is Mr. Bannon was announcing that you were establishing a $100 million rule of law fund;

isn't that right?

A. I take the Fifth.

Q. Let's show PAX Exhibit 55, please. While we're waiting for that, when was the Rule of Law Foundation created?

A. I will take the Fifth.

Q. So for now, we'll wait for PAX 55.

THE COURT: Excuse me, Attorney Harbach. Attorney Harbach, did you say 55 or 58?

MR. HARBACH: I said 55.

THE CLERK: Okay. Thank you. 55 is on the screen. It's on display.

MR. HARBACH: Thank you. And for once, we need to make this a little smaller. Can you move it down to 75, please? Great. Thank you.

BY MR. HARBACH:

Q. Mr. Kwok, are you familiar with the book whose cover is pictured on PAX's 55?

A. I will take the Fifth.

Q. Is that a picture of you on the cover of this book?

A. I will take the Fifth.

Q. Do you know who Claudi Seagale (phonetic) is?

A. I will take the Fifth.

Q. Are you a revolutionary whistleblower?

A. I will take the Fifth.

Q. I'm going to represent to you that one paragraph in this book reads as follows -- and I'll read it slowly, and then the question is going to be whether you said this. From Page 90 of this book, Miles said, "I take legal responsibilities on what I have said here. I am only a donor to the fund."

MR. HARBACH: I'm going to read it in parts, okay, Shi?

THE INTERPRETER: Okay.

BY MR. HARBACH:

Q. "My first donation of $100 million has been transferred to the fund. By today, two-thirds of the cash deposits in the official accounts of the fund has come from Miles Kwok."

THE INTERPRETER: Can I ask for repetition after the cash deposit?

BY MR. HARBACH:

Q. "I am coordinating with my family funds now to donate another $1 billion."

THE INTERPRETER: Interpreter asked for repetition after two-third of the cash deposit. You said coordinated with the family funds to donate $1 billion? That's it?

MR. HARBACH: The sentence with two-thirds, I'll read it in full.

BY MR. HARBACH:

Q. "By today, two-thirds of the cash deposits in the official accounts of the fund has come from Miles Kwok. I am coordinating with my family funds now to donate another $1 billion. Without enough cash there, we will not be able to influence the decision-making process of the future executives commission. This is a reality." The question for you, Mr. Kwok, is whether it is accurate that you said that -- those things.

A. I will take Fifth.

Q. Do you know who the current president of the Rule of Law Foundation is?

A. I will take the Fifth.

Q. Does your family have an office on East 64th Street in Manhattan?

A. I will take the Fifth.

Q. Isn't the Rule of Law Foundation also located in that family office?

A. I take the Fifth.

MR. HARBACH: I neglected to offer PAX 55, which is the book cover that's up on the screen, Your Honor. I offer it now.

THE COURT: Counsel?

MR. HARBACH: Just so we're crystal clear about the offer, so there's no confusion, the offer is of a picture

of the cover of the book. We are not offering the book into evidence, only the portion that I quoted to ask Mr. Kwok my question.

THE COURT: Counsel?

MR. WACHEN: Yeah, Your Honor, I object both to the offer of the cover, which I think is irrelevant, and also to the -- counsel quoted -- purported to quote from the book. We don't have the book. So we don't know -- I'll accept his representation that he's reading from the book, but there's nothing really to offer because there's no exhibit with the language in the book.

And Mr. Kwok did not answer any questions regarding that. I think it's also irrelevant. So we object to both.

MR. HARBACH: On the question of relevance of the book cover, admittedly, the cover standing alone doesn't have a whole lot of relevance to what we're doing here today. But in connection with the quotation from the book and the witness' answer or, in fact, his invocation of the Fifth Amendment in response to my question, I think it's relevant for the record to demonstrate what book the quote came from.

As for my having accurately recited a quotation from the book, I'm happy to append to the record PAX's 55-A, which is a printout of the relevant page. And I'm happy to share it with counsel.

THE COURT: Yeah, I'd like you to pull up 55-A, please.

MR. HARBACH: Well, I'm sorry to say there is no 55-A.

THE COURT: Oh.

MR. HARBACH: I'm appending --

THE COURT: I see. That's fine.

MR. HARBACH: -- to it right now.

MR. WACHEN: Is it possible to -- I don't know if there's a way to project this or not.

MR. HARBACH: I can tender it to the Court.

MR. WACHEN: Let me just take a look. Yeah, thank you.

MR. HARBACH: Would you like to see it, Your Honor?

THE COURT: Yes, I would, please.

MR. HARBACH: For the record, I'm just going to put a red box on Government's 55-A around the portion that I read as part of my question.

MR. WACHEN: I'm assume you meant PAX 55-A.

MR. HARBACH: Did I just say Government?

THE COURT: Yes, you did.

MR. HARBACH: First time I've done it today. PAX 55.

THE COURT: If you would just hand that to the

courtroom deputy, please. Thank you. Okay. Thank you. I'm going to have you give that back to counsel. Thank you.

MR. HARBACH: So then we'll modify our offer to be 55 and 55-A, Your Honor.

THE COURT: Okay. Thank you. Counsel, you still have the same objection with regard to 55 and 55-A?

MR. WACHEN: 55 and 55-A, yes, Your Honor.

THE COURT: So you're asserting that these documents are irrelevant and hearsay?

MR. WACHEN: Well, I don't know about the cover, 55. I heard counsel say that he didn't even think it was relevant. So I'm not sure why we need the cover.

THE COURT: Well, he said it was -- it wouldn't be relevant unless he had referred to Page 90. I think that's what he said.

MR. WACHEN: Oh okay. Perhaps -- could be right. So I apologize. But yeah, I would say we object on relevance and hearsay grounds. It's not been established that Mr. Kwok said any of this. And it seems irrelevant --

THE COURT: Not established what?

MR. WACHEN: I beg your pardon?

THE COURT: He failed to establish what? That Mr. Kwok didn't say that?

MR. WACHEN: No, no, I'm sorry. No. If I said that, that's not what I meant.

THE COURT: Okay.

MR. WACHEN: He -- A, it's not -- I think most importantly, I don't see how it's relevant to what we're doing here today. I'll just leave it at that.

THE COURT: Okay. Thank you. All right. Taking into consideration the review of the cover of Exhibit 55 and then the 55-A that has been shown both to counsel for Mr. Kwok and to the Court and the other issues that I've already addressed with regard to the admission of documents today, including relevance, I do think that the Exhibit 55 and 55-A are relevant, and I will give them whatever weight I think is appropriate under the circumstances. So they are admitted as full exhibits.

MR. HARBACH: Thank you, Your Honor.

(PAX Exhibits 55 and 55-A entered into evidence)

THE COURT: Counsel's going to get it to us after the close -- after we're done with the hearing with a sticker on it so we'll have it, okay?

BY MR. HARBACH:

Q. Are you familiar, Mr. Kwok, with an entity called Himalaya Australia?

A. I will take the Fifth.

MR. HARBACH: Please bear with me for one moment, Your Honor.

THE INTERPRETER: Your Honor, interpreter wonder,

will there be a lunch break?

THE COURT: Well, it's quarter of 3:00. So it'd be a late lunch.

THE INTERPRETER: Yes, we have not --

THE COURT: Well, we're going to see how much longer counsel -- I agree. We'll take a break soon. But I want to see how much longer counsel may be with Mr. Kwok because that might be a better time to take a break.

THE INTERPRETER: Yeah, because the interpreter is working very hard.

THE COURT: I know. I appreciate that. We all are -- all of our stomachs are probably growling a little bit, okay? But we're going to continue for now.

Counsel, do you have any idea of how long -- I'm not asking you to be precise -- how much longer do you think you'll be with direct examination of Mr. Kwok? And if it's going to be a long time, maybe it's an appropriate time for a break. I'm asking you because I'm trying to understand, it being almost 10 of 3:00 now.

MR. HARBACH: Yes, Your Honor. I would say -- I would say about another hour.

THE COURT: About another hour. Okay. Well, if we -- there is no question pending at the moment, is there?

MR. HARBACH: No, Your Honor.

THE COURT: Okay. If we take a break right now,

then we are going to take a break that's -- we're going to all be back in here at 3:00. We have to keep going. This is going to be -- I don't even know if we're going to finish today. So why don't we -- with the same rules as when we took our previous break. Mr. Kwok is still on the stand. He's under oath. No lawyers -- any lawyers in the courtroom can talk to Mr. Kwok. We're going to take this short break, give everybody a little break, time to get a little something to maybe eat and drink. And then we're going to come back to the continued examination of Mr. Kwok. Does anybody have any questions about the fact that Mr. Kwok is still on the stand, under oath, and no discussions can be had with him regarding whatever testimony he has previously given or will give today? Anyone have any questions?

MR. WACHEN: And what about with respect to advising him on his Fifth Amendment rights?

THE COURT: Well, counsel, again, normally when you take a break, the discussions are supposed to be about how's the weather, not about the issues. You've already told me -- quite clearly, and I understand -- that Mr. Kwok has been advised about his Fifth Amendment rights. So I don't see any reason why there would be a need for any further advice to be provided to him on that subject.

But you do -- you -- you know, you act -- I'm not authorizing you to do that. You act in whatever way you feel

is appropriate, and whatever occurs occurs. But we're just taking a break. Okay? We're taking a break because it is 10 of 3:00. We've been here since 10 o'clock.

MR. WACHEN: Sure.

THE COURT: The interpreters are saying that they would like a break, and I want to provide them with the break. Okay? So we're going to take a -- Court will be in recess until 3:00 p.m.

COURT OFFICER: All rise.

(Off the record at 2:47 p.m.)

(On the record at 3:03 p.m.)

COURT OFFICER: All rise. Court is in session after recess.

THE COURT: Okay. We're back on the record after recess. Counsel, please proceed.

MR. WACHEN: Your Honor, can I raise one minor housekeeping issue --

THE COURT: Sure.

MR. WACHEN: -- and that is we've talked to co-counsel or the other side's counsel, and they've generously agreed to at least a 24-hour extension of our opposition to the motion for contempt, if that's okay with Your Honor.

THE COURT: Let me think back for a moment. Just give me a second.

MR. WACHEN: Sure.

THE COURT: So the motion for contempt -- oh, that was supposed to be -- was that supposed to be filed tomorrow?

MR. WACHEN: Tomorrow. Yes.

THE COURT: Okay. Sorry. Takes -- there's -- as I noted at the beginning of the day, there's a lot of pleadings that have been filed in both the main case and the adversary. So a consent to an extension till Wednesday at whatever time it was, 4:00 or 5:00 or whatever; is that right?

MR. WACHEN: Yes.

THE COURT: Okay. Okay. That's fine. Thank you.

MR. WACHEN: Thank you, Your Honor.

MR. HARBACH: While we're dealing with housekeeping, Your Honor, during the break, Mr. Napierala inquired about whether he might be released, and as far as PAX is concerned, he may be. I consulted briefly with Mr. Wachen about the issue during the break. But I don't know his position on that.

THE COURT: With regard to your first witness of the day?

MR. HARBACH: Yes, please.

THE COURT: So counsel, do you intend to call Mr. Napa -- is that who you're talking about?

MR. HARBACH: Napierala, yes, Your Honor.

THE COURT: Napierala?

MR. WACHEN: Your Honor, at this point, we're not in a position to agree that we won't call him. It appears that he's not going to be called today because it doesn't -- I don't know that we'll get to our case today. But --

THE COURT: Well, when direct examination of Mr. Kwok is completed, I assume you're going to cross-examine Mr. Kwok or -- okay?

MR. WACHEN: Possibly.

THE COURT: So are you saying that if I let Mr. Napierala leave today, you're going to want him to be back here tomorrow.

MR. WACHEN: Possibly.

THE COURT: So Mr. Napierala, I don't know if you -- I saw him back there somewhere. So sir, if you want to leave today and not attend the rest of this hearing, you're welcome to do that. But counsel for the Defendant may call you in the morning as a witness. So I don't know how you'd rather proceed. Do you want to wait and see if it happens today? Or do you want to come back tomorrow? That's up to you.

MR. NAPIERALA: I'll wait and see if it happens today.

THE COURT: Okay. Thank you.

MR. WACHEN: Thank you.

THE COURT: And just before you continue, counsel,

Mr. Napierala, you know, you can -- if you have something you have to do, if there's a conference room and things out there, if you need to use a room and make a phone call or something and come back in, whatever works for you. But there are rooms out there if you need to do something in the meantime to check with your office or something.

MR. NAPIERALA: Thank you, thank you.

THE COURT: Okay. All right. Thank you. So counsel, whenever you're ready to proceed, please -- are we -- we had not pulled up an exhibit at the time of the break. We were -- we had admitted Exhibits 55 and 55-A.

MR. HARBACH: I think that's right, Your Honor.

THE COURT: So please proceed whenever you're ready.

MR. HARBACH: Thank you, Your Honor.

BY MR. HARBACH:

Q. Mr. Guo, do you recall -- excuse me, Mr. Kwok, do you recall recording a video last night to be broadcast to your followers saying that you were going to be in meetings all day today?

A. Yes.

Q. And did you direct that that message be posted?

A. Yes.

Q. Which handle was it posted on?

A. Miles Guo.

Q. Did you post it yourself, or did somebody do it for you?

A. I did it myself.

Q. So you recorded the video of yourself and posted it yourself?

A. Yes. That is correct.

Q. Did you do that with a computer or a telephone?

A. Phone.

Q. Was it your phone or was it a burner phone?

A. Cell phone.

Q. Okay. Was it a burner phone?

A. Cell phone.

Q. Do you recall earlier today testifying about what a burner phone is?

A. Yes.

Q. Burner phones are cell phones, aren't they?

A. I don't know how to put those two together.

Q. Okay. Are the burner phones that you've used in the past cellular phones?

A. The phone is called a burner phone, I don't know if it's a kind of a cell phone or a cell phone.

Q. The cell phone that you used to record the video you posed on the @milesguo handle last night belongs to whom?

A. Me.

Q. What's the phone number?

A. I don't remember. My phone is hacked many times throughout the day. So I change phone numbers pretty frequently.

Q. Did you change phone numbers between last night and this morning?

A. No.

Q. So what was the number?

A. I don't remember.

Q. I'd like to show you a --

MR. HARBACH: Bear with me, Your Honor, please. Could we please pull up PAX 69?

THE CLERK: PAX 69 is on display.

BY MR. HARBACH:

Q. Who's depicted there, Mr. Kwok?

THE COURT: Hold on. I'm sorry. I don't have it.

MR. HARBACH: Okay.

THE COURT: I don't know why this keeps doing this. The green light is -- oh, here it is. It just populated. I don't know why it's taking so long. I'm sorry. I have it now.

MR. HARBACH: That's all right, Your Honor.

BY MR. HARBACH:

Q. The pending question to Mr. Kwok is, who is depicted there?

A. I will take Fifth.

Q. Can I see PAX 70, please? Before 70 comes up, I asked you who's depicted there. Let me ask this question. Do you recognize that person depicted in PAX 69?

A. I will take Fifth.

Q. Okay. Can we see PAX 70, please? Do you recognize the person depicted in PAX 70.

THE CLERK: Displaying PAX 70.

MR. HARBACH: Excuse me.

THE WITNESS: I will take Fifth.

MR. HARBACH: Could we see PAX 71, please?

THE CLERK: Document 71 is displaying.

BY MR. HARBACH:

Q. Do you recognize the woman depicted in PAX 71, sir?

A. I will take Fifth.

MR. HARBACH: PAX 72, please.

THE CLERK: PAX 72 is displaying.

BY MR. HARBACH:

Q. Do you recognize the man depicted in PAX 72?

A. I will take Fifth.

MR. HARBACH: PAX 73, please.

THE CLERK: PAX 73 is displaying.

BY MR. HARBACH:

Q. Do you recognize the woman depicted in PAX 73?

A. I will take Fifth.

MR. HARBACH: PAX 74, please.
THE CLERK: PAX 74 is displaying.
BY MR. HARBACH:
Q. Do you recognize the person depicted in PAX 74?
A. I will take Fifth.
MR. HARBACH: Okay. PAX 75, please.
THE CLERK: PAX 75 is displaying.
BY MR. HARBACH:
Q. Do you recognize the woman depicted in PAX 75?
A. I will take Fifth.
MR. HARBACH: Okay. PAX 76, please.
THE CLERK: PAX 76 is displaying.
BY MR. HARBACH:
Q. Do you recognize the man depicted in PAX 76, sir?
A. The Fifth.
MR. HARBACH: PAX 77, please.
THE CLERK: PAX 77 is on display.
BY MR. HARBACH:
Q. Do you recognize the man depicted in PAX 77?
A. The Fifth.
MR. HARBACH: PAX 79, please.
THE CLERK: PAX 79 is on display.
BY MR. HARBACH:
Q. Do you recognize the man depicted in PAX 79?
A. The Fifth.

MR. HARBACH: Okay. And now, PAX 57, please.

THE CLERK: PAX 57 is on display.

MR. HARBACH: Could you zoom in on that, please? A little bit more. There we go. Now scroll up so it's in the middle of the screen. Thanks a lot.

BY MR. HARBACH:

Q. Focusing on PAX 57, that is you standing at the center of the photo, isn't it, sir?

A. Yes.

MR. HARBACH: Your Honor, PAX offers PAX's 69 through 77, 79, and 57.

MR. WACHEN: Objection, Your Honor.

THE COURT: Go ahead, counsel.

MR. WACHEN: Yeah. These are just pictures of faces that have not been identified that Mr. Kwok hasn't testified about. And at this point, there's been no relevance established for these pictures.

MR. HARBACH: Your Honor?

THE COURT: Yes.

MR. HARBACH: Two responses. Number one, there will be additional evidence later today about several of these individuals participating in some of the harassing activity that is at issue in the case. Number two, Mr. Kwok's having invoked the Fifth Amendment as to each of the other individuals in the photo when asked simply whether he

recognized them arms Your Honor to draw an adverse inference about the significance of his admitting that he recognizes them.

So for both of those reasons, this is plainly relevant.

MR. WACHEN: Your Honor, I'm sure there are plenty of people that he recognizes or doesn't recognize. But that alone, whether he recognizes these people or not, we don't -- I don't even recognize them. So I don't know how, at this point -- I mean, if counsel has more to offer later on, we can obviously revisit it. But at this point, all he's shown is a bunch of faces without any indication who these people are and how they're in any way connected to the case or the motion.

MR. HARBACH: Your Honor, I'm happy to hold the offer in abeyance for a little while. It'll become quite clear.

THE COURT: All right. Then why don't we hold the offer in abeyance for a bit, and we'll go from there.

MR. HARBACH: But I just want to flag for the Court so Your Honor remembers 57. 57 is the photo with Mr. Kwok and all the people whose faces we just went through. I'd also like to offer 56 -- correction. I'd like to display 56, please.

THE CLERK: 56 is on display, PAX's 56.

BY MR. HARBACH:

Q. Question for you, Mr. Kwok, first of all, that's you wearing the black shirt and the glasses in this photo, correct?

A. Yes.

Q. And the other five individuals in this photo are individuals whose photographs we just saw a few moments ago, correct?

A. I will take the Fifth.

Q. Okay. Do you recognize any of the other five people in PAX 56?

A. I will take the Fifth.

Q. It looks like you're pretty friendly with them. Would you agree with that?

MR. WACHEN: Objection, Your Honor.

THE COURT: All right. Tell Mr. Kwok not to answer for a moment, okay? Go ahead, counsel.

MR. WACHEN: Yeah, it's argumentative.

THE COURT: Well, I'll just ask counsel to ask the question in a different way.

MR. HARBACH: Yes, Your Honor.

MR. WACHEN: Thank you, Your Honor.

BY MR. HARBACH:

Q. Mr. Kwok, everyone in PAX 56 has a smile on his or her face, right?

A. I will take the Fifth.
Q. On whether the people in PAX's 56 are smiling or not? You're taking the Fifth?
A. About all the people relevant here, I will take Fifth.
Q. Is that because you feel that a truthful answer to your connection with them would tend to incriminate you?
MR. WACHEN: Objection.
THE COURT: Don't answer yet, Mr. Kwok. Hold on. There's an objection. Okay? Go ahead, counsel.
MR. WACHEN: Your Honor, Mr. Kwok is not a lawyer, and it's -- calls for a legal conclusion. It's argumentative.
MR. HARBACH: I'll withdraw the question, Judge.
THE COURT: Okay. Thank you.
BY MR. HARBACH:
Q. Mr. Kwok, you have your arms around a couple of the people in PAX 56, don't you?
A. Yes.
Q. And the woman in the white sweater is holding a thumbs-up, right?
A. I will take the Fifth.
Q. Are these people your friends, sir?
A. I will take the Fifth.
Q. Are these people your colleagues?

A. I will take the Fifth.

Q. Are these people your subordinates?

A. I will take Fifth.

Q. Do you direct these people in what they do on your behalf?

A. I will take the Fifth.

Q. Are these people involved in the protests that have been occurring in front of the law firms and the homes of individuals connected with this case?

MR. WACHEN: Objection.

THE INTERPRETER: Allow me to answer (sic) the question first.

THE COURT: Don't answer the question yet. Go ahead.

MR. WACHEN: It assumes fact not in evidence. There's been no evidence about protests at this point.

MR. HARBACH: It's a question.

THE COURT: I think it's a question actually. I would agree with you if it was -- I think the only thing I heard, anyway, the only question I heard was are these people in the photo people that are involved in the protests. I think that's all that was asked. And I think Mr. Kwok can answer or not answer. But I don't think it's objectionable at this point, okay?

MR. WACHEN: Thank you.

THE COURT: Thank you.

THE WITNESS: I will take the Fifth.

MR. HARBACH: Could we have 56 up again for a moment? Correction, 57. Sorry. Thank you.

THE CLERK: PAX 57 is on display.

BY MR. HARBACH:

Q. With respect to PAX 57, to your knowledge, Mr. Kwok, are any of the individuals depicted here involved in any protests?

A. The Fifth.

MR. HARBACH: Could we see PAX 38, 38-D, please?

BY MR. HARBACH:

Q. Mr. Kwok, while we're waiting for that exhibit to come up, with respect to any of the people in PAX 56 or 57, do you pay them for their work?

A. I will take the Fifth.

Q. Have you paid them in connection with any protest work?

A. I will take the Fifth.

Q. PAX's 38-D is now on the screen. Could we please blow that up to 125? Thank you. Scroll down a little bit. Perfect. Looking at PAX 38-D, as in dog, there are two photographs in this still, Mr. Kwok. On the left, you appear in the center of that photo, don't you?

A. Yes.

Q. And the gentleman on the left side of the photo with black hair and a moustache wearing glasses, do you recognize that person?
A. I will take the Fifth.
Q. Where is this photo taken?
A. Fifth.
Q. Isn't it inside your apartment at the Sherry-Netherland Hotel?
A. Fifth.
Q. Were you all sharing a meal when this photo was taken?
A. The Fifth.
Q. There's some glasses on the table that look like they have red wine in them. Is that consistent with your memory of this occasion?
A. The Fifth.
Q. On the right-hand side of PAX 38-D, there's a woman wearing red. Do you recognize her?
A. The Fifth.
Q. Is she someone who works for you?
A. The Fifth.
Q. Do you pay her any salary or other money?
A. The Fifth.
Q. Do you direct her work in broadcasting videos like this one?

A. The Fifth.

MR. HARBACH: Okay. Let's see 38-E, as in echo, please.

THE CLERK: PAX 38-E is on display.

BY MR. HARBACH:

Q. Okay. Mr. Kwok, PAX 38-E is very similar to 38-D, except in this one, in the photograph on the left-hand side of the frame, there's a gentleman whose face I'm circling now who appears to your left in the photo. The question is do you recognize him?

A. Fifth.

MR. HARBACH: Okay. Now, can we please see PAX 41-C?

THE CLERK: PAX 41-C is on display.

BY MR. HARBACH:

Q. Taking a look at PAX 41-C, on the left-hand side of the frame, it's another photo of you and three other people sitting at the table with somebody -- it looks like maybe serving you. First question, that is you depicted on the left-hand side of the screen with your hand up in the air, correct?

A. Yes.

Q. The two gentlemen -- well, correction. The gentleman on the right-hand side of the screen wearing a black tee shirt with a white insignia on it, do you recognize

him?
A. The Fifth.
Q. Looks like he's wearing a similar shirt to this man, who is sitting on your right. Does that look like the same shirt to you?
A. I don't know.
Q. Do you recognize the man who's on your right in the picture?
A. The Fifth.
Q. What about the person standing with the mask on, do you recognize that person?
A. The Fifth.
Q. Is he someone who serves you in your home?
A. The Fifth.
Q. Where is this photo taken?
A. The Fifth.
Q. When was it taken?
A. The Fifth.
Q. The top right-hand part of the screen, which is the date and time stamp within the video says November 17, 2022 at -- it looks like maybe 1408 Eastern Standard Time. Does that date and time sound about right?
A. I don't know.
MR. HARBACH: Can I see 41-B, as in bravo, please?
THE CLERK: PAX 41-B is on display.

BY MR. HARBACH:

Q. 41-B is another still; the same people appear in this still as appeared in 41-Charlie, correct?

A. The Fifth.

Q. The bottom right-hand part of the screenshot says Fey Fey Show (phonetic). Do you know what Fey Fey Show is?

A. The Fifth.

Q. Is the woman at the microphone in the gray outfit immediately above where it says Fey Fey Show, is she Fey Fey?

A. The Fifth.

MR. HARBACH: Can we please see PAX 43, please?

MR. WACHEN: I don't have a 43. Is it 43-A or 43-B or C?

MR. HARBACH: My mistake. Thank you, counsel. There is a 43 -- hang on. Yeah. 43 was in Bucket 1, and what I'd like published, please, is 43-B. It's a video.

THE CLERK: 43-B is on display.

MR. HARBACH: And -- okay. 43-B, there should also be a video file associated with that, Madam Clerk. It had a different little icon. And that's what I'd like you to play, please.

While we're waiting for these technical issues, Your Honor, may I continue asking some questions?

THE COURT: Certainly.

BY MR. HARBACH:

Q. Mr. Kwok, have you directed the Rule of Law Foundation to pay individuals who have been protesting the last couple of weeks?

A. The Fifth.

Q. Have you informed comrades of yours and protestors that the Rule of Law Foundation would pay their legal fees if they got in trouble?

A. I will take the Fifth.

Q. Have you told individuals who have been protesting and comrades of yours that the Himalayan Alliance would pay for their legal fees if they encountered legal trouble?

A. The Fifth.

Q. Okay. So now, back to PAX 43-B.

THE CLERK: 43-B is on display.

MR. HARBACH: Could you please move the slider to 1:22:07 or thereabouts? Oh, you don't need to play it. A still is -- approximately 1:22:00, somewhere around there. There you go, that'll do. That's fine right there. A still is just fine.

BY MR. HARBACH:

Q. So for the record, we're now looking at PAX's 43-B as in boy, and it's a video, and the Clerk has paused the video at the 1:06:56 mark. And on the screen, there is a document on the left and two vertically arranged photos on the right. First question, the document that appears here on

the left is the temporary restraining order that this Court entered in this case on November 23rd, isn't it?

A. What was your question?

Q. The document that is on the left-hand side of the screen, do you see it?

A. Yes, I can see it.

Q. The question is, that document is the temporary restraining order that this Court issued in this case; isn't that right?

A. I can only read Chinese, not English.

Q. Okay. What does it say next to number one in Chinese characters?

THE INTERPRETER: Allow me to repeat.

THE WITNESS: You want me to read the Chinese to you?

MR. HARBACH: I do, and then I'm going to have this nice lady translate it for us.

THE WITNESS: Just the first one for now?

MR. HARBACH: Correct.

THE WITNESS: Prohibited to harass and send fraudulent information to employee at LUC, PAXI, PHE, and any relevant parties.

BY MR. HARBACH:

Q. The gentleman on the top right of the screen right now, do you recognize him?

A. The Fifth.

Q. That's the same guy we saw seated at table with you in PAX 38-D, isn't it?

A. The Fifth.

Q. It's also the same guy we saw seated at table with you in PAX 41-C, isn't it?

A. The Fifth.

MR. HARBACH: Okay. Madam Clerk, could you please just like move the slider on the video to the left, kind of toward the beginning, and I'll tell you when to stop? That's good right there. For the record, we've paused it here at -- the timer says -- I'm wondering whether the timer is right. Can you play the video just briefly, please?

(Audio played)

MR. HARBACH: Okay. So this is at -- in PAX 43-B, the 23:34 mark.

BY MR. HARBACH:

Q. And I just want to ask you, the folks on the right-hand side of the screen, the gentleman with the sunglasses on and the woman behind the microphone, those are the same people we saw in another part of the video, right?

A. The Fifth.

Q. Okay.

MR. HARBACH: Thank you, Madam Clerk. You can take down 43-B. I'd like to see 42 now, please.

THE CLERK: The video?

MR. HARBACH: It's a video.

THE CLERK: PAX 42 is on display.

MR. HARBACH: This one is a short one, so I'd like to just let it play. It's about a minute long, Your Honor.

THE COURT: Okay. Just give me one second. I don't know --

THE INTERPRETER: Does this one need translation? Do I need to translate the content of the video to him?

MR. HARBACH: That's up to him. But there isn't going to be a question about any of the content, other than the persons who are there.

THE COURT: My connection (inaudible) give me a second, okay?

MR. WACHEN: We don't have anything.

THE COURT: You're having trouble?

MR. HARBACH: May I have one moment, please, Your Honor, while we're waiting?

THE COURT: Yes. Okay. Don't do anything yet. Thank you. I have it now too. I don't know why this keeps -- seems to turn on and turn off. But it's on right now.

MR. HARBACH: Thank you, Your Honor. Let's play PAX 42, please, in its entirety.

(Audio played)

BY MR. HARBACH:

Q. Mr. Kwok, do you know where the MetLife building is in New York City?

A. I don't know.

Q. Do you know that that's where Paul Hastings' Law Firm's offices are located?

A. I don't know.

Q. You've never looked up where Mr. Despins's law firm is located?

A. No.

Q. Well, you know he works for Paul Hastings, right?

THE INTERPRETER: Interpreter will --

THE WITNESS: Who works for Paul Hastings?

BY MR. HARBACH:

Q. The Trustee in this case, Mr. Luc Despins, you know that he works for Paul Hastings, don't you?

A. The Fifth.

Q. Okay. So let's just resume the video, and I'm going to pause it.

(Audio played)

Q. Perfect. We've paused PAX's 42 at the 57-second mark. It depicts a man holding a placard, and the man's wearing a black ball cap and some glasses. Do you recognize that man, Mr. Kwok?

A. The Fifth.

Q. That's the older fellow who was depicted in PAX 38-E at a meal table with you, correct?

A. The Fifth.

MR. HARBACH: And can we pull up PAX 57, please?

THE CLERK: PAX 57 is on display.

BY MR. HARBACH:

Q. The man who we just saw at the 56-second mark in PAX 42 is the same man you have your arm around in PAX 57, isn't it?

A. The Fifth.

MR. HARBACH: Let's take a look at PAX -- actually, before we do that, at this point, Your Honor, I will reoffer PAX's 69 through 77, 79, 56, 57, 38-D, 38-E, 41-B, 41-C, 42, and 43-B, our view being that relevance has been amply established.

THE COURT: Counsel?

MR. WACHEN: We object. We respectfully disagree that relevance has been established on these. And there's also been no foundation for most, if not all, of these. So we object.

THE COURT: What foundation do you need? They've all been authenticated, right? So what's the foundation that you need here? He's asked Mr. Kwok questions about them. Mr. Kwok hasn't answered those questions, which is his right. I'm not suggesting anything to the contrary. But what

foundation do you need?

MR. WACHEN: My understanding -- and it's hard to keep track of all the numbers. But for example, the one that we have on the screen, I mean, it doesn't even appear to be from the internet. Maybe if it is, then we can talk about it. But it just appears to be a photograph of a bunch of people. There are other photographs with people where it's unclear where they came from. And if that was in Bucket Number 1, I'm happy to go back and cross-reference or if counsel wants to represent that it was, okay. But some of these pictures are just pictures. So it's hard to know what they are.

MR. HARBACH: Your Honor, I'm --

THE COURT: Go ahead, counsel. I'm just looking back at notes, but go ahead.

MR. HARBACH: I'm really not clear what additional foundation counsel is pushing for. As he rightly points out, they're photographs. Whether they're electronic photographs or a paper photograph that I handed up to a witness makes not a whit of difference.

I've asked the witness to look at the photographs. I've attempted to use the witness to identify all of the people in these photographs. He has admitted that he, himself, appears in many of these photographs, and there have been some video stills also. They are in a different

category, of course.

But we just showed a video of a protest going on outside of Paul Hastings' offices, depicting photographs of Paul Hastings lawyers. And one of the men holding the placard, we think, it's plain to see is the same as the man who's got -- excuse me -- who Mr. Kwok has his arm around in PAX 57.

You're the fact finder, Your Honor, and you would be well within your discretion to conclude that they're one in the same person, which makes this photograph, 57, acutely relevant.

Similarly, the gentleman with the glasses and the goatee that's depicted here in 57, who has also appeared at a dinner table on two -- correction -- a meal table on two separate occasions with Mr. Kwok, at least, is apparent commentator or host of a video in which the names and photographs of certain Paul Hastings lawyers were highlighted with red arrows and in which the temporary restraining order that Your Honor entered was being discussed.

So they do go together, it's true, but that doesn't make them somehow less relevant that they depend on each other. It actually makes the whole thing more relevant. It's what ties them all together.

And I'll just -- I know Your Honor knows this. But relevance is a pretty darn low bar. And if what we're

talking about here is attempting to establish, as is our burden in part, that Mr. Kwok is behind the antics that have gone on in this case, that's what these are being offered for. They're part of the circumstantial evidence that, in our view, plainly establishes that. I'm not going to descend into argument, but that's relevance.

THE COURT: Okay. Thank you. Any response, counsel?

MR. WACHEN: Well, I respectfully object to the use of the word "antics". I would say the only antics are happening on the other side of the room. But we will deal with that when we do get to argument.

It's not clear to me that the fellow with the blue jacket is the same person holding up the sign. But we don't know when this picture was taken. We don't know who took it. We don't know where it came from, and it's just hard to see how it, at this point, establishes anything. It's just a bunch of people posing for a photograph. Unclear who took it, where it taken, and when it was taken.

MR. HARBACH: None of that is foundational to the admissibility of a photograph. Identity of photographer? Time of -- that the photo was taken or location that it was taken.

If Mr. Kwok had testified that he knew all -- and he told us the names of all of these people and you were able

to conclude that any one of these named people participated in a protest, then I candidly cannot understand how identity of photographer, time, or place that it was taken is at all relevant. It's not. It's not foundational to the reason the photo is being offered. It's not foundational to any photograph being offered in evidence, particularly where the point isn't any of those things. It's not being offered to prove that it was taken at a certain time or that it was taken at a certain place. It's being offered to show the relationship among these people, which is manifestly a close one. That's why it's being offered.

MR. WACHEN: Your Honor, if the person in the blue jacket was Joe Biden, who happened to be walking through and posed for a photograph, would that be relevant? I mean, it's a photograph that was taken of unknown time. We don't know who these people are, and at this point, nothing's been established about anything, except that Mr. Kwok is in the photograph. That's the only thing, I think, that's been established. But I'm sure he's in many photographs that have no bearing on the preliminary injunction.

And whether people protesting are in any way related to Mr. Kwok, I would submit, doesn't have any bearing either on the preliminary injunction.

THE COURT: Okay. Anything further?

MR. HARBACH: No, Your Honor.

THE COURT: All right. Having now seen Exhibits 69 through 77, 79, 57, 56, 38-D, 38-E, 41-C, 41-B, 43-B, 42 -- and 42, I think that's the world -- what you're asking for right now, counsel; am I correct? Did I get all those exhibits right?

MR. HARBACH: 42 being the last one, yes, Your Honor, we're offering all of those into evidence.

THE COURT: Yes. Having reviewed those exhibits now, having understood the arguments of the parties with regard to those exhibits, the Court finds that they are relevant and will give those exhibits whatever weight the Court feels is appropriate under the circumstances of the case. So all of those exhibits are admitted in full.

(PAX Exhibits 69 through 77, 79, 57, 56, 38-D, 38-E, 43-B, and 42 entered into evidence) (41-C and 41-B previously entered)

MR. HARBACH: Thank you, Your Honor. The next one I'd like to look at is PAX 40-B, as in bravo. Yeah, excuse me, Madam Clerk --

THE INTERPRETER: Allow me one moment to repeat. Please go ahead.

THE COURT: Hold on one second. You're not projecting it yet, are you? Because I don't see it.

MR. HARBACH: No, Your Honor.

THE COURT: Okay. Thank you.

(Audio played)

THE COURT: Hold on a second. I've got it now. Got it.

THE CLERK: PAX's 40-B, as in boy, is on display.

MR. HARBACH: Thank you. For the moment, you can just leave the slider right there.

BY MR. HARBACH:

Q. This, Government's (sic) Exhibit 40-B, is a video that has a date stamp of November 24th, 2022. And up in the top left-hand corner, it says G News. Mr. Kwok, what's G News?

A. The Fifth.

Q. Is that an entity that you control?

A. The Fifth.

Q. Is that an entity that you founded?

A. The Fifth.

Q. Is that an entity that you fund?

A. The Fifth.

Q. The man on the right in this photo who's wearing the maroon jacket, do you recognize him?

A. The Fifth.

Q. What about the woman on the left in the white shirt, do you recognize her?

A. The Fifth.

MR. HARBACH: And if I haven't said this already,

just for the record, Government's -- excuse me, PAX's 40-B is paused at the 20-second mark.

BY MR. HARBACH:

Q. It's a little difficult to see, Mr. Kwok, but right here -- I've circled it on the screen -- there's a logo on the man's maroon jacket that has a script G and then it says G Fashion underneath that. Do you see that there?

A. The Fifth.

Q. What's G Fashion?

A. The Fifth.

Q. Is that a clothing line that you created?

A. The Fifth.

Q. Is it a clothing line or a business that you fund?

A. The Fifth.

Q. Does your son have anything to do with it?

A. The Fifth.

Q. Is G Fashion connected to G News or GETTR (phonetic) or G Coin?

A. The Fifth.

MR. HARBACH: Okay. Now, could you please move the slider to, say, about 1:50 -- 1 minute, 50 seconds, please? 1:50 -- yeah, your slider is not working. I see. Now, that's good enough right there. That's just fine.

(Audio played)

MR. HARBACH: Pause, please.

BY MR. HARBACH:
Q. The gentleman just referred to the NFSC. What is that?
A. The Fifth.
Q. Doesn't it stand for the New Federal State of China?
A. The Fifth.
Q. Isn't that a new alternative to the regime of the Chinese Communist Party that you, yourself, founded?
A. The Fifth.
Q. Isn't the date that you chose for the founding of the New Federal State of China the same date, June 4th, as the Tiananmen Square Massacre?
A. The Fifth.
Q. Do you recall shooting a video with Mr. Steve Bannon in New York Harbor in front of the Statue of Liberty, announcing the founding of the New Federal State of China?
A. The Fifth.
Q. The New Federal State of China has a flag, doesn't it?
A. The Fifth.
Q. It's a blue flag with yellow stars on it?
A. The Fifth.
MR. HARBACH: Okay. You can start playing the video, please.

(Audio played)
MR. HARBACH: Pause it.
BY MR. HARBACH:
Q. Now, according to the English translation of this part of the video, Mr. Kwok, the gentleman in the red coat is talking about how grateful he is to have a founder like you. Do you see that there?
A. The Fifth.
Q. You were the one and only founder of the New Federal State of China, right?
A. The Fifth.
Q. Okay. Let's take a look at PAX 44, please.
THE CLERK: PAX 44 is on display.
BY MR. HARBACH:
Q. Okay. Now, this one is a GETTR post that is from someone else besides you, admittedly. But what I'm interested in is the still shot that's there on the screen.
MR. HARBACH: So Madam Clerk, can you blow it up a little bit? Okay.
BY MR. HARBACH:
Q. Question one is, in the still shot that is captured on the post that is PAX's 44, there appear to be some people sitting around a table, and there's a man wearing all black with glasses between a man in red and a man in a black and white coat of some sort. And I've just put a green

arrow over his head. That's you, isn't it?

A. Here's the thing. There are a lot of fake videos, fake pictures, and fake audios of me created daily on the internet. The pictures you've shown me previously, I can see clearly those were my faces, so I can identify. However, in those -- in this one, particularly, it was too blurred for me to identify.

Q. What about a man who's seated here -- I've just put an arrow over his head -- with a white jacket and a black undershirt, do you recognize him?

A. No.

Q. Where was this video shot?

A. The Fifth.

Q. That's inside your apartment at the Sherry-Netherland, isn't it?

A. The Fifth.

Q. The post above, which I acknowledge does not appear to have been written by you, refers to someone called Seventh Brother. Who's that?

A. The Fifth.

MR. HARBACH: Madam Clerk, could you please scroll up?

BY MR. HARBACH:

Q. There's another person mentioned here in this post called the Little Prince. It says the Little Prince is real,

and it has a handle. It says Prince Lee. Do you know who the Little Prince is?

A. The Fifth.

MR. HARBACH: Could we go back to PAX's 40, which is the tab right to the left of there, Madam Clerk? Thank you. Oops. I meant 40-B. I'm sorry.

THE CLERK: PAX's 40-B is on display. Okay. PAX 40-B is on display.

MR. HARBACH: Thank you. And you can leave it paused right there. This is 40-B, as in boy, at the four-second mark.

BY MR. HARBACH:

Q. Mr. Kwok, isn't it true that the man on the right wearing the red G Fashion coat is, in fact, Little Prince?

A. The Fifth.

Q. Let's play PAX's 45. It's a video. And we're just going to play, I don't know, the first 30 seconds of it. While we're waiting for that, Mr. Kwok, we've heard today about --

(Audio played)

MR. HARBACH: Thank you, Madam Clerk. I'll finish this question.

BY MR. HARBACH:

Q. We've seen some evidence today and I've asked you some questions about G Fashion, GETTR, G News. Isn't it true

that the G in those things stands for your name, Guo?

A. The Fifth.

MR. HARBACH: Okay. Could we -- could you -- Madam Clerk, if you wouldn't mind rewinding this to the beginning and then just letting it play for, I don't know, about a minute?

THE CLERK: This is PAX's 45 on display.

MR. HARBACH: Thank you very much. Now, publishing PAX's 45.

(Audio played)

MR. HARBACH: You can stop it there.

BY MR. HARBACH:

Q. The man who's speaking there in the white coat and the glasses, that's the same guy we saw a moment ago in PAX 45 with the red jacket, correct?

A. The Fifth. The Fifth.

Q. I mean, that's Prince, right?

A. The Fifth.

Q. And that's also the same guy who is among the people depicted in the large group photo that was PAX's 57, right?

A. The Fifth.

MR. HARBACH: Okay. Now, I'll just point out for the record so that it's clear, if it's not entirely clear to Your Honor, that where we have Government's -- I'm sorry --

PAX's -- where we have PAX's 45 stopped right now is at the 56-second mark. There's a time stamp of November -- correction -- a date stamp of November 22nd, 2022, and at this moment in the video, there appear to be folks holding placards. One is -- says CCP's running dog and has a picture of me with a hammer and sickle on my forehead.

The next one is CCP -- and next one to the right of that -- is a picture of CCP's running dog. That one has a photograph of the chairman of the O'Melveny firm with a hammer and sickle on his forehead. And then just to the right of the man in the center of the screen with the white coat on, there's another placard with my colleague Stuart Sarnoff's face, with a hammer and sickle emblazoned on his forehead.

The next placard over says Luc Despins makes the 2022 A list scumbags, and then finally, on the right, a man holding a placard that says your dad's hands are stained with my dad's blood in Chinese Gulag. That's it for 45.

And I misspoke a moment ago. So I'm going to put another question to Mr. Kwok.

BY MR. HARBACH:

Q. Isn't it true that the man we saw in the center of PAX's 45 wearing the white coat is the same as the young man in the red coat on the right side of PAX's 40-B, as in bravo? That is the question.

THE INTERPRETER: Interpreter has only one question. What is your colleague's name, one more time, in white coat? Like he was holding the guy in white coat was holding a placard. What was your colleague's name one more time? That's the only thing I missed.

MR. HARBACH: Well, there are multiple colleagues of mine involved in that exhibit.

THE INTERPRETER: I'll just summarize.

THE WITNESS: I will take the Fifth.

MR. HARBACH: Next, I'd like to offer -- correction -- display PAX's 67, please.

THE CLERK: PAX 67 is on display.

BY MR. HARBACH:

Q. Do you recognize either of the people depicted in PAX's 67?

A. The Fifth.

Q. These two are both wearing G Fashion, aren't they?

A. The Fifth.

Q. The guy on the left in the red, that's Little Prince, isn't it?

A. The Fifth.

MR. HARBACH: Could we please see PAX's 68?

THE CLERK: PAX's 68 is on display.

BY MR. HARBACH:

Q. In PAX's 68, there are three people depicted. Do

you recognize any of these three individuals, Mr. Kwok?

A. The Fifth.

Q. The person on the right is Little Prince, isn't it?

A. The Fifth.

Q. The man in the center is wearing some G Fashion also, isn't he?

A. The Fifth.

Q. And that guy's name is Elliot Dordick, D-O-R-D-I-C-K, isn't it?

A. The Fifth.

Q. All right.

MR. HARBACH: Now, Your Honor, I'd like to make another proffer at this point. And that is to offer PAX's 40-B, 44, 45, 67, and 68. Now, I'd like to explain for a moment about the significance of 67 and 68.

THE COURT: All right. Before you go any further, let me make sure -- I think I might have missed one.

MR. HARBACH: Okay.

THE COURT: 40-B. Is the next one 44?

MR. HARBACH: Yes, ma'am.

THE COURT: 45?

MR. HARBACH: Yes.

THE COURT: 67 and 68?

MR. HARBACH: Correct.

THE COURT: Okay. Good. I just want to make sure I'm following you. So go right ahead.

MR. HARBACH: Your Honor, for 67 and 68, a little bit of explanation is in order. 68, which is still up for publication, appears elsewhere in the record, and I'm going to explain it, and hopefully Your Honor can review the exhibit herself.

But the screenshot or the still that is PAX's 68 appears in ECF 1133, Exhibit C, as in Charlie. Now, ECF 1133 was the Trustee's declaration that was filed on November -- I believe it was the 21st of this year, Your Honor. Oh, thank you. It's a statement, not a declaration.

THE COURT: Okay.

MR. HARBACH: And --

THE COURT: Oh yes. Okay. I think I know what you're referring to. The statement that says something about the social media campaign? That's the title of the document?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay.

MR. HARBACH: That -- that filing has exhibits appended to it, which are sealed. And when Your Honor sees them, you'll recall why they're sealed. But the reason why we were offering 67 and 68 at this stage is because 68 is a part of a screen capture that appears in 1133, Exhibit C. And 67 -- if we could have 67 back on the screen, please.

And --

THE CLERK: 67 is on display.

MR. HARBACH: Okay. 67 is part of Exhibit B, as in bravo, to ECF Number 1133. So without going into too much detail now to avoid additional sealing concerns, suffice it to say that that is the relevance of these two photographs. It was our hope that Mr. Kwok would identify these individuals, but you heard him. He's invoked the Fifth as to anything having to do with these people, including what they're wearing.

So -- but that's the proffer of relevance for 67 and 68. 40-B, 44, and 45 all tie together. 45, as Your Honor heard, was a gentleman I've been referring to in my questions, at least, as Little Prince, standing in front of -- by his own admission in English, O'Melveny's offices in New York City, conducting a protest in front of defamatory placards of me and my colleagues. So that's our proffer of relevance.

THE COURT: Counsel?

MR. WACHEN: Your Honor, I'm assuming ECF 1133 is in the --

THE COURT: It's in the main case.

MR. WACHEN: -- in the main case. So I'm not sure why that would necessarily make it relevant in this case.

THE COURT: Well, the point is is that some of the

information in that document in the main case is already under seal.

MR. WACHEN: Okay. But how does that establish the relevance for this case?

MR. HARBACH: Your Honor, may I have a moment --

THE COURT: Because it's all about the social media issues that occurred in connection with seeking a temporary restraining order. It wasn't filed in the adversary proceeding. But it was filed in the main case by the Chapter 11 Trustee.

MR. WACHEN: I'm not sure that we've seen it, Your Honor.

THE COURT: You may not have, but it's filed in the main case.

MR. BASSETT: Nick Bassett from Paul Hastings on behalf of the Chapter 11 Trustee. As the Court will recall, at the TRO hearing, we actually did have all the exhibits -- I think it was A through G -- attached to the statement admitted into evidence.

THE COURT: So the documents that were filed under seal were admitted in full as sealed or unsealed? I don't recall.

MR. BASSETT: I believe it was all sealed, Your Honor.

THE COURT: All sealed. Okay.

MR. WACHEN: That was an ex parte proceeding.

THE COURT: Well, no, it wasn't an ex parte proceeding. That -- I don't think that's an accurate statement for the record, actually. The service was made. That was all established at the temporary restraining order. In fact, hearing -- in fact, there were -- if you look at the temporary restraining order, there are findings by this Court about service with regard to the application for temporary restraining order.

And counsel in the main case, although I know they don't represent Mr. Kwok in the adversary proceeding, were served with the application for a temporary restraining order, as was Mr. Kwok at two addresses, both in Greenwich and New Haven. And there were Federal Express receipts that established that service.

So I agree that no one appeared on behalf of the Defendant in this adversary proceeding. But I don't think it's accurate to describe that proceeding as an ex parte proceeding.

MR. WACHEN: Your Honor, I'm not familiar with the details of when the service occurred and how much notice they were given.

THE COURT: I understand. But unfortunately, whether you're familiar with them or not, you're bound by them. I mean, you know, whatever happened, happened, right?

MR. WACHEN: Sure. Yes, Your Honor.

THE COURT: Okay.

MR. WACHEN: Okay. But he was not represented at the hearings.

THE COURT: No one -- let me point it in the affirmative. I agree with you that he was not represented by a lawyer during the temporary restraining order that was defending him in connection with the temporary restraining order.

However, his Chapter 11 case counsel was here and sat through the entire temporary restraining order hearing and made a statement on the record about the temporary restraining order and -- I can't remember everything that was said, but you can order a transcript. It was part of that record.

MR. WACHEN: Thank you. And Mr. Kwok, it's my understanding, was not there either.

THE COURT: Mr. Kwok was not here. That is correct. At least, I didn't see him.

MR. WACHEN: That's my understanding. So I think we would object to the admission, at this time, of 67 and 68. And also 44, Your Honor. 44 is the post by Win Yung. There's a picture, and it's not clear to me what the relevance is of that, a picture from October of 2022. So we would -- we don't object to the other two this time. But we

do object --

THE COURT: You don't object to 40-B and 44?

MR. WACHEN: No, 44 I do -- that's the one I just --

THE COURT: All right. So tell me -- I apologize. What exhibits that PAX has just offered into evidence in full do you not object to?

MR. WACHEN: I think we would not object to 40b-B.

THE COURT: Okay.

MR. WACHEN: We would object to 44.

THE COURT: Okay.

MR. WACHEN: I think we would not object to 45.

THE COURT: Okay.

MR. WACHEN: And we would object to 67 and 68.

THE COURT: Okay. Thank you. Then with regard to 40-B and 45, those exhibits are admitted as full into evidence.

(PAX Exhibits 40-B and 45 entered into evidence)

THE COURT: No objection has been asserted on behalf of the Defendant. And the Court will take those into consideration and give those exhibits whatever weight the Court deems appropriate.

With regard to Exhibits 44, 67, and 68, I've heard the objection -- I've heard the proper of why PAX is seeking to have those documents admitted in full, and I've heard the

objection of counsel for the Defendant. And the Court finds that Exhibits 45 -- excuse me -- 44, 67, and 68 are relevant and are admitted in full. So counsel you may proceed.

(PAX Exhibits 44, 67, and 68 entered into evidence)

MR. HARBACH: Thank you, Your Honor. I'd like to return to PAX Exhibit 38, please.

THE COURT: 38-E?

MR. HARBACH: Just 38.

THE COURT: All right. Because right now, if I am correct in my notes, 38-D and E are admitted as full exhibits, but I don't see any other parts that have been offered of 38 at this point. Is that correct?

MR. HARBACH: You're exactly right.

THE COURT: Okay. But you would like the -- the courtroom deputy to pull up Exhibit 38?

MR. HARBACH: That is correct.

THE COURT: Okay. Thank you.

MR. WACHEN: We don't see a -- is there an Exhibit 38?

MR. HARBACH: There is indeed. It is a video. No. No. Just a moment. Let me make sure.

THE COURT: Just give everybody a second. We'll catch -- everybody will catch up.

THE INTERPRETER: Your Honor, this is the interpreter speaking. Do you mind if I use the bathroom real

quick. I drank too much water.

THE COURT: We'll take a -- I'm not going to move. How about that? Okay. So you go ahead. We'll take a recess for two minutes. Go ahead. And I'm going to stay right here. Okay. Because it's 10 of 5:00 as it is, and we have to continue.

MR. WACHEN: May I -- may I as well, Your Honor?

THE COURT: Yes. The Court is in recess for two minutes.

(Off the record at 4:49 p.m.)

(On the record at 4:56 p.m.)

THE COURT: All right. We're back on the record after recess. Go right ahead, counsel. I think you were asking for Exhibit 38-B. Is that correct?

MR. HARBACH: I changed my mind.

THE COURT: Oh, I'm sorry.

MR. HARBACH: And we're going to start with 38-A, Your Honor.

THE COURT: 38-A.

BY MR. HARBACH:

Q. And so this is a still shot of a YouTube page that contains embedded video. And the -- the caption reads, 2022.11.21 Guo lectures on how to escape subpoenas. In this still, Mr. Kwok, on the left-hand side, that's you in the center of the picture, isn't it?

A. Fifth.

Q. This is the same meal scene that we saw earlier in another exhibit with the glasses of red wine on the table. Isn't that right?

A. The Fifth.

Q. I'd like to play 38-B now, please, which is the embedded video.

MR. HARBACH: And for the record, this one is in Chinese, but it has English subtitles. And then, in addition, I'll identify for Your Honor that PAX's 38-C is a translation prepared by TransPerfect of the Chinese in this video.

THE CLERK: PAX's 38-B is on --

MR. HARBACH: Okay. Could you just hold for a moment to allow the translator to catch up.

THE WITNESS: Go ahead.

MR. HARBACH: Okay. So -- yes, please. Pause it, please. Go back just two seconds.

(Audio played)

MR. HARBACH: Right there.

BY MR. HARBACH:

Q. In the subtitles that appear at the bottom, a name appears Shan Weijian, who's that?

A. The Fifth.

Q. You're invoking the Fifth Amendment on who Shan

Weijian is?

A. Yes. The Fifth. I will repeat. Yes. The Fifth.

Q. Thank you. Isn't it true that Mr. Shan Weijian is the chairmen of Pacific Alliance Group?

A. The Fifth.

MR. HARBACH: All right. Can resume playing, please.

(Audio played)

MR. HARBACH: Pause it. Go back maybe two seconds. Boom. Perfect.

BY MR. HARBACH:

Q. The name, Jiao Bing Shang appears in the subtitles now. Who's that?

A. The Fifth.

MR. HARBACH: Okay. Let's just play the video then, please.

(Audio played)

MR. HARBACH: Pause.

BY MR. HARBACH:

Q. When you said, Fey Fey there, you were referring to the woman in the red on the right-hand side of the screen, right?

A. The Fifth.

Q. And after you told her that her name's been included on subpoenas, she appears to laugh, correct?

A. The Fifth.
MR. HARBACH: Okay. Keep playing.
(Audio played)
MR. HARBACH: Pause.
BY MR. HARBACH:
Q. What is the alliance that you referred to there that your counseling people who were too stupid to avoid service of a subpoena to come for help?
A. The Fifth.
MR. HARBACH: All right. Keep going.
(Audio played)
MR. HARBACH: Pause.
BY MR. HARBACH:
Q. You just said that the Alliance will hire you a lawyer, the Rule of Law Foundation will hire you a lawyer. Isn't it true that this is you, sir, promising on behalf of the Alliance and the Rule of Law Foundation to pay for any legal expenses associated with comrades receiving subpoenas?
A. The Fifth.
Q. You wouldn't make that promise to your comrades if you couldn't deliver on it, would you?
A. The Fifth.
Q. You weren't lying to your comrades, were you?
A. The Fifth.
Q. By the way, the folks who have been protesting

outside O'Melveny's offices, outside Mr. Sarnoff's home as of yesterday, outside Paul Hastings offices, outside the Trustee's home, you consider those folks your comrades in arms, don't you?

A. The Fifth.

Q. I'm sorry. What was the answer?

A. The Fifth. Would you like me to repeat one more time? I would take the Fifth.

Q. Thank you very much.

MR. HARBACH: I'm going to tender to the witness ECF Number 58 in the adversary case, which is Mr. Kwok's objection filed on December 2nd. And Your Honor, it might be helpful --

THE COURT: If we can all look at it at the same time.

MR. HARBACH: Yes, Your Honor.

THE COURT: All right. I'll have to ask if we can pull up ECF 58 in this adversary proceeding, please.

MR. HARBACH: Okay. And could you please go to Page 5?

THE CLERK: Okay. ECF 58 is on display.

BY MR. HARBACH:

Q. All right. Mr. Kwok, can you see the screen?

A. Yes, I can.

THE COURT: Could you make that just a little

bigger for me please. I'm sorry. I can't see it -- there you go. Okay. Thank you.

BY MR. HARBACH:

Q. Now, Mr. Kwok, as I mentioned a moment ago, this is a brief that you filed on December 2nd.

A. I do not understand English.

Q. I know that. And I'm going to use the interpreter to help you. Can I ask if -- actually, you know what, I'll give the interpreter the paper copy.

MR. HARBACH: So the sentence that I'm going to read into the record and ask the interpreter to translate for Mr. Kwok is the last sentence on the page that says, and while Mr. Kwok agreed that the Trustee's actions were outrageous, he did not participate in those protests, and in fact, on November 20, issued the following statement that was disseminated on Twitter.

THE INTERPRETER: I will repeat Twitter. No.

THE CLERK: We did not -- I don't think it's picking up the interpreter reading. I don't know if that --

THE INTERPRETER: Oh, I read that in Mandarin to him.

THE COURT: Yeah. That's okay. You didn't have to pick that up.

THE INTERPRETER: And allow me to explain. Mr. Guo stressed to me the one word Twitter, and he said, no.

BY MR. HARBACH:

Q. Okay. Well, let's look at what, according to the brief, was Mr. Kwok's statement, which is on the next page. Take a look at that, sir. Again, from your brief. And tell me if that is a video that you made that was disseminated on Twitter.

A. Yes. The person in the photo is me. But I've never posted anything on Twitter.

Q. Ah, I think there's a misunderstanding. The brief doesn't say that Mr. Kwok posted it. The brief just says it was posted on Twitter. So I want to make sure he understands that we're not suggesting that his brief said he posted because it doesn't.

A. What is the question then?

Q. The question then is, is the description that is listed here of the video accurate? Read the Chinese characters to yourself and tell us if it accurate. Is that an accurate description of what was in the video?

A. Yes. It is.

THE INTERPRETER: Do you want me to translate what he read in Chinese, because you asked another question before he --

MR. HARBACH: Sure.

THE INTERPRETER: Allow me. Mr. Guo states that he just -- he did not make any comments regarding the content

in the video. He only comment on the two Chinese character sentence that you ask him to read, which says that, Mr. Guo's statement regarding the comrades' incoming protests against PAG cases is the following, Mr. Guo strongly -- Mr. Guo is strongly against and nor does he support anyone who would join this protest. And Mr. Guo just said that he approved this message. He did say that.

MR. HARBACH: Okay.

BY MR. HARBACH:

Q. Here's my question. It's true, is it not, that you regard individuals participating in protests as your comrades in arms? Because that's what this post says.

THE INTERPRETER: Could you repeat that one more time.

BY MR. HARBACH:

Q. It's true, is it not, that you regard individuals who are protesting the PAG case as your comrades in arms?

A. The Fifth.

Q. You filed a brief three days ago in which you asserted that these people who were protesting against PAG were your comrades in arms. These are your words, and now you're taking the Fifth about whether they're true? Is that what's happening?

MR. WACHEN: Objection, Your Honor. Argumentative.

THE COURT: I'll allow it.

THE WITNESS: The Fifth.

BY MR. HARBACH:

Q. Isn't it true that it's these same comrades in arms who are protesting against the PAG case who you are addressing in PAX Exhibit 38 and promising to support if they're served -- correction, if they're too stupid to get served with a subpoena. Isn't that true?

A. The Fifth.

Q. The subpoenas that you were discussing in PAX's 38, in that video at the table, who were those subpoenas coming from?

A. The Fifth.

Q. By the way, returning to your post from your brief from three days ago, the statement that you just read that you said you agreed with doesn't say anything about protests against the Trustee, does it?

A. The Fifth.

Q. How many times in the last two weeks have you told -- let's pull up --

I'm going to withdraw that and ask that before I ask it we pull up PAX 57, please. How many --

THE CLERK: PAX 57 is on display.

BY MR. HARBACH:

Q. PAX 57 being published now. How many times in the

last two weeks have you told any of the folks in this photograph that you, quote, strongly oppose and firmly do not support anyone participating in this protest?

A. I would like to, regarding this photo, say that, yes, that was me in this photo. However, though, if you looked up online, you would see a lot of photoshopped or fake pictures involving me. I cannot identify any other people on this photo, nor do I have any comments about them. And to answer your question, I will take the Fifth.

Q. Well, you can't have it both ways, Mr. Kwok. Earlier today when I asked you about people in this photograph, individually and as a group, every single time your answer was that you invoke the Fifth Amendment, which is entirely your right. Thirty seconds ago, however, you said that you cannot identify anyone in this photograph. And I'd like to know which is your answer.

A. The Fifth.

Q. So we're crystal clear on the question of do you recognize any of the people in 57, is your answer that you take the Fifth, or is your answer that you don't recognize anyone?

A. The Fifth.

Q. Now, let's return to my question that prompted your dissertation on the photo. How many times in the last two weeks have you told any of the people in this photograph

that you strongly oppose and firmly do not support anyone participating in this protest?

A. The Fifth.

Q. Have you told any of them that since the TRO issued?

THE INTERPRETER: And TRO and stands for temporary restraining order, right?

MR. HARBACH: Yes, ma'am.

THE INTERPRETER: And told them as you told them he opposed the same statement?

MR. HARBACH: Correct.

THE WITNESS: The Fifth.

BY MR. HARBACH:

Q. And the video that was Exhibit 38, the advice on how to avoid subpoenas video, you remember that one?

A. Can I see that video again?

Q. Sure.

MR. HARBACH: Can we please publish PAX's 38? And -- yeah. 38-B. My mistake. Thank you.

THE CLERK: 38-B is on display.

MR. HARBACH: We don't have audio. And I don't know about Your Honor, but I don't have it on my screen.

THE COURT: Not yet. Yeah. I don't have it either. Now I do. Does everyone?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. Go right ahead.

MR. HARBACH: So could you rewind to the beginning and let it play. It's pretty short.

BY MR. HARBACH:

Q. So, Mr. Kwok, I'm allowing you to view this again to refresh your recollection about it.

(Audio played)

MR. HARBACH: Pause it. Thank you.

BY MR. HARBACH:

Q. You just referred to some calamities that people would suffer. Did you see that there?

A. The Fifth.

Q. Let's keep going.

(Audio played)

Q. Why was this funny to you?

A. The Fifth.

Q. At this meal or this gathering at a table on looks like November 21st or so, did you tell any of those people at that gathering what you put in your brief about opposing and firmly not supporting anyone participating in the protest, did you tell the folks who were seated around the table in this video that?

A. The Fifth.

Q. Isn't it true, sir, that the screenshot that you included in your brief was just to cover yourself?

A. The Fifth.

MR. HARBACH: Your Honor, we will offer 38-B and 38-C, which I will remind Your Honor, is the translation -- the translation and transcript form.

THE COURT: 38-B and 38-C, did you say?

MR. HARBACH: Yes, Your Honor.

THE COURT: Yeah. Counsel, 38-B and 38-C are being offered into evidence as full exhibits.

MR. WACHEN: Yeah. We don't have an objection to 38-B. 38-C, could counsel proffer some information about how this was created?

MR. HARBACH: I'd be happy to. Your Honor, this was a translation that was created by TransPerfect, the same company for whom our official interpreter today works. I don't mean to suggest that she personally did it. But the company she works for produced it for us. And that's it. That's the provenance of it.

MR. DESPINS: You Honor, if I may. I want to make sure, Your Honor, that it is clear that those request to admit exhibits apply to the trustee we're joining and PAX -- we've talking about PAX so far, but I want to make sure it's clear, the trustee is joining in all these requests.

THE COURT: You're a joint plaintiff, so you're joining in all the requests.

MR. WACHEN: Your Honor, I just want to be clear

on who's representing the Trustee. Is the Trustee representing himself? And if not, then should he be speaking in this proceeding?

THE COURT: He can speak just for that -- he hasn't said anything else, so I think we're okay. So how are we proceeding with 38-C, counsel?

MR. WACHEN: Could we -- could I show the 38-C to the translators and have them verify.

THE COURT: Sure. Go right ahead.

MR. WACHEN: May I approach.

THE COURT: Yes. Please do.

(Background conversation)

THE COURT: I believe the interpreter is still looking at the document.

THE INTERPRETER: I just wanted to have --

THE COURT: Yeah. No. That's fine. I was just talking to counsel. That's fine that you're -- take your time.

MR. HARBACH: Your Honor.

THE COURT: Yes.

MR. HARBACH: I've consulted with the official interpreter today. And thank you, ma'am, for doing that. And we'll -- we'll withdraw 38-C. I don't mind putting on that record that in the official interpreter's judgement, the subtitles that appeared in the course of the video itself,

were a better quality translation that the written one I hold here in my hand. And so we'll --

THE COURT: Does counsel -- you just need to tell counsel for Mr. Kwok that, okay? You're saying that the document as translated is not as accurate as the translation on the video?

THE INTERPRETER: Yes.

THE COURT: Okay. So counsel, there you go. Not only that, he's going to -- counsel's going to withdraw it. So you don't have anything to object to at this point. And the interpreters, both of whom are nodding their heads for the record, so that I want to be clear, is saying that the interpretation of the spoken language on the video into English, the English translation is better than the written translation. Okay? So I think that should take care of your issues on that -- he's going to withdraw it anyway. But now that you know that, okay?

MR. WACHEN: Thank you.

THE COURT: All right. So then let's go back, counsel, to -- there's no objection to 38-B, so that's admitted as a full exhibit, and 38-C, you're not going to seek its admission as a full exhibit at this time, correct?

MR. HARBACH: That is correct, and I neglected to add that would also like to offer 38-A, which is just the screenshot of the YouTube page with the title of the video.

THE COURT: Counsel, do you have an objection to 38-A?

MR. WACHEN: No, Your Honor.

THE COURT: Okay. Thank you. Then 38-A will be admitted as a full exhibit as well as 38-B.

(PAX Exhibits 38-A and 38-B entered into evidenc.)

THE COURT: Okay. Please proceed, counsel.

BY MR. HARBACH:

Q. The protests in this case are not the first protests that you have helped organize or paid for, are they?

MR. WACHEN: Objection; assumes fact not in evidence.

THE INTERPRETER: Allow me to translate prior.

THE COURT: I'm sorry. Hold on just a second. I just want to hear what his objection was again. I heard part of what you said, but I didn't hear everything.

MR. WACHEN: Yeah, sorry, Your Honor. Assumes fact not in evidence. As I heard counsel say that these are not the first protests you've organized. I don't think it's been established that Mr. Kwok organized these protests.

THE COURT: Okay. Counsel, you want to rephrase the question?

MR. HARBACH: I'd be happy to, Your Honor.

THE COURT: Go right ahead.

BY MR. HARBACH:

Q. Mr. Kwok, did you help organize any of the protests that are at issue in this case?

A. The Fifth.

Q. Did you fund any of the protests?

A. The Fifth.

Q. At any other time in your life, have you funded a protest?

MR. WACHEN: Objection. Relevance. And citing Rule --

THE COURT: Don't answer, Mr. Kwok, yet.

MR. WACHEN: Citing Rule 404(b), Your Honor.

THE COURT: 404(b)? Counsel, do you have a response?

MR. HARBACH: Can I borrow your rule book? Thank you.

MALE VOICE: Pleasure. Here you go.

MR. HARBACH: Wow. In our opinion, Your Honor, it's -- it would fall within the scope of the carve-out 404(b)(2).

THE COURT: Because it's going to prove motive, opportunity, and intent or is that what you're saying?

MR. HARBACH: Preparation, plan, knowledge, identity, absence of mistake or lacks of -- accident, excuse me. Yes, Your Honor.

THE COURT: So what was the question that was

pend- -- the question was did you participate in any other protests? Is that what the question was?

MR. HARBACH: It was did you fund --

THE COURT: Did you fund. Okay.

MR. HARBACH: -- any other protests --

MR. WACHEN: I thought it was help organize. Maybe I misheard.

MR. HARBACH: It's possible that it was. I intended not to ask a compound question, but I'm -- the question I will put to the witness is have you funded any other protests at any time in your life. That is the question.

THE COURT: Okay. Are you objecting, counsel?

MR. WACHEN: I am, Your Honor.

THE COURT: Okay. Your objection is overruled. Go ahead. You can -- Mr. Kwok can answer that question.

THE WITNESS: I take the Fifth.

BY MR. HARBACH:

Q. At any other time in your life, have you encouraged, praised, or otherwise expressed support for acts of violence?

MR. WACHEN: And same objection, Your Honor.

THE COURT: Okay. Thank you. Objection's overruled.

THE WITNESS: The Fifth.

BY MR. HARBACH:
Q. Do you recall testifying in another proceeding called the Eastern Prophet case?
A. The Fifth.
Q. Isn't it true that in that proceeding, when you were asked about whether you funded any of the protests at issue there, you invoked the Fifth Amendment?
A. The Fifth.
Q. Okay.
MR. HARBACH: I'd like to mark as an exhibit -- this will be a new exhibit. Your Honor, is the next -- I think the next number should be 81. I want to make sure I'm squared away with the list that you have. Is the last exhibit number 80?
THE COURT: Just give me one second, and I'll catch up with you. The last exhibit is Number 80; that is correct.
MR. HARBACH: Thank you, Your Honor. So I'll mark for identification PAX 81. And I'm fixing to tender a copy to counsel. And what we've done to avoid confusion about some names that I intend to ask Mr. Kwok if he knows is rather than attempt to pronounce them and spell them and whatnot for the record, I've asked a colleague who has nice handwriting to make a list of the names on this piece of paper, and that's what we'll hopefully facilitate asking my

questions.

THE COURT: Okay. And then you can show them to the interpreter, and if there's any trouble, we can go from there.

MR. HARBACH: Yes, Your Honor.

THE COURT: All right. Go right ahead.

MR. HARBACH: Thank you. For the record, I'm tendering PAX's 81 to the interpreter and the witness.

BY MR. HARBACH:

Q. So Mr. Kwok, take a moment and look at that list of names. There are five on there.

THE INTERPRETER: Okay. I have to read the name to him.

MR. HARBACH: Okay. There are six. Thank you.

BY MR. HARBACH:

Q. Okay. I gather you've had a chance to look at these names. So please forgive my mispronunciation, but let's walk through them one by one. The first one is Yong Bing Zhang. Do you know someone by that name?

A. The Fifth.

Q. The second name is Huo Lai, spelled H-U-O L-A-I. Do you know anyone by that name?

A. The Fifth.

Q. The third name, admittedly, is just a first name. It says Sam. Do you know anyone by the name of Sam?

A. The Fifth.

Q. The fourth name is Pamela, last name Tsai, T-S-A-I. And then an associated nickname of Nicole. Do you know that person?

A. The Fifth.

Q. The fifth name is Roy Guo, G-U-O. Do you know anyone by that name, sir?

A. The Fifth.

Q. The last name on the list is Bing Shang Jiao, B-I-N-G S-H-A-N-G J-I-A-O. Do you know anyone by that name, sir?

A. The Fifth.

MR. HARBACH: Okay. And I neglected to include the spelling of the first name for the record. It's Y-O-N-G B-I-N-G, last name, Z-H-A-N-G. Thank you, sir. PAX offers PAX's 81.

THE COURT: Counsel, have you seen it?

MR. WACHEN: I've seen it, Your Honor. No objection.

THE COURT: Okay. Thank you. Then Exhibit 81 will be marked as a full exhibit.

(PAX Exhibit 81 entered into evidence)

THE COURT: Now, right now, is it on yellow paper?

MR. HARBACH: It is.

THE COURT: So we'll have to -- you'll either have

to put a sticker on that ultimately and send it to the courtroom deputy in PDF format because we don't have that as part of your record yet, correct?

MR. HARBACH: Correct.

THE COURT: Okay.

MR. HARBACH: And there's another piece of paper that we'll have to do that same procedure with, Your Honor. It's 55-A.

THE COURT: Okay.

MR. HARBACH: And we'll take care of it.

(Background conversation about parking)

THE COURT: But we are -- I will say that our staff is going to need to go home soon. So we are going to have to see where we stand and how much further we're going to go tonight, okay? Because our staff doesn't get paid overtime or anything like that.

MR. HARBACH: Your Honor, if you'll give me one minute, I think I may be finished.

THE COURT: Okay. Thank you.

MR. HARBACH: Your Honor, I pass the witness.

THE COURT: Before you do, I just want to make sure -- I'm looking at notes of exhibits, and as you know, I didn't -- it's hard to keep up and make sure that I have followed. Although I think I have followed substantially, but there was an exhibit, I thought, 46-B that I think you

were relying on, but I do not think -- or I think it has not yet been offered as a full exhibit. I'm not sure about that, so I'm going to ask you to take a moment and let me know where that stands.

MR. HARBACH: You're right, and it was on purpose.

THE COURT: Okay. So you're not moving for its admission.

MR. HARBACH: Yet.

THE COURT: Okay. Fine. Okay. That's fine. So then I believe I have all of the exhibits that have been moved into evidence as full exhibits, some of which counsel objected to, and the objections were overruled, some of which counsel did not object to and were admitted. So I have a list, and our courtroom staff will have a list, and obviously, we'll have the record, ultimately, that will have the list.

So you are complete on your direct examination of Mr. Kwok at this time, counsel?

MR. HARBACH: Yes, Your Honor.

THE COURT: Okay. Do you want to proceed with your cross -- oh, I'm sorry, wait a minute. Mr. Bassett, what -- oh, the Chapter 11 Trustee is going to ask questions. Okay. That makes sense. It is joint Plaintiffs. I apologize.

Now, Mr. Bassett, I will say that it is 5 of 6:00.

I can't keep the staff much, much longer. If you're going to commence, you go right ahead, but there will come a time where I'm going to have to stop for today.

MR. BASSETT: Okay.

THE COURT: I just can't -- it's not fair to the staff. So how do you want to proceed?

MR. BASSETT: I completely understand, Your Honor. Again, and for the record, it's Nick Bassett from Paul Hastings on behalf of the Chapter 11 Trustee. Very respectful of your time and your staff's time. I think in light of the extensive testimony that you've already heard, the questioning that I have will be relatively short. I'm optimistic -- maybe 20 minutes or so.

THE COURT: Okay. You go right ahead then.

MR. BASSETT: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BASSETT:

Q. Mr. Kwok, good afternoon.

A. Good afternoon, sir.

Q. Mr. Kwok, earlier during your testimony -- I believe it was this morning -- you had made reference to an allegation that you have made concerning a payment of $250 million that you say the Trustee requested; do you recall that?

A. Yes, I do.

Q. And it's your testimony that that occurred at a meeting in New York City; is that correct?

A. Yes.

Q. And that meeting was on November 17th at the office of Brown Rudnick; is that correct?

A. I actually signed a nondisclosure, and I need to ask the -- Your Honor, is it okay for me to answer this question at all?

THE COURT: Hold on a second, sir. I think the parties -- is everyone -- well, I guess counsel was not there for Mr. Kwok?

MR. WACHEN: I wasn't there, Your Honor. I believe he is -- bankruptcy counsel may have been there.

THE COURT: Mr. Mitchell was there?

MR. MITCHELL: I was there, Your Honor.

THE COURT: Okay. And so you've signed a nondisclosure agreement? Well, then unless you have an objection, counsel, I think Mr. Kwok could answer the question, correct?

MR. MITCHELL: Are you asking me, Your Honor?

THE COURT: No, I'm asking Mr. Wachen. No.

MR. BASSETT: Your Honor, I'm going to ask the courtroom deputy, if I could, to put PAX Exhibit 32 on the screen.

THE COURT: All right. Just hold on a second. I

just want to -- Mr. Kwok asked a question about whether he can answer a question with regard to a nondisclosure agreement. We've just determined that -- I believe -- Mr. Despins and Mr. Bassett and PAX signed that nondisclosure agreement, and Mr. Mitchell did on behalf of Mr. Kwok. So my question is do you have an opposition to discussing -- Mr. Kwok wants to say something, but he's concerned because there's a nondisclosure agreement.

MR. WACHEN: Your Honor, we don't have -- if they are going to ask questions about this meeting, we don't have an objection. They don't -- they're the ones that wanted the nondisclosure, as I understand it. So if they are okay answering -- having him answer questions about it, we're --

THE COURT: I just want to make sure before Mr. Kwok answers any questions that no one's going to have a problem with it.

MR. BASSETT: Your Honor, I'm going to be very limited in the scope of my questions. Not getting into the content of what happened at the meeting, but I'm going to limit my questions to the meeting's occurrence and the participants at that meeting.

What I would note is that what we have put on the screen as PAX Exhibit 32 is a publication of the nondisclosure agreement by the at Miles Guo Live GETTR handle. So to the extent there was any issue with that

document becoming public, it has already happened.

THE COURT: Okay. Hold on one second, okay, because I don't have -- I don't have any -- here, hold on. It might be displaying now.

MR. WACHEN: I'm sorry, is the issue whether the nondisclosure agreement itself is public or whether the substance of what happened at the meeting? That's what --

THE COURT: The -- go ahead.

MR. BASSETT: I am not going to ask any questions about the substance of the meeting. I'm not going to ask any questions, other than what will call for the --

THE COURT: Okay. Well, then I think we'll let Mr. Kwok answer, and if you -- and you do whatever you need to do with Mr. Kwok's answer. Okay?

MR. BASSETT: Okay.

BY MR. BASSETT:

Q. Mr. Kwok, do you understand at the meeting that we were discussing occurred at Brown Rudnick on November 17th, 2022?

A. Yes.

Q. Now, the participants at that meeting, you were there, correct?

A. Yes.

Q. And I was there, correct?

A. Yes.

Q. And Trustee Despins was there, correct?
A. Yes.
Q. And Ms. Una Wilkinson was there, correct?
A. Yes.
Q. And your counsel, Aaron Mitchell, was there, correct?
A. Yes.
Q. And your counsel in the bankruptcy case, Mr. Stephen Kindseth, of the Zeisler Firm, was also there, correct?
A. Yes.
Q. And no one else was there, correct?
A. I think that there were some kind of a partner in B-2, my former lawyer was there, and some kind of security guard was there. Also my two security details was there too.
Q. In the actual conference room in which the meeting occurred, it was limited to me, you, Trustee Despins, Ms. Una Wilkinson, Mr. Kindseth, and Mr. Mitchell, correct?
A. When you starting to threaten me, yes. That was the people who were presented.
Q. So Mr. Kwok, if the content of any of the discussions at that meeting were to have been revealed to somebody outside of that meeting, the person who would have revealed that information would have had to have been one of the five people I just mentioned who were in attendance,

correct?

A. I don't know.

Q. Mr. Kwok, you testified earlier that you have used what you called -- referred to as burner phones before. Do you remember that?

A. Yes.

Q. Do you still have those phones?

A. I don't know.

Q. You don't know whether you still have them?

A. I don't have them now.

Q. Mr. Kwok, do you understand that as part of this bankruptcy case, you are under an obligation to maintain and preserve potentially responsive materials, including communications that you had -- including devices that you would use to communicate?

MR. WACHEN: Objection, Your Honor.

THE COURT: Okay. One second. Don't answer that, Mr. Kwok, yet. Go ahead.

MR. WACHEN: Your Honor, Mr. Kwok is represented by counsel. He's not a lawyer.

MR. BASSETT: Your Honor, it does not call for a legal conclusion. The Debtor is well aware from communications, including letters he's received from the Trustee, document requests he's received, and from the proceedings before this Court of that general obligation. It

does not take a lawyer to understand the answer to the question that I just asked.

MR. WACHEN: Your Honor, as far as I know, Mr. Kwok has been represent by counsel throughout the bankruptcy proceeding. I don't think any of the documents counsel recited were sent directly to him. I think they were all sent to his counsel, and I -- you know, it's sort of between him and his counsel at that point. But I'm not sure --

THE COURT: What part of it do you object to? Because -- of the question do you object to. Because I think -- I thought -- and maybe I didn't hear it properly. I thought the question was asking Mr. Kwok if he understands that he needs to cooperate with the Trustee and keep information that might be relevant to the Trustee's investigation of the case.

MR. WACHEN: I guess I heard the question a little differently. Maybe --

THE COURT: And maybe you did. So you want Mr. Bassett to ask -- Mr. Bassett, why don't you ask the question again, and then let's see where we stand on the question?

MR. BASSETT: Sure.

BY MR. BASSETT:

Q. Mr. Kwok, do you understand that you have an obligation to maintain information and cooperate with the Trustee in its investigation in this case?

A. Yes.

Q. And you understand that applies to communications you may have on a phone?

A. Yes.

Q. But you did not maintain the burner phones that you discussed earlier, correct?

MR. WACHEN: Objection, Your Honor.

THE COURT: Don't answer that, Mr. Kwok.

MR. WACHEN: I mean, is counsel saying that he has to maintain all information, no matter whether it's relevant to the case or not? Does he have to keep all his mail? Does he have to keep, you know, junk mail, magazines, newspapers? I think it -- doesn't it have to bear some relationship to the case?

MR. BASSETT: Your Honor, I think the testimony that Mr. Harbach elicited earlier today made very clear the relevance of the communications that Mr. Kwok had on these burner phones.

THE COURT: I think you can just qualify the question, right? I think you can just change the question that does it -- does he understand it applies to communications you have on the phone that relate to the administration of the case. So why don't you go ahead, Mr. Bassett, and ask that question?

MR. BASSETT: Sure.

BY MR. BASSETT:
Q. Mr. Kwok, do you understand that your obligation to maintain information and cooperate in the Trustee's investigation applies to communications you have on a phone that relate to this case?
A. Yes.
Q. And as discussed during your testimony earlier, you in the past have used burner phones to communicate on matters related to this case, correct?
A. I'm going to take Fifth.
Q. Mr. Kwok, when did you first retain your attorney, Mr. Wachen?
THE INTERPRETER: Interpreter asks repetition, when or why?
MR. BASSETT: When.
THE WITNESS: I'm going to take the Fifth.
BY MR. BASSETT:
Q. You're going to take the Fifth as to when, approximately, you engaged Mr. Wachen to represent you in this matter?
A. Yes.
Q. How were you introduced to Mr. Wachen?
MR. WACHEN: I'm going to object. Object, Your Honor. I'm not sure how either of these questions are relevant.

MR. BASSETT: Your Honor, we've presented today an abundance of evidence as to the organization behind these protests that are occurring, the sources of funding, as you saw in the videos that were displayed on the screen, for these protests. I'm simply exploring whether there might be commonality among these organizations, the sources of funding, and counsel who's here today.

As the Court knows, one of the next questions that I'm going to answer is how Mr. Wachen is being paid. There's a Bankruptcy Code obligation under Section 329 for that information to be provided. It's highly relevant to the Trustee's work in this case, and it's a permissible line of inquiry.

THE COURT: Well, as I indicated today, the parties have policed that issue are the U.S. Trustee and they're not here. You can ask the question. You can let him ask the question, and whatever answer is given is given, counsel, and we'll see where things go from there.

MR. WACHEN: Okay. Well, I just want to state my objection.

THE COURT: I understand.

MR. WACHEN: As to relevance. I'm not sure any disclosure is due at this point.

THE COURT: Well, whether it's due or not at this point isn't the issue. The issue is can he ask the question,

and is it relevant, and ultimately, it is relevant under the Bankruptcy Code. It is relevant, even if a debtor is out of possession, it's still -- it's still relevant as to how the lawyers that are representing him, according to Congress, by the way. So Congress passed the law. And it says that that has to be disclosed. That is the -- and the United States Trustee's Office takes that position in every case.

MR. WACHEN: But Your Honor, we're in an adversary proceeding.

THE COURT: I understand. Doesn't matter, though, because you've been retained as his counsel. Doesn't matter -- the adversary proceeding is part of the case. It impacts the case.

MR. WACHEN: Right. But -- I understand that, Your Honor, but for -- for today's purposes, this hearing is in connection with an adversary proceeding. So --

THE COURT: It doesn't matter. It doesn't matter.

MR. WACHEN: These questions are relevant to the adversary proceeding?

THE COURT: Yes, they are. I think they're relevant. So I'm going to let -- and then, you know, whatever the answer is, the answer is, but it is relevant. This is a -- this is a situation where -- and I know you've just become involved. But the problem with this is that the -- one of the issues that has been raised all along is

what -- what assets are part of this estate. And so the Trustee gets to investigate that.

And as part of the temporary restraining order and preliminary injunction, there are issues that relate to -- there's allegations about -- whether they're proven or not is a completely different issue. But there's allegations about where funds come from and where they -- and who are the source of those funds. And so I'm going to allow the question to be asked.

I understand your objection, and I note it for the record.

MR. WACHEN: Thank you.

BY MR. BASSETT:

Q. So I'll restate my question. Mr. Kwok, how were you introduced to Mr. Wachen?

A. I will take Fifth.

Q. Does Mr. Wachen have a retainer for his services in this case?

A. I will take the Fifth.

Q. Who is responsible for paying Mr. Wachen's legal fees in this case?

A. I will take the Fifth.

MR. WACHEN: And a belated objection to that question.

THE COURT: Thank you.

BY MR. BASSETT:

Q. Mr. Kwok, is the Rule of Law Foundation paying Mr. Wachen's legal fees in this case?

MR. WACHEN: Objection, Your Honor.

THE COURT: Okay. Tell Mr. Kwok, right, not to answer yet. So counsel, your objection is the same is that it's irrelevant to this adversary proceeding?

MR. WACHEN: Correct.

THE COURT: Okay.

MR. WACHEN: I have an objection to the whole line of --

THE COURT: I understand. And the question -- the -- the considerations that the Court has weighed in connection with your objections is that -- are that the Chapter 11 counsel made it very clear that they were not representing Mr. Kwok in this case. In the adversary proceeding, I apologize. Let me be clear as I should be. In the adversary proceeding -- and that someone was going to be retained to do that.

The problem -- not the problem -- the status of the Chapter 11 case is what, if anything, is available to pay creditors. And therefore, the Trustee is conducting that investigation. That is what the Trustee's duties and responsibilities are under the Bankruptcy Code.

The Debtor's transactions with attorneys, Section

329 of the Bankruptcy Code says “any attorney representing a debtor in a case under this title or in connection with such a case, whether or not such attorney applies for compensation under this title shall file with the Court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing petition for services to be rendered in contemplation of or in connection with the case by such an attorney and the source of such compensation”.

That's required by the Code. That's -- Congress decided that, right? So the -- while I understand your -- your objection, weighing the objection against the requirements of the Bankruptcy Code and the decision -- and it's a decision that is -- it is what it is, that the Chapter 11 Trustee -- Chapter 11 Debtor's counsel is not going to represent because they've already disclosed in the Chapter 11 context. They've already done that. They did that very early on. Then that's the -- unfortunately is another obligation that the Debtor has with regard to transactions with attorneys in a case or a case involved in a case, and that's what an adversary proceeding is.

MR. WACHEN: But Your Honor, wouldn't – wouldn’t that inquiry be more appropriate in the context of the underlying case?

THE COURT: Not necessarily. Here's the problem.

I mean, the problem is that we have a Chapter 11 case in which the Trustee is trying to conduct an investigation and has -- has not been able to do so, okay? And it's taking steps, and he needs to know -- in most Chapter 11 cases where a Trustee is appointed in an individual -- in an individual Chapter 11 case, the Trustee takes over all the affairs of the Debtor so the Trustee would know, you know, who, if anyone, was paying the Debtor's counsel's fees, even if it wasn't the Debtor. Even if it's some other entity. And the Code requires that.

So I'm going to let -- I understand everything you've said. I note your objections for the record. But under the specific facts and circumstances of this case in this adversary proceeding, I'm going to overrule your objections. Let Mr. Bassett ask the questions, and then Mr. Kwok will answer those questions in whichever way he feels is appropriate.

MR. WACHEN: Thank you.

THE COURT: Okay? Thank you.

MR. BASSETT: Thank you, Your Honor.

BY MR. BASSETT:

Q. Mr. Kwok, I believe the question I had asked was is the Rule of Law Foundation paying Mr. Wachen's legal fees?

A. I will take the Fifth.

Q. Is the Himalaya Alliance responsible for paying

Mr. Wachen's fees?

MR. WACHEN: Your Honor, may I just have a standing objection to this line of inquiry?

THE COURT: Certainly. Hold on one second, okay? Counsel for Mr. Kwok would like to have a standing objection with regard to this line of questioning. So I'll note that objection with regard to all the questions that are being asked about the payment of your fees in this adversary proceeding.

MR. WACHEN: Thank you, Your Honor.

THE COURT: Thank you.

MR. BASSETT: I think that was actually going to be my last question anyway, Your Honor.

THE COURT: Go right ahead.

BY MR. BASSETT:

Q. Mr. Kwok, is the Himalaya Alliance responsible for paying Mr. Wachen's fees in this case?

A. I will take the Fifth.

Q. Mr. Kwok, are you familiar with a cryptocurrency investment called H Coins?

A. Take the Fifth.

Q. Is that an investment that you have promoted?

A. I will take the Fifth.

Q. Mr. Kwok, did you do a music video promoting H Coin called H Coin to the Moon?

A. I will take the Fifth.
Q. Mr. Kwok, the participants in your protests are being offered the opportunity to acquire H Coin as part of their compensation for participating in the protests, right?
A. I will take the Fifth.
Q. Mr. Kwok, outside of this bankruptcy case, do you have any other relationship with Trustee Despins?
A. He represent a lot of proceedings that such as UBS, PAX, PAG. Like, there are some of them in the past that I cannot even pronounce the name. But he represents them. So yeah.
Q. What I'm asking is if you personally, Mr. Kwok, have any relationship with Mr. Trustee outside of the relationship that exists between him as Chapter 11 Trustee and you as the debtor in this case.
A. He extorted me last month 14 -- serious extortion. I already notified authority.
Q. Mr. Kwok --
A. He want $250 million.
Q. Mr. Kwok, I'm glad you brought that up. Before, during your testimony earlier today, I believe you said you had reported this incident that you are alleging occurred to the police; is that right?
THE INTERPRETER: Interpreter requests repetition. I was talking to my colleague. One more time. Thank you.

BY MR. BASSETT:

Q. Earlier today, Mr. Kwok, you stated that you informed the police of this allegation that you just made; is that right?

A. Yes, I did.

Q. Which police department did you inform?

A. I will take the Fifth.

Q. So you told the police, but you're not going to tell me which police department you told because of the Fifth Amendment; is that right?

A. Okay. My -- let me correct what I said. When I said that I informed the authority, I did not mean I called the police. What I meant is that I used my -- my counsel in criminal proceedings to file a criminal complaint litigation. I did not mean police. I just mean that I made a report in a criminal proceeding regarding this.

Q. In what criminal proceeding was this report made, Mr. Kwok?

A. Okay. What I meant is that my criminal counselor has filed a criminal complaint against the Trustee and you regarding that you guys were threatening -- extorting me on that day, threat to destroy me for $250 million and saying something regarding like to take away the boat and my daughters and my family, such as.

Q. Where was the criminal -- where was this criminal

complaint filed, Mr. Kwok?
A. I will take the Fifth.
Q. When was the criminal complaint filed?
A. The Fifth.
Q. When you say that you worked with your counsel on this complaint, who are you referring to?
A. I cannot tell you his full name.
Q. What part of his name can you tell me?
MR. WACHEN: I'm sorry. What was the original question? I apologize.
MR. BASSETT: I asked him which counsel he worked with on his complaint.
MR. WACHEN: Thank you.
THE WITNESS: I cannot even like --
THE INTERPRETER: Let me ask for clarification.
THE WITNESS: Due to my limited English proficiency, I meant that I cannot pronounce his name, not even one part of it. I call him Guy.
BY MR. BASSETT:
Q. Is it Guy Petrillo (phonetic)?
A. I'm not sure.
Q. Mr. Kwok, is it fair to say that you wish that Mr. Despins was not a Trustee in this case?
A. Because I remember when they switched the first trustee, the Judge even said that he then denied the first

Trustee. So I find that I'm very much against that he was appointed a Trustee because there were too many conflict of interest involved.

Q. And you have actually moved to remove the Trustee's appointment, correct?

A. Yes.

Q. So is it fair to say, Mr. Kwok, that you'd be happy if Mr. Despins either was removed or resigned and was no longer involved in this case?

A. This is actual, Your Honor, not up to me. And -- but however, though, I feel like he was -- he is the biggest conflict of interest since day one, too much lies.

THE INTERPRETER: Interpreter requires clarification.

THE WITNESS: Here's the thing that I want you to know. That I was in prison in China back then, and I saw about like more than ten people were executed in front of me. I was not scared. I was not in fear. However, that day when you and the Trustee Despins threatened me, I was in tremendous fear. I was so scared, so fearful of him. He is like mafia. He's worse than CCP, the Chinese Communist Party.

MR. BASSETT: I would move to strike the entire answer, given that my question was, Mr. Kwok, would you be happy, yes or no, if Mr. Despins was no longer the Trustee in

this case. Your Honor --

THE WITNESS: It doesn't matter if I'm happy or not because here is under bankruptcy case, I wish to resolve all the financial affairs and -- but however, I do wish the Court to show fair and justice.

MR. BASSETT: Your Honor, there's no question pending.

THE WITNESS: We almost at Court and satisfy with PAX. However, though, he like showed up all of sudden, asked for $250 million --

MR. BASSETT: Your Honor, there's not a question pending.

THE COURT: I understand.

MR. BASSETT: I move to strike.

THE COURT: I'm going to let her finish. Just hold on.

THE INTERPRETER: Allow me to finish.

THE WITNESS: He moved to ask -- extort $250 million. This is scarier than the mafia.

THE COURT: Okay. Do you have anything further, Mr. Bassett?

MR. BASSETT: You know what, I don't think I do. Thank you, Your Honor.

THE COURT: Okay. Thank you. All right. It is 6:30 p.m. We cannot keep the staff any longer. Mr. Kwok --

hold on one second, okay? Are you going to cross-examine Mr. Kwok in the morning, counsel?

MR. WACHEN: Your Honor, could we have a two-minute recess to discuss that?

THE COURT: You can have a two-minute recess. And then I would ask everyone, please, because of the late time of the day, if you take your waters and your cups and whatever there’s recycling bins and garbage bins out at the front of the building. But no one has to leave yet because they're taking a two-minute recess. I'm not moving. If I move, it's going to take more time, and I've got staff I have to let go home.

MR. WACHEN: We'll be right back.

THE COURT: Okay? The Court will be in recess for two minutes.

(Off the record)

(On the record)

THE COURT: On the record at 6:32 p.m. Go right ahead.

THE INTERPRETER: He's not back.

THE COURT: Oh, Mr. Kwok's not back.

THE INTERPRETER: He's in the bathroom.

THE COURT: Good point. Sorry. Thank you. He did just say he had to use the restroom. So I'm sure he'll be back in a moment.

(Off the record)

(On the record)

THE COURT: -- three, and we're all back on the record. Counsel for Mr. Kwok, you were going to check and see what your -- if you were going to be calling Mr. Kwok in the morning.

MR. WACHEN: Yes, Your Honor, and we will not be calling Mr. Kwok.

THE COURT: You're not going to call him? Okay.

MR. WACHEN: Correct.

THE COURT: So then Mr. Kwok, you can -- you can stand down, and you don't have to come back tomorrow. Your counsel isn't calling you, okay?

THE WITNESS: Thank you, Your Honor.

THE COURT: Thank you. I'm just seeing if the lawyers had anything else they wanted to add.

MR. FRIEDMAN: Your Honor, this is Peter Friedman from O'Melveny & Myers. I know your staff has worked all day, which we are extremely grateful to each of you. If possible, if the wave file from today's hearing can be uploaded so we can begin the process of getting a transcript whenever -- as soon as the Clerk as possible --

THE COURT: We do the best we can.

MR. FRIEDMAN: I understand.

THE COURT: I don't know how long that will take,

but we'll do the best we can.

MR. FRIEDMAN: Of course, Your Honor. I just wanted to --

THE COURT: And if not, it will be very early in the morning, okay?

MR. FRIEDMAN: Thank you, Your Honor.

THE COURT: All right. So Mr. Kwok is relieved. You've asked your -- you've done your direct examination. They're not going to cross. So Mr. -- and if someone has a different opinion on that, they better tell me now.

MR. HARBACH: Your Honor, for PAX, we're not interested in any further examination of Mr. Kwok.

THE COURT: Okay.

MR. HARBACH: The impact of Your Honor's order requiring him to be present, I don't know -- it's up to you what the scope of that is. But there's not going to be any additional examination of him.

THE COURT: Well, it actually wasn't an order requiring him to be present.

MR. HARBACH: Oh, excuse me.

THE COURT: The Defendant's counsel accepted service of the trial subpoena. That's what occurred, okay?

MR. HARBACH: Thank you, Your Honor.

THE COURT: I did not order Mr. Kwok to be present.

MR. WACHEN: So he's free to go now?

THE COURT: Yes, he is. Mr. Kwok is free to go. Now, we still have -- this isn't -- we're not resting. This is not the end of this hearing from the Court's perspective. I don't know about anybody else. But it's not. And so it's 6:35. You can go ahead, Mr. Kwok. It's 6:35. Thank you. Thank you.

So we need -- we're going to resume tomorrow morning, okay? We're going to -- I'm going to start at 10:30 tomorrow morning. It'll give the staff a little bit of time, and then Mr. Friedman, if we can't get that loaded tonight, we'll be able to get it loaded in the morning before -- definitely before we start the continuation of the proceedings, okay?

Is there -- I don't think there's anything else we need to address tonight. And the interpreters are going to be allowed to be released as well. There's no need for the interpreters to be here, correct?

MR. HARBACH: That's correct, Your Honor, and I'll just re-urge our request that Mr. Napierala be released.

THE COURT: You're going to call Mr. Napierala?

MR. WACHEN: We may, Your Honor. We'd be willing to call him remotely, if that was --

THE COURT: No, we're not doing remote. No, that's not going to happen in this case. There's been too

many issues. It's not going to happen. Mr. Napierala -- is Mr. Napierala still here?

MR. NAPIERALA: Yes.

THE COURT: So Mr. Napierala, can you -- can you communicate, the two of you, so that you know -- I would like you to make sure that you tell counsel in the morning. Mr. Napierala, how long does it take you to get here?

MR. NAPIERALA: I'll be spending the night. I was intending to fly out tonight.

THE COURT: Oh, so you're flying from somewhere.

MR. NAPIERALA: Correct. Yes.

THE COURT: Okay. So I need you to tell counsel by 9:00 a.m. tomorrow morning whether you're calling Mr. Napierala so he can make arrangements, whether he's coming here or not, and if not, he's going to have to get a flight, obviously. Okay? And I think that's fair under the circumstances, counsel. Okay?

MR. WACHEN: Yes, Your Honor.

THE COURT: All right. Any -- I think that is, then, all we can do tonight. As I said, the hearing is not concluded. We're simply concluding for the day. And we will be back here tomorrow morning at 10:30. As I said, we'll do what -- we will have something available to start a transcript by the morning, at the latest. And counsel, you're going to let opposing counsel know whether you're

going to call Mr. Napierala so he can make arrangements by 9:00 a.m.

You both -- have you been communicating, I hope?

MR. HARBACH: We have since we met today, and we can continue, Judge.

THE COURT: Okay, good. Thank you. All right. Then Court is adjourned for today. We'll see you in the morning.

MR. WACHEN: Thank you, Your Honor.

MR. HARBACH: Thank you.

COURT OFFICER: All rise. Court's adjourned.

(End of Proceedings)

CERTIFICATION

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.

/s/ Mary Zajaczkowski December 7, 2022

Mary Zajaczkowski, CET-531
Certified Court Transcriptionist
For Reliable

/s/ WENDY SAWYER December 7, 2022

WENDY SAWYER, CDLT