**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

| | | |
|---|---|---|
| In Re: | ) | CHAPTER 11 |
| | ) | |
| HO WAN KWOK, GENEVER | ) | CASE NO.: 22-50073 (JAM) |
| HOLDINGS CORPORATION and | ) | |
| GENEVER HOLDINGS LLC | ) | |
| | ) | |
| PACIFIC ALLIANCE ASIA | ) | ADV. PRO. NO.: 22-05032 |
| OPPORTUNITY FUND L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HO WAN KWOK, | ) | DECEMBER 15, 2022 |
| | ) | |
| Defendant. | ) | |

**OPPOSITION TO JOINT MOTION FOR ENTRY OF AN ORDER**
**HOLDING HO WAN KWOK IN CIVIL CONTEMPT FOR FAILURE TO COMPLY**
**WITH TEMPORARY RESTRAINING ORDER**

## I.    INTRODUCTION

The Court should deny PAX and the Trustee's Contempt Motion because Movants have

not come close to meeting their substantial burden of justifying this extraordinary relief,

particularly with regard to an Order that appears to be facially unconstitutional order. Not only

do they fail to put forward clear and convincing evidence that Mr. Kwok personally violated the

Court's November 23, 2022 temporary restraining order ("TRO" or "Order"), but they also fail

to establish that the TRO's terms are "clear and unambiguous." Language in the Order

purporting to enjoin Mr. Kwok from posting "false" information without any determination –

judicial or otherwise – as to what is false, is not clear and unambiguous.[1] Restricting him from

---

[1] The TRO, by its terms, purports to restrict posting about the relatives of any of PAX's and
PAG's officers and employees as well as those of counsel for the Trustee and PAX, which are

"suggesting" or "indirectly funding" protests, whatever that means, is not clear and unambiguous. Enjoining him from "interfering *in any way* with the integrity of his Chapter 11 case" (emphasis added) without defining what would *not* be considered "interfering" or what is meant by "the integrity" is not clear and unambiguous. And requiring him to "remove all existing social media posts" of categories of information apparently anywhere in the world, regardless of who posted them, is an impossible task on its face and certainly not a clear and unambiguous term. These are just a few examples. Fundamental principles of due process preclude this Court from holding Mr. Kwok in contempt for this reason alone.

The Contempt Motion also lacks any real evidence—let alone, clear and convincing evidence—that Mr. Kwok is in "non-compliance" with the TRO. Simply put, Movants have no proof that Mr. Kwok is behind the conduct they allege violates the TRO. They rely on speculation and, once again, layer their claims on inference upon inference that, because Mr. Kwok has associated with certain groups at one time or those organizations and individuals support his mission, the only possible conclusion is that he is directing their actions now. That is not clear and convincing evidence that he is acting in concert with them or otherwise has control over them such that he can restrain their conduct. Indeed, three witnesses testified before this Court at the Preliminary Injunction hearing that they participated in protests entirely on their own

---

represented by law firms with over 1,000 and over 700 attorneys worldwide respectively, and each of which presumably has at least hundreds of non-attorney employees. According to Wikipedia, PAG has more than 600 employees in 12 offices globally. (Available at https://en.wikipedia.org/wiki/PAG_(investment_firm) (last accessed December 15, 2022).) All of these people presumably have relatives. Thus, by its express terms, the TRO purports to limit Mr. Kwok's speech about potentially tens of thousands of unidentified people worldwide. The Order does not address how this restriction, entered *ex parte* at the urging of the Trustee and PAX, could possibly be constitutional.

volition and were never asked, directed, or even encouraged to participate by Mr. Kwok. In fact, they testified that they protested despite Mr. Kwok's request that people *not* protest.

Movants claim that Mr. Kwok does not respect the Court's authority because he shared a post describing the TRO as "against the law" and stating that he has "no intention of complying with the TRO" (Contempt Mot. ¶ 52), but Mr. Kwok's opinion about the legality of the TRO that he is challenging in this Court and, if need be, before an appellate court, does not violate the terms of the Order. As discussed in Mr. Kwok's preliminary injunction filings, Movants cited no precedent that the First Amendment allows such a broad prior restraint on speech as this TRO purports to accomplish, and the undersigned have been unable to locate any reported decision that would support the constitutionality of such an order. Moreover, the evidence shows that Mr. Kwok personally complied with the TRO (*e.g*., he removed posts, did not identify personal identifying information, and did not encourage protests). Movants fail to cite any direct evidence that demonstrates any non-compliance with the TRO by Mr. Kwok. Absent clear and convincing evidence of such conduct, the Court cannot hold him in contempt. The Court should therefore deny the motion in its entirety.

## II.    BACKGROUND

### A.    <u>The Court Enters an Impermissibly Broad and Vague TRO</u>

On November 23, 2022, at 6:00 p.m. (*i.e.,* the evening before Thanksgiving), the Court entered the TRO. The TRO, among other things, bars the posting of allegedly false and harassing materials, enjoins Mr. Kwok from interfering in any way with the "integrity" of his Chapter 11 case, bars him from even *suggesting* protests at the home or office of the Trustee, PAX or PAG, or their respective officers, employees or counsel, *or any of their relatives* (apparently, no matter how distant), and orders Mr. Kwok to remove "all existing social media posts"—whether he

posted them or not—that contain "personal information" about the Trustee or the employees or counsel of PAX and PAG. At the TRO hearing, which was held on less than eighteen hours' notice, Mr. Kwok was not represented by counsel and was not able to present a defense our counterargument to the TRO.

B.    **Mr. Kwok Denounces the Protests and Complies With the TRO to the Extent Possible**

In the days immediately preceding entry of the TRO, Mr. Kwok actively discouraged protests. In a video posted online on November 20, 2022 and entered into evidence at the Preliminary Injunction hearing as Kwok Exhibit 6, Mr. Kwok stated:

> It's now almost 11pm on November 19th.  I have just heard that some fellow fighters want to work together to organize some protests in front of PAX office building and some other places.  I'm here to express my opinions on this matter … , Here I can tell everyone:  Personally, I strongly oppose such protests.  I strongly oppose, and absolutely do not support such protests, absolutely not.  I hope no one will go to such protests.

Mr. Kwok further advised that if people did protest, that they: "act within the perimeter of the law and be sure to observe your state ordinances and respect the local police. Be sure to consult police before taking actions." *Id.*

After entry of the TRO, Mr. Kwok attempted compliance, notwithstanding the overly broad nature and vagueness of the Order. The unrebutted testimony from protesters at the Preliminary Injunction hearing was that Mr. Kwok did not order, recommend, fund, support, or in any way suggest that they protest. As one protester, YaQin Li testified:

> Q. And so you travelled from Ontario to Greenwich,
> Connecticut, to participate in these protests?
> A. Yes.
> Q. And did anybody pay you to do that?
> A. No.
> Q. Did anybody offer to reimburse you?
> A. No.
> Q. Did anyone ask you to do it?

A. No.
Q. And the person who you said was the number one
enemy of the Chinese people, who are you referring to?
A. Miles Guo.
Q. And have you ever -- did Miles Guo ask you to come
and protest?
A.  No.

(Redacted Transcript of Hearing on Preliminary Injunction ("Tr.") at 477:8-22, attached hereto

as Ex. A.) In fact, Ms. Li testified that she never met or communicated directly with Mr. Kwok:

Q. Have you ever met Mr. Kwok.
A. Yesterday I saw him in the court.
Q. Have you ever seen him before that?
A. Never ever.
Q. Have you ever spoken with Mr. Kwok before that?
A. Never.
Q. Have you ever communicated with him by any means
before that?
A. What do you mean by any means?
Q. Have you ever emailed with Mr. Kwok?
A. Never.
Q. Have you ever texted with Mr. Kwok?
A. Never.
Q. Have you ever exchanged messages on any sort of
social media platform with Mr. Kwok?
A.  I don't remember.

(Tr. at 493:15- 494:5, attached hereto as Ex. B.)

Another protestor, Ziheng Cheng, testified that not only did Mr. Kwok not ask him to

protest, but he saw the videos in which Mr. Kwok expressly advised people not to protest, yet

chose to protest anyway:

Q. And has Mr. Miles Kwok -- you know who he is,
right?
A.  Um-hum, yeah.
Q. Has he -- did he ask you to do these protests?
A. No, I have no -- any -- I don't have any
connection with him on this effects.

(Tr. at 439:13-18, attached hereto as Ex. C.)

> Q. Did you see any videos where he told people not to
> protest?
> A. Yeah, so there is a short video that said -- you
> know, that he, himself, says, I strongly be object to this
> movement, the protestation.
> Q. And you went ahead and protested anyway?
> A. Yeah, so because I was seeing our social media
> group, and there is some people who are following this
> movement for a long time. And we talk a little bit about
> those news, and we think it was our duty to do something for
> the New Federal State of China. So that's why we volunteer
> ourselves to do this protestation.

(*Id*. at 440:16-441:2.)

A third witness, Bing Shang Jiao, who helped organize protests, offered similar

testimony, responding "no" to questions as to whether she works for, is paid by, or was directed

by Mr. Kwok. (Tr. at 335:11-23, attached hereto as Ex D, 344:16-25, attached hereto as Ex. E.)

Movants have not presented in the Contempt Motion or at the Preliminary Injunction hearing

evidence of any violence by Mr. Kwok or others. The unrebutted testimony at the hearing was

that the protests were all peaceful. (*See* Tr. at 436:3-437:6, attached hereto as Ex. F, Ex. A at

478:23-479:25.)

Moreover, most of the social media posts referenced in Movants' preliminary injunction

papers have been removed, including those cited in footnotes 53, 60, 67, 73-77, 79-80.

### C.    The Motion for Contempt

On November, 30, 2022, Movants filed the instant Motion seeking to hold Mr. Kwok in

civil contempt and impose sanctions, arguing that Mr. Kwok and an undefined group denoted

simply as his "followers" have failed to comply with the TRO and purportedly have escalated

their "intimidation efforts" against Movants. (Contempt. Mot. ¶¶ 2-4.)

Through erroneous assertions and mischaracterized evidence, the Contempt Motion

assigns blame for alleged violations of the TRO to Mr. Kwok personally. For example:

6

1)      **Movants allege that Mr. Kwok and his followers have not complied with the TRO by taking down all offending social media posts. (Contempt Mot. ¶ 3)**

It is impossible for Mr. Kwok to take down purportedly offending social media posts on accounts over which he has no control. The Contempt Motion cites numerous postings on GETTR with the handle "@MilesGuoLive" as being violative of the order (*id.* at ¶ 28), but as Mr. Kwok testified at the Preliminary Injunction hearing, he does not control that handle:

> Q. This is a screenshot of a GETTR page with the
> handle at Miles Guo Live, do you see that there?
> A. Yes.
> Q. Are you familiar with this GETTR page?
> A. No.

(Tr. at 132:1-5, attached hereto as Ex. G.)

> Q. Okay. Mr. Guo, isn't it true -- excuse me. Mr.
> Kwok, isn't true that you approve what gets posted under this
> handle [@MilesGuoLive]?
> A. No.
> Q. Isn't it true that you control the person or
> people who post under this handle?
> A.  No.

(*Id.* at 135:25-136:6, attached hereto as Ex. H.)

Many posts challenged by Movants were made on accounts that Movants have failed to show—even through hearsay—have any connection to Mr. Kwok. The only evidence that Movants present in support of the allegation that these accounts are Mr. Kwok's is that they include his name or, in the case of @MilesGuoLive, that it purportedly was opened with his permission. But use of his name or even permission to use his name does not establish that he has control over the accounts. Movants omit from their Motion the display names[2] on the accounts, which appear to refer to other third persons and entities. They instead refer only to the

---

[2] *See* Dec. 5, 2022 testimony of Brian Napierela identifying the bolded name at the top of a GETTR profile as a "display name" (Tr. at 63:22-63:12 attached hereto as Ex. I).

username, [3] such as "@miles." Their strategy is apparently to mislead the Court into believing there is a closer relation to Mr. Kwok than exists in reality. (*See, e.g.*, Contempt Motion ¶¶ 22, 24-26, 30, 91, 94-96 (identifying posts made on the account "NFSC Speaks" instead as posts by "@miles") and ns. 5, 32, 36-37, 52, 56-57, 62-63, 66, 88).) Mere use of Mr. Kwok's first name is not evidence that he controls and operates the account, or that he even knows about the account. Anyone can open an account bearing Mr. Kwok's name in the title or listed as the user. Take for example, former President Donald Trump. A search for accounts bearing his name on GETTR reveals dozens, if not hundreds of accounts created using variations on his name. Mr. Trump cannot bear legal liability for each and every one of those accounts absent proof of his actual involvement with them.

In any event, as noted above, many social media posts cited in the Motion for Preliminary Injunction have been removed. Movants even admit that certain posts were removed before that motion was filed. (*See* Mot. Prelim. Inj. n. 72; and Objection to Mot. for Prelim. Inj. ("Kwok Objection to PI") at 15.)

2)      **Movants allege that Mr. Kwok is responsible for the continuation of protests at Movants' homes and offices. (Contempt Mot. ¶ 29.)**

Movants do not, and cannot, allege that Mr. Kwok was present at or had any involvement in the protests. They also admit that Mr. Kwok publicly expressed his opposition to the protests (*see* Mot. Prelim. Inj. n. 86), and the protesters themselves have denied his involvement. (*See* Kwok Objection to PI at 14 and n.8; Ex. A-E.) Though Movants present him as having sway

---

[3] *Id.* at 64:13-17, identifying the name following the @ sign under a "display name" as a "username."

over thousands, if not millions, of anti-communist activists, they present no evidence that Mr.

Kwok controls the physical activities of each and every protester, or any of them for that matter.

**3)**  **Movants allege that, over the Thanksgiving weekend, Mr. Kwok and his supporters caused emails to be sent to employees of Paul Hastings and O'Melveny & Meyers containing false statements. (Contempt Mot. ¶¶ 31-32.)**

Movants present no evidence that Mr. Kwok had any involvement with the emails sent to

the law firms. As the emails show (*see* Contempt Mot. Exs. 3 and 4), they originated from "Li Li

<lili707808@gmail.com>" and "Victoria Lee <vc.lee116@gmail.com>." On its face, the email

contained in Exhibit 4 does not evidence that it was sent to any O'Melveny employees (the

recipient is listed as "vc.lee116@gmail.com.") In any event, the email does not bear Mr. Kwok's

name and there is no evidence that he is in any way connected to the email originators.

**4)**  **Movants allege that Mr. Kwok apparently caused someone to send the Trustee a "harassing and threatening" voicemail referring to him as, among other things, a "running dog" of the CCP. (Contempt Mot. ¶ 32.)**

In alleging that Mr. Kwok violated the TRO because the Trustee received a distasteful

voicemail, Movants avoid the pivotal question—*who* left it? The Contempt Motion admits that

the Movants do not know who left the voicemail, and the Trustee testified that he did not believe

that Mr. Kwok personally left the voicemail. (Tr. at 655:1-13, attached hereto as Ex. J.) Movants

provide no evidence whatsoever to establish a connection with Mr. Kwok, but nevertheless

conclude that the voicemail was part of the "violative and harassing conduct by Kwok and his

followers." (Contempt Mot. ¶ 4.) There is simply no evidence—let alone, clear and convincing

evidence—that Mr. Kwok, directly or indirectly, played any role in sending that voicemail to the

Trustee.

**5)** **Movants allege that Mr. Kwok personally posted a video supporting a class action lawsuit against the Trustee and an "accompanying" video that showed Mr. Kwok's supporters expressing their gratitude for him. (Contempt Mot. ¶ 33.)**

There is no evidence that Mr. Kwok posted the video. While the video was posted to the account with the "@miles" username, it has the display name of NFSCTV and there is no evidence establishing that Mr. Kwok used that account, posted the video at issue to that account, or posted anything to that account. In addition, Mr. Kwok does not appear in the video or make any statements in it that would be in violation of the TRO.

**6)** **Movants allege that Mr. Kwok deployed "frivolous" third party lawsuits in the U.S. District Court for the Southern District of New York to intimidate and dox PAX and the Trustee. (Contempt Mot. ¶ 34.)**

Mr. Kwok is not a plaintiff in those cases, his name does not appear anywhere in the papers, and Movants offer no evidence that he has any connection to the plaintiffs or played any role in the lawsuits. In the United States, people have the right to petition a court for relief. The plaintiffs in those cases have done that and, if those cases lack merit, then they will likely be dismissed. But it is worth noting that Movants have not even presented evidence here that the lawsuits are necessarily "frivolous."

## III.   ARGUMENT

An order imposing sanctions for civil contempt is a "potent weapon to which courts should not resort where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). This is because the "exercise of the contempt powers is awesome in its implications." *United States v. Wendy*, 575 F.2d 1025, 1030 (2d Cir. 1978). Accordingly, "a district court's contempt power is narrowly circumscribed." *Perez v. Danbury Hosp.*, 347 F.3d 419, 423 (2d Cir. 2003), as is that of the bankruptcy court. *See PHH Mortg. Corp v. Sensenich (In re Gravel)*, 6 F.4th 503, 511 (2d Cir.

2021) (A "bankruptcy court's contempt power, like that of a district court, is 'narrowly circumscribed.'") (internal citation omitted).

"A contempt order is warranted only where the moving party establishes *by clear and convincing evidence* that the alleged contemnor violated the district court's edict. More specifically, a movant must establish that (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *King*, 65 F.3d at 1058 (citation omitted) (emphasis added). The moving party must, moreover, prove each element with the heightened burden of proof of clear and convincing evidence. *Id.* That is, it must show evidence that "demonstrates to a 'reasonable certainty'" that a violation occurred. *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 99-CV-10175, 2021 WL 3418475, at *5 (S.D.N.Y. Aug. 5, 2021). The "[p]rocess of contempt is a severe remedy, and should not be resorted to where there is fair ground of doubt as to the wrongfulness of the defendant's conduct." *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885). *See also In re Gravel*, 6 F.4th at 511 ("[A] bankruptcy court may hold a [party] in contempt for violating the court's injunction *only* 'if there is no fair ground of doubt as to whether the order barred the [party's] conduct. The 'fair ground of doubt' standard has long been used in this Circuit to determine when a party may be held in contempt in the district court.") (internal citation omitted) (emphasis added).

Movants' conclusory and unsupported allegations in the Contempt Motion fall far short of meeting their burden to entitle them to the "awesome" relief that they seek. The evidence, rather, shows that the Motion must be denied because Movants have not established that the Order is clear and unambiguous, that there is clear and convincing evidence of noncompliance, and that Mr. Kwok has not attempted to comply with the Order. The Court must also overcome

11

threshold issues of whether it has jurisdiction to hear this matter and whether it can and should

hold a party in contempt in connection with what Mr. Kwok believes is an unconstitutional

order.

      **A.     The TRO is Void Because This Court Lacked Jurisdiction to Enter It.**

The Contempt Motion fails at the outset because the Court lacks jurisdiction over this

adversary proceeding, and, correspondingly, all attendant motions, including Movants' motion

for a preliminary injunction and this Contempt Motion. (Kwok Obj. to PI at Section III(A).) In

such circumstances, the Court's view on the merits of Movants' allegations is irrelevant. Under

the Federal Rules of Civil Procedure, "a facially sufficient complaint must be dismissed for lack

of subject matter jurisdiction if the asserted basis for the jurisdiction is not sufficient."

*Augienello v. F.D.I.C.*, 310 F. Supp. 2d 582, 587 (S.D.N.Y. 2004) (internal citations omitted).

"Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly

in doubt." *Ashcroft v. Iqbal*, 556 U.S. 662, 671 (2009) (internal citations omitted). As Mr. Kwok

previously argued in his Objection to the Motion for a Preliminary Injunction, incorporated

herein by reference, the Complaint fails to state a valid cause of action over which the Court may

properly exercise subject-matter jurisdiction. Mr. Kwok preserves this argument. The Contempt

Motion must be denied because the Court lacked jurisdiction to enter the TRO in the first

instance.

      **B.     The Terms of the TRO are Not "Clear and Unambiguous" But Rather Vague and Overly Broad as to Make Compliance by Mr. Kwok Impossible.**

It is well-established that a judicial order that does not clearly set forth what a party is

required to do, or not, precludes a finding of contempt for violation of the order. *See*, *e.g.*, *Int'l*

*Longshoreman's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n*, 389 U.S. 64, 76 (1967)

(finding that, in a contempt proceeding, it must be clear that "those who must obey [orders] will

12

know what the court intends to require and what it means to forbid"); *Taggart v. Lorenzen*, 139
S. Ct. 1795, 1802 (2019) ("[P]rinciples of 'basic fairness require[] that those enjoined receive
explicit notice' of 'what conduct is outlawed' before being held in contempt.") (quoting *Schmidt
v. Lessard*, 414 U.S. 473, 476 (1974)). Thus, the issuance of a vague order is, in fact, "a deadly
one" to the imposition of sanctions on the order. *Int'l Longshoreman's Ass'n*, 389 U.S. at 76.

A court order is not sufficiently "clear and unambiguous" unless it leaves "*no uncertainty*
in the minds of those to whom it is addressed." *Hess v. N.J. Transit Rail Ops.,* 846 F.2d 114, 116
(2d Cir. 1988) (emphasis added). That is, the subject "must be able to ascertain from the four
corners of the order precisely what acts are forbidden." *Drywall Tapers, Local 1974 v. Local
530, Operative Plasterers Int'l Ass'n*, 889 F.2d 389, 395 (2d Cir. 1989), *cert. denied,* 494 U.S.
1030 (1990). "*No one* may be held in contempt" in the face of an order that is not clear and
specific. *Hess*, 846 F.2d at 116 (emphasis added).

Moreover, a "long recognized defense to a civil contempt citation is the cited individual's
inability to comply with the court's order." *Wendy*, 575 F.2d at 1030 (finding technical ability to
comply did not support contempt where there was no practical ability to comply). The "classic
example of the factual impossibility defense arises when a court orders a witness to produce a
document that is not in his control." *A.V. By Versace, Inc. v. Gianni Versace S.p.A.*, 446 F. Supp.
2d 252, 257 (S.D.N.Y. 2006).

The TRO does not clearly and unambiguously state what is required of Mr. Kwok and
appears to order him to undertake actions that are impossible to do. For example, it is unclear
what constitutes a "false" statement and what conduct is "harassing." There has been no
adjudication that any statement is false. And the TRO is entirely silent on what type of conduct
should be deemed harassing. Courts addressing language that is clearer than that in the instant

TRO have found such language still impermissibly vague. *See, e.g., Liberty Propane L.P. v. Feheley*, 522 Fed. Appx. 38, 39 (2d Cir. 2013) (vacating contempt order for failing to produce specific documents where underlying orders regarding production did not expressly require production of *those specific* documents); *Red Ball Interior Demolition Corp. v. Palmadessa*, 947 F. Supp. 116, 121 (S.D.N.Y. 1996) (refusing to hold parties in contempt where order referenced information that was not found in the order itself); *Hess*, 846 F.2d at 116 (vacating judgment of civil contempt, finding term "bonafide offer of settlement" was vague and imprecise and forced defendant to "guess what the court meant" in attempting to comply with order) (citing *U.S. v. Joyce*, 498 F.2d 592, 595-96 (7th Cir. 1974) (finding term requiring appellant to use "his best offices" [sic] was improperly vague and imprecise)).

The cases cited by Movants fail to support a finding that this TRO is clear and unambiguous. Most of those cases involved orders with simple, clear, and easily understood terminology that was not open to interpretation. For example, *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2021 WL 3716398 (Bankr. S.D.N.Y. Aug. 20, 2021), *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chauteaugay Corp.)*, 920 F.2d 183 (2d. Cir. 1990), and *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys. Info. Tech.*, 369 F.3d 645 (2d Cir. 2004), all involved orders enforcing automatic stays or otherwise enjoining parties from commencing or continuing cases outside of the proceeding in which the respective orders were entered. Contemnors defied those easily understood instructions and continued to file new actions or failed to dismiss existing ones. Nor is there comparable ambiguity as to what the court was ordering when it directed the defendant to return all paintings that the plaintiff had given the defendant to sell on consignment, *Al Hirschfeld Found. v. Margo Feidman Galleries*, 438 F. Supp. 3d 203 (S.D.N.Y. 2020), or to turn over sale proceeds from an auction, *In re 1990's*

*Caterers, Ltd.*, 531 B.R. 309 (E.D.N.Y. Bankr. 2015), or to cease selling items with an infringing

trademark, *Lavatec Laundry Tech. GmbH v. Voss Laundry Sols.*, No. 3:13-CV-00056 (SRU),

2018 WL 2426655 (D. Conn. Jan. 9, 2018). Movants' reliance on *Patsy's Brand,* in fact,

underscores why this TRO cannot be upheld. In that case, the court was tasked with resolving a

trademark dispute between two restaurants with similar names. Both establishments sought to

use their names to sell products in stores. The order entered in *Patsy's* enjoining defendant from

infringing on plaintiff's trademark was clear both as to what defendant could do as well as what

it could not do and was specific down to the font size that the defendant could continue to use on

its labeling. The court orders in those cases are a far cry from the TRO's reliance here on terms

like alleged "falsity," "harassing," and "interfering," which lack clear meaning absent extrinsic

evidence. Is any critical post about the Trustee harassing? Is any negative post about this

proceeding that he oversees also harassing and interfering with its integrity?  Interference could

encompass almost any conduct one might undertake, on or off this docket. The TRO is rife with

ambiguity.

To the extent the TRO requires Mr. Kwok to remove any online post made on virtually

any platform by virtually any person, that is an impossible task for Mr. Kwok to perform. *See*

*Wendy*, 575 F.2d at 1030 (no contempt where there was no practical ability to comply). Nor is it

clear on the face of the TRO to whom it applies. Are Mr. Kwok's "officers, agents, servants,

employees, and attorneys and other persons who are in active concert or participation" also

required to seek the removal of any and all social media posts that violate the TRO terms, and if

so, who are all these people since the TRO does not specifically identify the individuals, for

example, who are considered to be "in active concert or participation?"

The overly broad terms in the TRO also run afoul of the long-established principle that any injunction on speech should have the "narrowest terms that will accomplish the pin-pointed objective" sought. *See Carroll v. Pres. And Com'rs of Princess Anne*, 393 U.S. 175, 183-184 (1968) (reversing injunction prohibiting entire rally that petitioners argued would generally "disturb" or "endanger" local citizens).

While Movants seek contempt against Mr. Kwok for the actions of others, the Second Circuit has rejected such a result in similar circumstances. *See Perez v. Danbury Hosp.*, 347 F.3d 419, 425-26 (2d Cir. 2003) (refusing to find defendant hospital in contempt where hospital altered its policies to comply with the order and the violations of the order were committed by individual practitioners whose conduct the hospital was not directly responsible for).

The law does not permit the Court to make Mr. Kwok, who is not fluent in English, to guess as to whether his conduct is barred by the TRO.[4] As Mr. Kwok testified, on one occasion he attempted to repost a video on social media but he did not believe the post to be covered by the TRO. (*See* Tr. at 120:2-11, attached hereto as Ex. [K] ("I didn't try to post any fraudulent rumors. What I tried to post was the fact—the truth…It was a widespread report from the media.").) The TRO's vagueness and ambiguity precludes any legitimate finding of contempt against Mr. Kwok.

### C.     Movants Fail to Present Clear and Convincing Evidence of Mr. Kwok's Non-Compliance.

Movants point to various social media posts, videos, protests, leaflets, emails, an anonymous voicemail, and even lawsuits, that they believe violate the terms of the TRO. But the one common thread is that they have failed to present clear and convincing evidence of Mr.

---

[4] While Mr. Kwok engages in this analysis of the terms of the TRO for purposes of this Opposition, the law does not permit the Court to require him to research and guess what it means in order to comply. *See Hess*, 846 F.2d at 116.

16

Kwok's involvement in anything. The Court cannot infer and conclude by clear and convincing evidence that because a social media account has part of Mr. Kwok's name in the title that he is responsible for its contents. Rather, the Second Circuit has long held that "a bankruptcy court may hold a [party] in contempt for violating the court's injunction *only* 'if there is no fair ground of doubt' as to whether the order barred the [party's] conduct." *In re Gravel*, 6 F.4th at 511. Not only is there a fair ground of doubt concerning Mr. Kwok's involvement in any enjoined conduct, there is *substantial* doubt here because Movants have not pointed to any direct evidence that Mr. Kwok personally engaged in such conduct or directed others to do so. The uncontroverted evidence presented at the Preliminary Injunction hearing was that Mr. Kwok directed people *not* to protest and that protesters did *not* act at the direction of Mr. Kwok. There was no direct evidence presented that Mr. Kwok engaged in any activities prohibited under the TRO after it was entered. As evident in case law cited by Movants, the Court may not adjudge the alleged violations as one lump sum contemptable offense. The Court must evaluate each and every alleged violation—that is, each alleged violative post, protest, or other expression of free speech—to determine whether *that act on its own* meets the standard to hold Mr. Kwok in contempt. *See, e.g.*, *In re Chief Exec. Officers Club, Inc.*, 359 B.R. 527 (Bankr. S.D.N.Y. 2007) (evaluating the date and details of each alleged violation to determine whether the act properly fell within the terms of the order and, in fact, constituted a violation warranting a finding of contempt, and dismissing all but one alleged violation); *North Am. Oil Co., Inc. v. Star Brite Distrib., Inc.*, 14 Fed. App'x. 73, 75 (2d Cir. 2001) (vacating order awarding sanctions that lacked "specificity" because "[i]n this Circuit, it is imperative that the district court explain its sanctions order with care, specificity, and attention to the sources of its powers") The alleged violations, as pleaded, fail, individually or together.

For example, Movants fail to present any evidence that could identify the caller of the anonymous voicemail. In the lawsuits filed in federal court in Manhattan against the Trustee and PAX, Mr. Kwok's name does not appear anywhere in the filings. Nonetheless, Movants baldly claim that these lawsuits are an "attempt" directly by Mr. Kwok to "dox, harass, and intimidate" the Trustee and PAX. (Contempt Mot. ¶ 34.) Movants also cite to an online article stating that the Trustee tried to extort Mr. Kwok and they allege that this "absurd and outrageous allegation…could only have originated with Kwok."[5] (Contempt Mot. ¶ 4.) The evidence elicited from Mr. Kwok's bankruptcy counsel at the Preliminary Injunction hearing establishes that the allegation is neither absurd nor outrageous. (*See* Tr. at 897:1-899:2, attached hereto as Ex. J.)

Movants questioned Mr. Kwok about whether he, at some time, had access to the MilesGuo GETTR account, but there is no evidence—not even hearsay evidence—that Mr. Kwok made the posts at issue. Because Movants cannot point to evidence that Mr. Kwok is responsible for the conduct they seek to halt, they rely on alleged prior acts by Mr. Kwok in an entirely separate case[6] as evidence that he violated the TRO in this case. (*See* Contempt Mot. ¶

[5] The Contempt Motion identifies these statements as "absurd and outrageous"; it does not allege them to be false. Moreover, the testimony from Mr. Kwok and Mr. Kindseth, if anything, confirmed that the Trustee's actions were perceived as extortionist by those in attendance. (*See* Exs. J and K.)

[6] The agreed injunction in the *Pastor Bob Fu* case (Contempt Mot. ¶ 35) is nothing like the TRO entered here. Significantly, that injunction covered only conduct by the defendants themselves (including their representative, agents, and employees) not any "followers" or others. And as Mr. Kwok had never picketed outside the plaintiff's home or office and had no intention of doing so, nor did he intend to meet the plaintiff in person, he agreed to a narrowly tailored injunction on those terms to avoid protracted litigation over the matter. In contrast, the TRO here precludes him from encouraging or even suggesting protests, among other overly broad terms. Ironically, Movants rely on the Fu injunction when Mr. Kwok offered a similar resolution of the instant TRO and preliminary injunction (see Objection to Motion for PI at p. 14 n. 9), an offer rejected by both Movants and the Court.

35-38 (stating that "publicly available information also reflects that Kwok has been engaged in similar egregious behavior against other perceived adversaries" and citing to two entirely separate cases).) Mr. Kwok's alleged prior conduct—which is based on hearsay—does not prove that he engaged in any violations of the TRO here, which is all that matters.

Movants cannot meet their burden based on vague allegations and conclusory statements. *See*, *e.g.*, *Mpala v. Funaro*, 2017 WL 1364577, at * 3 (D. Conn. Apr 14, 2017) (finding that "speculative, vague, and supported allegations fail to present [] clear and convincing evidence").

### D. Movants Fail to Present Clear and Convincing Evidence That Mr. Kwok's "Followers" Had Actual Knowledge of the Terms of the TRO

Movants raise allegations that Mr. Kwok's followers had actual knowledge of the TRO, an argument that is, frankly, irrelevant to whether Mr. Kwok is responsible and may be held in contempt for the alleged violations. The relevant issue is what interaction took place between the alleged "followers" and Mr. Kwok.

Nonetheless, Movants' allegations as to the "followers'" actual knowledge are insufficient to establish that they had actual notice of the terms of the TRO. Rule 65(d)(2) of the Federal Rules of Civil Procedure states that an injunction only binds those who "receive actual notice of it by personal service or otherwise."

Consistent with the lack of evidentiary support underlying their other allegations, Movants hardly put forth evidence of actual notice. They do not allege that they served Mr. Kwok's "followers" with the TRO. The Contempt Motion, instead, alleges that Mr. Kwok's "followers" had "actual notice" because: (1) on November 24, 2022, *one* of Mr. Kwok's "associates" using the handle "QMAY" posted a picture of the TRO online, which was later posted to a GETTR account using Mr. Kwok's name; (2) on November 25, 2022, NFSCTV's GETTR account posted a video showing text and discussing the TRO; and (3) also on November

19

25, 2022, NFSC's YouTube channel posted a video discussing the TRO. (Contempt Mot. ¶ 22.) Alternatively, Movants argue that every one of an amorphous group of persons and entities (who Movants almost entirely fail to identify with any level of specificity that would enable Mr. Kwok or this Court to identify) had actual knowledge of the TRO because on three dates portions of the TRO were posted online. Movants do not specifically allege that any of the people whose behavior forms the basis of this Motion actually saw those online posts. At best, the Trustee and PAX could plausibly assert that some people had actual knowledge of the TRO from those posts but nothing permits this Court to simply assume that the alleged "bad actors" here were among them. And even so, the Trustee and PAX are not seeking to hold those persons in contempt, but rather they are seeking to hold only Mr. Kwok in contempt.

The Contempt Motion further suffers because logic does not follow that if an alleged "bad actor" saw the TRO online they would believe that the TRO prohibited *them* from engaging in the lawful exercise of their First Amendment rights. (The reasons why the TRO did not and could not prohibit any "follower" from free expression, even if they mistakenly believed that it did, are set forth above.) The TRO purports to apply "only" to Mr. Kwok, his officers, agents, servants, employees, and attorneys, and other persons in active concert or participation with him—terms that, as set forth above, are too impermissibly vague and ambiguous to hold any unnamed person accountable. Clearly, the Trustee and PAX cannot assert that anyone, anywhere in the world viewing the posts concerning the TRO online falls within the boundaries of the TRO.[7] And it would be unreasonable to expect every person who viewed the TRO online to consult with an attorney to determine whether it applied to them. Some protesters, in fact,

---

[7] During the Preliminary Injunction hearing, the Trustee and PAX pointed to protests outside of Paul Hastings's Tokyo office, as if this U.S. Bankruptcy Court in Connecticut has the power to enjoin people in Japan (including potentially protesters who have never set foot in this country) from protesting, and to then hold them in contempt.

specifically stated that they were not acting for Mr. Kwok in any of the capacities mentioned in the TRO, and that they did not believe that any TRO applied to them. (*See* November 27, 2022 video from Instagram account from handle @tuding123 at https://www.instagram.com/p/CldV4s-pMfL/?hl=en.)

###### E.    Movants Have Failed to Prove That Mr. Kwok Has Not Attempted to Comply With the TRO in a Reasonable Manner.

As discussed above, the online posts challenged in Movants' Motion for Preliminary Injunction were removed from the internet after the TRO was entered. Mr. Kwok did not post the identifying information of the persons identified in the TRO, did not posted any information that has been adjudged to be false or harassing, and continued to advise others not to protest. There is simply no evidence that Mr. Kwok has not attempted to comply with the TRO.

###### F.    The TRO Represents an Impermissible Intrusion on the First Amendment Rights of Mr. Kwok and Innumerable Others.

In addition to the Movants failure to meet the burden of establishing contempt, the Court should also deny their Motion because the TRO should not have been entered in the first place. It is incontrovertible that, where the First Amendment is concerned, courts must tread lightly when imposing prior restraints on free speech. (*See* Kwok Objection to PI at Section III(B), incorporated here by reference.) The risk of infringing on fundamental constitutional rights is heightened where, as here, a court considers restraining speech at a *preliminary* stage. This is because "[w]hen a prior restraint takes the form of a court-issued injunction, the risk of infringing on speech protected under the First Amendment increases." *Metro. Opera Ass'n v. Local 100, Hotel Employees and Restaurant Employees Intern. Union*, 239 F.3d 172, 176 (2d Cir. 2001) (citing *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 764 (1994)) ("Injunctions…carry greater risks of censorship and discriminatory application than do general ordinances."). *See also U.S. v. One Book Entitled "The Adventures of Father Silas,"* 249 F.

Supp. 911, 918-19 (S.D.N.Y. 1966) ("'[A]ny restraint imposed in advance of a final judicial determination on the merits *must* similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution.'") (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)) (emphasis added). To that end, the Supreme Court has held that prior restraints on free speech are tolerable only where there will be "almost immediate judicial determination of the validity of the restraint." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). In the case of alleged false and libelous statements, it "is the universal rule in the United States" that "[e]quity will not restrain by injunction the threatened publication of libel…however great the injury to property may be." *Metro. Opera*, 239 F.3d at 177.

As set forth below, the TRO against Mr. Kwok is not just an unconstitutional overreach of this Court's powers over Mr. Kwok, but over the freedom of millions of people worldwide—most of whom do not even fall under this Court's jurisdiction. Instead, the TRO purports to enjoin the actions of those the Court cannot enjoin directly by threatening to impose serious sanctions on Mr. Kwok for their conduct. What is equally offensive is that the Court entered and then extended its broad prior restraint on speech without any adjudication of whether the contested speech is protected, as the Supreme Court has ruled must be done. Movants have filed hundreds of pages of briefs and exhibits in this adversary proceeding and submitted evidence at a preliminary injunction hearing over multiple days, but they have offered nothing to address whether the speech at issue is actionable, whether as defamation[8] or otherwise.[9] Tellingly, they have not challenged the core assertions being made—that PAX, its counsel (with three offices in

---

[8] *See*, *e.g.*, *Philadelphia Newspapers, v. Hepps*, 475 U.S. 767, 774–78 (1986); *Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting Sys.*, 844 F.2d 955, 959 n.5 (2d Cir. 1988).

[9] For example, nowhere in the Trustee's oral and written submissions does it state that Paul Hastings does not provide legal or financial benefit to the CCP.

China), and the Trustee's law firm (with three offices in China) actively engage with the Chinese government and provide legal services to Chinese entities owned by and/or affiliated with the government. They should not be entitled to tread on the constitutional rights of Mr. Kwok and others to speak freely without first adjudicating the validity of the speech in question.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Kwok respectfully requests that the Court deny the Movants' request to hold him in contempt for alleged violation of the TRO. As raised in Mr. Kwok's Objection to the Preliminary Injunction, in light of Movants' failure to state a cause of action, the Court should dismiss the entire adversary proceeding.

**DEFENDANT**
**HO WAN KWOK**


By:    /s/ *Jeffrey Hellman*
       Jeffrey Hellman
       Law Offices of Jeffrey Hellman, LLC
       195 Church Street, 10th Floor
       Tel.: 203-691-8762
       Fax: 203-832-4401
       New Haven, CT 06510
       jeff@jeffhellmanlaw.com
       Federal Bar No.: ct04102

       /s/ *David Wachen*
       David Wachen (*pro hac vice*)
       Wachen LLC
       11605 Montague Court
       Potomac, MD 20854
       Tel.: 240-292-9121
       Fax: 301-259-3846
       david@wachenlaw.com